**UNITED STATES of America,**
**Plaintiff,**

v.

**VISA U.S.A. INC., Visa International**
**Corp., and MasterCard International**
**Incorporated, Defendants.**

No. 98 CIV. 7076(BSJ).

United States District Court,
S.D. New York.

Oct. 9, 2001.

John M. Nannes, Melvin A. Schwarz, Joel I. Klein, Rebecca P. Dick, Susan L. Edelheit, Steven Semerano, Kurt Shaffert, Scott A. Scheele, Jeffrey I. Steger, Sean T. Fox, Ahmed Taha, M.J. Moltenbrey, U.S. Dept. of Justice, for U.S.

Richard A. Martin, Heller, Ehrman, White & McAuliffe, L.L.P., New York City, for VISA U.S.A., Inc.

Eugene F. Bannigan, Morgan, Lewis & Bockius, New York City, for VISA Intern. Corp.

Martin L. Seidel, Rogers & Wells, New York City, for MASTERCARD Intern. Inc.

Akin, Gump, Strauss, Hauer & Feld, LLP, Jonathan M. Jacobson, Abid Qureschi, Jason Kural, Christine Doniak, filed Amicus brief on behalf of American Express.

### Decision

JONES, District Judge.

### INTRODUCTION

This civil action was brought by the Antitrust Division of the Department of Justice, Washington, D.C., against the defendants, VISA U.S.A. INC., ("Visa U.S.A."), VISA INTERNATIONAL CORP., ("Visa International") (collectively "Visa") and MASTERCARD INTERNATIONAL INCORPORATED, ("MasterCard"). It involves the U.S. credit and charge card industry, which has only four significant network services competitors: American Express, a publicly owned corporation; Discover, a corporation owned by Morgan Stanley Dean Witter; and the defendants Visa and MasterCard, which are joint ventures, each owned by associations of thousands of banks.

The Government claims, in two counts, that each of the defendants is in violation of Section 1 of the Sherman Antitrust Act, which provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal." 15 U.S.C. § 1. Count One centers around the governance rules of Visa and MasterCard, which permit members of each association to sit on the Board of Directors of either Visa or MasterCard, although they may not sit on both. Count Two targets the associations' exclusionary rules, under which members of each association are able to issue credit or charge cards of the other association, but may not offer American Express or Discover cards. Because the Sherman Act outlaws only those agreements that unreasonably restrain trade and because the agreements alleged in this case are not the type of agreements that are unreasonable *per se,* for each count the plaintiff must demonstrate that the restraint has substantial adverse effects on competition. For the reasons to follow, the court finds that the Government has failed to prove that the governance structures of the Visa and MasterCard associations have resulted in a significant adverse effect on competition or consumer welfare. However, the proof clearly shows that the exclusionary rules and practices of the defendants have resulted in such adverse effect and should be abolished.

Turning to Count One, plaintiff focuses on what it calls the "governance duality" of

the associations. Plaintiff's expert defines governance duality as a governance scheme which permits banks to have "formal decision-making authority in one system while issuing a significant percentage of its credit and charge cards on a rival system." Plaintiff's theory is that because of the overlapping financial interests of the banks they represent, the dual Directors on each of the associations' boards have a reduced incentive to invest in or implement competitive initiatives that would affect their other card product, and as a result the Visa and MasterCard associations have failed to compete with each other by constraining innovation and investments in new and improved products. To support this theory, the Government claims that the associations' failure to compete is exemplified by delayed or blunted innovation in four areas: (1) chip-based "smart" cards; (2) an encryption standard for Internet transactions; (3) advertising, and (4) premium cards. It also cites a number of statements made over the years by Visa and MasterCard executives which generally criticize "duality" as an impediment to aggressive competition between the associations. The Government claims that these statements are further proof that dual-issuing association board members engaged in anticompetitive behavior.

Based upon what it hoped to prove, the Government proposed the imposition of a court-mandated governance structure for Visa and MasterCard for a period of ten years. This structure would require that any issuer who served either on the Board of Directors or any governing committee of either association agree prospectively to issue credit, charge and debit cards exclusively on that association's network. It would also require that by 2003, 80% or more of the issuer's total dollar volume in credit and charge transactions be transacted on that association's network in the U.S. and worldwide.

After a review of the evidence, the court concludes that with the exception of the associations' failure to name each other in their advertising—a dated example that no longer reflects the aggressive advertising competition that has existed for some years between the defendants—the Government's examples fail to prove that dual governance has significantly diminished competition and innovation in the credit and charge card industry. Defendants' statements about "duality" do not persuade the court to the contrary. Most of them relate to dual issuance rather than to dual governance or board conduct; those that do refer to governance are dated and far too general to be of any probative value. In addition, the Visa and Master-Card boards have an impressive record of supporting "share-shifting" initiatives specifically designed to gain market share for their association at the expense of the other association, as well as American Express and Discover. The Government's failure to establish causation between dual governance and any significant blunting of brand promotion or network and product innovations is fatal to this claim.

Moreover, if innovation competition between Visa and MasterCard has been jeopardized in the past, it is at least as likely that dual issuance and the influence of the major dual issuers has been to blame as has dual governance. If this is so, the only remedy may well be the separation of the major banks as owner/issuers into one association or the other. This is precisely the direction the industry has taken. During the last three years, most of the top banks and monoline[1] issuers have already chosen to enter into "dedication" agree-

---

1. "Monoline" is an industry term indicating a financial institution which has no branches and specializes in banking by mail and the credit and charge card industry.

ments with either Visa or MasterCard which provide that the issuer must solicit 100% of its new cards in the association with which it has contracted. Although entering into one of these contracts is not a prerequisite for board membership, not surprisingly, the current "dedication" levels ("portfolio skews")[2] of the members of the associations' Boards of Directors now reflect the market reality that dual governance is virtually at an end.

Of course, whether or not dual issuance has been or will be the source of anticompetitive conduct is not the issue. In this case the Government set out to prove that dual governance has been—if not *the* cause—a cause of an actual adverse effect on competition in the market. This it has not done. Even if market forces had not already all but ended dual governance, since the Government has failed to prove that adverse effect, no remedy altering the governance structures of Visa and MasterCard is justified.

In the second count, the Government alleges that Visa and MasterCard have thwarted competition from American Express and Discover through exclusivity rules forbidding members of the associations from issuing credit cards on competing networks. Since the penalty for issuing American Express or Discover cards is forfeiture of the association member's right to issue Visa or MasterCard cards, the Government claims that these "rules raise the cost to a member bank of issuing American Express or Discover credit cards to prohibitively high levels and make it practically impossible for American Express and Discover to convince banks ... to issue cards on their networks." (Cmplt.¶ 136.) And, indeed, since Ameri-

can Express' decision in 1996 to open its network and seek bank issuers, no bank has concluded a deal with American Express at the expense of losing its Visa and MasterCard portfolios. The Government also claims that American Express and Discover, as the smaller networks, need Visa and MasterCard members to issue their cards in order to increase their share of the card-issuing market to better compete with the associations in the network services market. The Government argues that as a result of the exclusionary rules, American consumers have been denied the benefits of credit and charge cards with new and varied features.

The proof demonstrates that Visa U.S.A.'s By-law 2.10(e) and MasterCard's Competitive Programs Policy ("CPP") do weaken competition and harm consumers by: (1) limiting output of American Express and Discover cards in the United States; (2) restricting the competitive strength of American Express and Discover by restraining their merchant acceptance levels and their ability to develop and distribute new features such as smart cards; (3) effectively foreclosing American Express or Discover from competing to issue off-line debit cards, which soon will be linked to credit card functions on a single smart card, and (4) depriving consumers of the ability to obtain credit cards that combine the unique features of their preferred bank with any of four network brands, each of which has different qualities, characteristics, features, and reputations. At the same time, the direct purchasers of network services (the issuers) restrict competition among themselves by ensuring that so long as all of them cannot issue American Express or Discover cards,

---

**2.** "Portfolio skew" is the parties' term describing the degree to which an issuer's card portfolio is weighted toward a particular association. For example, in 1998, 93% of U.S. Bancorp's outstanding cards were Visa cards; U.S. Bancorp thus had at that time a portfolio highly skewed toward Visa.

none of them will gain the competitive advantage of doing so.

The defendants argue strenuously that no consumer harm results from the exclusionary rules because the member banks of the associations compete fiercely as card issuers with each other and with American Express and Discover to offer lower interest rates and all manner of incentive programs and services to card consumers. This issuer-level competition, however, does not take the place of competition at the network level, and while there is no claim in this case that member banks of Visa and MasterCard have conspired intra-association or inter-association to raise prices to consumers directly, their exclusionary rules have significantly reduced product output and consumer choice in the issuing market and have reduced price competition in the network services market.

The defendants also argue that these exclusionary rules actually enhance competition between the four systems because they keep the systems separate. They argue that if "duality", however defined, actually does cause reduced incentives to compete at the network level, triality or quadrality will only make things worse. However, the fact is that the major issuers have for some time now been wooed aggressively for their business by Visa and MasterCard, and as the defendants themselves have argued, the result has been procompetitive. There is no reason to believe that permitting American Express and Discover also to solicit the major issuers will be anticompetitive. It will simply mean that four networks instead of two will be able to compete to sell network services to America's banking institutions. Of course, at present the dedication agreements concluded between Visa and MasterCard and their major issuers have locked up most of the credit and charge card market, leaving only a few major issuers uncommitted and currently free to partner with American Express or Discover. The current competitive landscape thus requires that in addition to abolishing the associations' exclusionary rules, the court declare the dedication agreements voidable by the individual banks in order to permit them to negotiate issuing arrangements with American Express and Discover, if they so choose.

Since this court has found no liability under Count One, the associations are free to respond to concerns about multiple-issuing governors with potentially conflicting financial interests as they see fit. They may retain or appoint board members whether or not the member's bank has agreed to solicit prospectively only that association's cards. They are also free to set, adjust, or abandon altogether requirements that board members reach certain percentages of volume on that association's system. This situation favors multiple issuance and leaves the monitoring of governors' competitive incentives in the hands of the associations' owners and the market. Under the remedy ordered by the court, banks that reach issuing arrangements with American Express, Discover or any other association may not be treated as well by Visa or MasterCard, but they will not be forced to give up their Visa and or MasterCard portfolios.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was tried to the court sitting without a jury for thirty-four trial days between June 12, 2000, and August 22, 2000. In addition to considering the oral and written testimony of a number of current and former executives of the Visa and MasterCard associations and their member banks, as well as American Express

and Discover, the court also heard expert testimony. The Government presented the testimony of Michael Katz, Professor of Economics and Business Administration at the University of California at Berkeley. Richard Schmalensee, Dean and Professor of Economics and Management at the Sloan School of Management at the Massachusetts Institute of Technology and Richard Rapp, an economist affiliated with National Economic Research Associates, Inc., testified on behalf of Visa U.S.A. and Visa International. Ronald Gilson, Professor of Law and Business at both Stanford University and Columbia University testified on behalf of Visa International. Robert Pindyck, Professor of Applied Economics at the Sloan School testified on behalf of MasterCard. The court has considered over six thousand pages of trial testimony, volumes of deposition testimony, approximately six thousand admitted exhibits and *amicus curiae* briefs from American Express and Discover—among others. The court has made determinations as to the relevance and materiality of the evidence and assessed the credibility of the testimony of the witnesses. Upon the record before the court at the close of the admission of evidence, pursuant to Fed.R.Civ.P. 52(a), the court finds the following facts to have been proved by a preponderance of the evidence, and sets forth its conclusions of law.

## I. OVERVIEW OF THE PAYMENT CARD INDUSTRY

This case involves the four major systems, or networks, that provide authorization and settlement services for U.S. credit and charge card transactions: Visa, MasterCard, American Express and Discover. Visa and MasterCard members issue credit, charge and debit cards with the Visa and MasterCard brands. American Express and Discover issue credit and charge cards with their brand names but do not issue debit cards. (*See* Ex. D–4118.) A charge card requires the cardholder to pay his or her full balance upon receipt of a billing statement from the issuer of the card. (*See* Krumme (JCB [3]) Dep. at 147–148.) A credit card permits cardholders to pay only a portion of the balance due on the account after receipt of a billing statement. (*See id.* at 148.) Although debit cards are similar to credit and charge cards in that they may be used at unrelated merchants, the fact that upon use they promptly access money directly from a cardholder's checking or deposit account strongly differentiates them from credit and charge cards. (*See* Tr. 151 (Kesler, Banco Popular); Krumme (JCB) Dep. at 148.)

As explained more fully below, the two relevant product markets are (1) the market for credit and charge cards issued under these brand names, and (2) the market for the network services that support the use of credit and charge cards. Because the cards at issue in this case are accepted at numerous, unrelated merchants, they are known as general purpose cards. There is no dispute that proprietary cards such as those issued by department stores like Sears or Macy's and accepted only at those locations are not in the relevant market.

**3.** JCB Bank, N.A. is the wholly-owned North American subsidiary of JCB International Credit Card Company, Ltd., a Tokyo-based credit card company. JCB Bank, N.A. was formed to issue JCB cards in the U.S. to consumer segments with travel and entertainment interests or familiarity with Japanese culture and service characteristics. In 2000 it had only approximately 25,000 cards in circulation in the U.S. (*See* Krumme Dep. at 35–38.) Compared with Discover, which in 1999 was the fifth-largest issuer with 48 million cards in circulation, JCB is not a significant competitor at the network or issuer level.

MasterCard and Visa are structured as open, joint venture associations with members (primarily banks) that issue payment cards, acquire[4] merchants who accept payment cards, or both. (*See* Tr. 4450–51 (Dahir, Visa U.S.A.).) They do not have stock, or shareholders; just members and membership interests. (*See id.* at 4451.) MasterCard is open to any eligible financial institution. (*See id.* at 5613–14 (Selander, MasterCard).) Similarly, any financial institution that is eligible for Federal Deposit Insurance Corporation deposit insurance can join Visa. (*See id.* at 4452–53 (Dahir, Visa U.S.A.).) Visa members have the right to issue Visa cards and to acquire Visa transactions from merchants that accept Visa cards. In exchange, they must follow Visa's by-laws and operating regulations. (*See id.* at 4451–53 (Dahir, Visa U.S.A.); Ex. D–1586 at § 2.03–2.04 (Visa U.S.A. By-laws).) The same is true of MasterCard. (*See* Ex. D–3228 at § 5 (MasterCard By-laws).) MasterCard has approximately 20,000 global members. (*See* Tr. 5571–72 (Selander, MasterCard).) Visa U.S.A. has approximately 14,000 members in the United States, including approximately 6,000 Visa card issuers. (*See id.* at 4453 (Dahir).) The remaining 8,000 members are acquiring banks.

MasterCard and Visa are operated as not-for-profit associations and are supported primarily by service and transaction fees paid by their members. (*See id.* at 4454–55, 4457–4458 (Dahir).) They set their fees to "cover the costs involved in providing the basic infrastructure to the members," but do not charge license fees or royalties. While the associations make a "profit" from these fees, they do not try to maximize retained earnings. The profit they earn is used to maintain a capital surplus account to pay merchants in the event of a member bank failure. (*See id.* at 4455–57, 4459 (Dahir); *see also id.* at 5582–83 (Selander, MasterCard).)

In a Visa or MasterCard credit card purchase the merchant actually receives only about 98 percent of the price of the item. The remaining 2 percent is called the "merchant discount," which is the fee paid to the merchant's acquiring bank for providing its services. The acquirer, in turn, splits this fee with the card-issuing bank, which is paid about 1.4 percent of the purchase price. The issuing bank owns the consumer's account and takes the payment risk. The 1.4 percent of the purchase price is called the "interchange fee" and is set by the associations.

The members of MasterCard and Visa work together through each of the associations to achieve benefits for themselves they could not provide independently, including globally recognized brands and sophisticated computer networks for processing transactions. The members of Visa and MasterCard compete with each other on practically every other dimension that directly impacts consumers, including pricing, fees and finance charges, product

---

4. In a typical payment card transaction, a merchant accepts a payment card from a customer for the provision of goods or services. The merchant then electronically presents the card transaction data to an "acquirer," usually a bank but sometimes a third party processing firm, for verification and processing. The acquirer presents the transaction data to the association (*e.g.* Visa or MasterCard) which in turn contacts the issuer (*e.g.* MBNA) to check the cardholder's credit line. The issuer then indicates to the association that it authorizes or denies the transaction; the association relays the message to the merchant's acquirer, who then relays the message to the credit card terminal at the merchant's point of sale. If the transaction is authorized, the merchant will thereafter submit a request for payment to the acquirer, which relays the request, via the association, to the issuer. The issuer pays the acquirer; the acquirer in turn pays the merchant, retaining a small percentage of the purchase price as a fee for its services, which fee it then shares with the issuer.

features and other services for cardholders and merchants. (*See* Schmalensee Dir. Test. at 114–15, 131–32; Tr. 4450–4451 (Dahir).)

Each association is managed by a Board of Directors (elected by its members) and by a management team. This team is responsible for day-to-day operations and has certain authority delegated by the Board. Because the owners of the associations are also the customers, and vice versa, the associations are necessarily consensus-driven. (*See* Tr. 4462–63 (Dahir, Visa U.S.A.).) By contrast, American Express and Discover are for-profit companies that operate as "closed loop," vertically integrated systems. They promote their brands and operate their networks to process transactions and (unlike the associations) also issue cards and enlist merchants to accept those cards. Neither American Express nor Discover needs to set interchange fees because they are both the issuer and acquirer on all transactions and keep the full amount of the merchant discount fee. American Express' average merchant discount rate in 1999 was approximately 2.73 percent compared to Discover's rate of approximately 1.5 percent and Visa's and MasterCard's rates of approximately 2 percent. (*See id.* at 2719 (Golub, American Express); 2981, 3007–08 (Nelms, Discover); Ex. D–0982 at AMEX0001260771; Ex. D–1683 at VUTE0001692.)

Because of these different business structures in the payment card industry, competition takes place at two interrelated levels—the network services level (where Visa, MasterCard, American Express and Discover compete) and the issuing level (where American Express and Discover compete with each other and with thousands of Visa and MasterCard member banks.) Competition among systems plays a major role in determining the overall quality of the brand, encompassing system-level investments in brand advertising, the creation of new products and features and cost-saving increases in the efficiency of the electronic backbone of the networks. (*See* Schmalensee Dir. Test. at 126.) Competition among issuers largely determines the prices that consumers pay and the variety of card features they can obtain. Individual issuers in the associations also sometimes invest separately in their own advertising and in the creation of new products. Unlike the concentrated network market, no single issuer dominates the industry; the largest credit and charge card issuers have only small shares of total industry output. (*See id.* at 119 & Table 4.)

American Express is the largest issuer of credit and charge cards in the United States as measured by transaction volume—$186 billion in fiscal year 1999. Consistent with the successful performance of its card business, American Express is highly profitable and it regularly meets its return on equity and earnings per share growth targets. (*See* Tr. 2468–70 (Chenault, American Express); Ex. D–1683 at VUTE0001671.) Discover entered the payment card business in 1985. Measured by transaction volume, Discover was the fifth largest issuer in 1999 with $70.98 billion outstanding. In 1999, measured by the number of cards outstanding (48 million), Discover placed among the top three issuers in the United States. (*See* Tr. 3028–31, 3057–58 (Nelms, Discover); Ex. D–1712; Ex. D–1859; Ex. D–4462.)

It was not until the 1970's that the growth of the payment card industry was significantly facilitated by the formation and growth of what would become the Visa and MasterCard associations. (*See* Schmalensee Dir. Test. at 132–133.) Before the existence of these joint ventures there were no national credit cards, and

charge cards were available only from three national issuers: American Express, Diners Club and Carte Blanche. Even those cards could be used only at a limited group of merchants. Today, credit and debit cards that can be used nationally and internationally at millions of merchants are issued by thousands of association members. (*See id.* at 132–133.) Minimum financial qualifications required for a credit card have declined dramatically so that even consumers with lower incomes are readily able to obtain payment cards. (*Id.*) The percentage of households with credit and charge cards quadrupled from 16 percent in 1970 to 68 percent in 1998. And the share of consumer spending paid for with general purpose credit and charge cards has increased from less than three percent in 1975 to 18.5 percent in 1999. (*See id.* at 123.)

Even without adjusting for the increased quality of services provided, prices to consumers have decreased 20 percent from 1984 to 1999. (*See id.* at 124 & n. 355.) The associations have also fostered rapid innovation in systems, product offerings and services. Technological innovations by the associations have reduced transaction authorization times to just a few seconds. (*See* Pindyck Dir. Test. at ¶¶ 9, 52; Rapp (Visa) Dir. Test. at 17–22; Schmalensee Dir. Test. at 124–25.) Fraud rates have also decreased through a number of technological innovations.

Consumers have access to products that combine dozens of features available through the associations with features and services developed by the individual issuers. (*See* Tr. 4991–92, (Schall, Visa U.S.A.); Moore (Visa U.S.A.) Dep. at 173–76 (approximately 130 products offered by Visa to members); Tr. at 5554–55 (Selan-

der, MasterCard).) Cardholders today can choose from thousands of different card products with varying terms and features, including a wide variety of rewards and co-branding programs and services such as automobile insurance, travel and reservation services, emergency medical services and purchase security/extended protections programs.[5] (*See* Ex. D–4510; Pindyck Dir. Test. at ¶¶ 9 & 66; Rapp (Visa U.S.A.) Dir. Test. at 53; Schmalensee Dir. Test. at 124–25.)

Consumers in the United States also have extensive information available to them about card offerings and can readily switch cards and issuers. Information about fees, finance charges and card features is primarily available through direct mail solicitations. In 1999 alone, issuers sent out 2.9 billion direct mail solicitations to households in the United States, an average of 2.4 solicitations per month to each household. Additional information is available through newspapers, magazines, the Federal Reserve Board survey and the Internet. Card solicitations also offer consumers an easy way to switch credit card balances and issuers. In 1999, consumers in the United States transferred bank credit card balances of approximately $47 billion. Since most cards charge no annual fee, consumers can accept a new card without cost and without canceling existing cards. From 1994–1999, approximately 28 percent of households with a general purpose credit or charge card acquired an additional card each year. (*See* Schmalensee Dir. Test. at 122–123.)

## II. SHERMAN ACT ALLEGATIONS

### A. RELEVANT MARKETS

 In order to analyze defendants' conduct for the antitrust violations alleged

---

**5.** However, as discussed *infra,* because of the defendants' exclusionary rules, consumers cannot obtain a card that combines the fea-

tures of the consumer's bank with the features of the American Express or Discover networks.

in this case, the court must first determine the relevant product market. (*See Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,* 996 F.2d 537, 543 (2d Cir.1993).) A relevant product "market is composed of products that have reasonable interchangeability," in the eyes of consumers, with what the defendant sells. (*United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *see also Eastman Kodak Co., Inc. v. Image Tech'l Servs.,* 504 U.S. 451, 482, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).) The assessment takes account of the factors that influence consumer choices, including product function, price, and quality (*du Pont,* 351 U.S. at 404, 76 S.Ct. 994); but the object of the inquiry in defining the market is to identify the range of substitutes relevant to determining the degree, if any, of the defendants' market power. (*See Rothery Storage & Van Co. v. Atlas Van Lines,* 792 F.2d 210, 218–19 (D.C.Cir.1986); *see also Eastman Kodak,* 504 U.S. at 469 n. 15, 112 S.Ct. 2072; *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.,* 7 F.3d 986, 995–96 (11th Cir.1993); *U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 598–99 (1st Cir.1993); *Home Placement Service, Inc. v. Providence Journal Co.,* 682 F.2d 274, 280 (1st Cir.1982).)

 Accordingly, for goods or services to be in the same market as the defendants', substitutability in the eyes of consumers must be sufficiently great that the defendants' charging of supracompetitive prices for its product would drive away not just some consumers but a large enough number to make such pricing unprofitable (and hence induce the defendant to restore the competitive price). (*See du Pont,* 351 U.S. at 394–95, 76 S.Ct. 994; *Rothery,* 792 F.2d at 218.) In other words, a market is properly defined when a hypothetical profit-maximizing firm sell-

ing all of the product in that market could charge significantly more than a competitive price, *i.e.,* without losing too many sales to other products to make its price unprofitable. (*See, e.g., Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.,* 79 F.3d 182, 197–98 (1st Cir.1996); *State of New York v. Kraft Gen. Foods, Inc.,* 926 F.Supp. 321, 361 (S.D.N.Y.1995); *Dep't of Justice and Fed'l Trade Commission Horizontal Merger Guidelines* (Apr. 2, 1992) at § 1 (product market is a "product or group of products such that a hypothetical profit-maximizing firm that was the only present and future seller of those products (monopolist) likely would impose at least a 'small but significant [generally 5 percent] and non-transitory' increase in price").)

The court adopts the market definitions of the Government's expert economist, Professor Michael Katz, and finds that the general purpose card network services market and the general purpose card market are the relevant markets for antitrust analysis in this case. Although the defendants argue that the relevant market is one which includes all methods of payment including cash, checks and debit cards, the defendants' own admissions and evidence of consumer preferences support Prof. Katz' opinion and demonstrate the existence of a general purpose card market separate from other forms of payment and a card network market comprised of the suppliers of services to the general purpose card issuers.

### 1. *General Purpose Cards Constitute A Relevant Product Market*

 Professor Katz employed the price sensitivity test articulated in the Department of Justice and Federal Trade Commission Horizontal Merger Guidelines to determine the relevant markets. (*See Dep't of Justice and Fed'l Trade Commis-*

*sion Horizontal Merger Guidelines* (Apr. 2, 1992) at § 1.) First, based upon price data from Visa U.S.A. for 1998, Professor Katz estimated the prevailing price-cost margin in general purpose cards to be about 26 percent. Then he conservatively estimated that a 5 percent increase in general purpose card prices would have to reduce general purpose card output by over 16 percent in order to make such a price increase unprofitable.

All of the experts found the use of consumer survey data to determine whether and how many consumers would in fact switch from credit or charge cards to cash, check or debit in the face of such a price increase extremely difficult. This is because cardholders do not face or observe consistent prices or costs for obtaining or using their credit or charge cards. Some consumers (known in the industry as revolvers) pay interest monthly; others (known as transactors) pay their entire bill monthly and thus have no monthly credit cost. Some consumers enjoy a positive benefit from the use of their card by obtaining mileage rewards or "cash back" while also obtaining the monthly grace period before paying in full when they receive their bill. Many pay no fee for obtaining a card; some pay small or even substantial annual fees for cards (*e.g.,* an American Express Platinum card) with extensive services offered. Consequently, it is essentially impossible to make a definitive calculation of consumer price sensitivity or elasticity of demand via survey. (*See* Schmalensee Dep. at 122–27, 272–73; *see also* M. Katz Dir. Test. ¶¶ 116–122.)

Despite these difficulties, the court is persuaded by Prof. Katz' analysis and finds that it is highly unlikely that there would be enough cardholder switching away from credit and charge cards to make any such price increase unprofitable for a hypothetical monopolist of general purpose card products. This conclusion is buttressed by the fact that (1) few, if any, cardholders actually can or do observe price increases, including interchange rate increases and increases in service fees charged by issuing banks; and (2) the burden of such increases is at least partly passed on by merchants and so is shared by consumers who use other means of payment. (*See* M. Katz Dir. Test. ¶ 131.)

Professor Katz' market definition is further supported by evidence of consumer preferences. In many circumstances, consumers strongly prefer to use credit and charge cards rather than cash or checks, because they generally do not want to carry large sums of cash to make large purchases, and checks generally have much lower merchant acceptance than either cash or general purpose cards. (*See* Schmidt (Visa U.S.A.) Dep. at 70; Tr. 5971–72 (Schmalensee); M. Katz Dir. Test. ¶¶ 113–14.) Also, consumers benefit from the general purpose card's credit function, which allows for the choice to purchase now and pay later. (*See* Schmalensee Dep. at 381–82; Schmidt Dep. at 69–72) Indeed, defendants' member issuers do not view cash or checks as "competitive" with general purpose cards. (Armentrout (Crestar) Dep. at 100.)

Because proprietary cards, such as a Sear's or Macy's card, are accepted only at a single merchant consumers do not believe that proprietary cards are substitutes for general purpose cards and therefore they should not be included in the relevant market. (*See* Krumme (JCB) Dep. at153–54; M. Katz Dir. Test. ¶ 102; Schmalensee Dep. at 131, 244.) Consumers also do not consider debit cards to be substitutes for general purpose cards.[6] Due to their rela-

---

**6.** *See* Tr. 1313–14 (Hart, Advanta/Master- Card); Tr. 1854 (Lockhart, MasterCard) (con-

tive lack of merchant acceptance, their largely regional scope, and their lack of a credit function, on-line debit cards, which require a pin number, are not adequate substitutes for general purpose cards.[7] Similarly Visa and MasterCard research demonstrates that consumers do not consider off-line debit cards to be an adequate substitute for general purpose cards, even though they have attained widespread merchant acceptance.[8] Knowledgeable industry executives agree with these conclusions. (*See* Tr. 742, 746–47, 965 (McCurdy, American Express); Tr. 2996–97 (Nelms, Discover); Krumme (JCB) Dep. at 156.)

Since the merchants' demand for general purpose cards is derived from consumers' demand to use these cards, their attitudes also reflect consumer attitudes. Some merchants, including large, prominent, national retail chain stores, such as Target and Saks Fifth Avenue, believe that if they were to stop accepting Visa and MasterCard general purpose cards they would lose significant sales. Consequently, these merchants believe they must accept Visa and MasterCard, even in the face of very large price increases. (*See* Scully (Target Stores) Dep. at 65–67; Rodgers (Saks) Dep. at 49–50, 58–59.) Even merchants that have profit margins as low as three percent, such as Publix

Supermarkets, feel compelled to accept general purpose cards. (*See* Tr. 378, 399–400 (Woods, Publix).)

In setting interchange rates paid by merchants to issuers (through the merchants' acquiring banks), both Visa and MasterCard consider, and have considered, primarily each other's interchange rates, and secondarily the merchant discount rates charged by Discover and American Express. (*See* Heuer (MasterCard) Dep. at 55–57; Fairbank (Capital One) Dep. at 50–52; Boardman (Visa Int'l) Dep. at 158–59; Ex. P–0717 at VU0282142; Ex. P–0514 at MET003814.) The costs to merchants of accepting cash, checks, debit, or proprietary cards were not a factor. (*See* Heasley (Visa U.S.A.) Dep. at 99–100.) In addition, general purpose card networks also track each other's merchant charges. (*See* Ex. P–0827; Sheedy (Visa U.S.A.) Dep. at 47.) And when tracking "competitors," defendants look to the major general purpose card networks, not to other payment methods. (*See, e.g.,* Ex. P–1110 at MC51959; Ex. P–1169.)

Although the defendants seek here to define the market more broadly, large numbers of defendants' documents explicitly recognize the existence of a separate general purpose card market. For example, Visa research showed that the "source

firming statement in P–0068, MasterCard's 1997 Annual Report); Schall (Visa U.S.A.) Dep. at 36–37; Russell (Visa U.S.A.) CID Dep. at 55–56 (a Visa study conducted with hundreds of thousands of accounts demonstrated consumers "used the debit card like a checking account, and they used the credit card like a credit card"); Ex. P–0355 at MCI–0806320–21; Ex. P–0522 at NH0006; Ex. P–0384 & Caputo (MasterCard) Dep. at 243–47 (MasterCard's U.S. Deposit Access Group's discussion of debit's competitors did not include general purpose cards).

7. *See* M. Katz Dir. Test. ¶ 103; Ex. P–0456 at MCJ4250997, 99 (September 1998 MasterCard presentation explaining that debit is "a

different business model from credit" and that "on-line debit does NOT replace credit").

8. *See* Dahir (Visa U.S.A.) Dep. at 214–15 (confirming Visa analysis showing that possession of off-line debit card doesn't affect a consumer's spending on credit cards); Ex. P–0359 (Sept.1998 MasterCard document summarizing several studies and concluding that there is little cannibalization of credit by debit); Ex. P–0076 at 1379041 (Visa Systems Payment Panel Study, "Impact of Check Card Acquisition: Debit cards dampen spending on paper checks with little effect noted on other payment alternatives.")

of volume for [the] New Premium Product" was MasterCard, Discover, and American Express. (Ex. P–0822 at VU 1371788.) There was no indication that the new premium card would displace consumer spending on cash, checks, debit cards or private label cards. In these documents, defendants calculate their "market" shares among general purpose card networks only. No percentages for cash, checks, debit or store cards are included in these calculations and pie charts.[9]

Finally, although it is literally true that, in a general sense, cash and checks compete with general purpose cards as an option for payment by consumers and that growth in payments via cards takes share from cash and checks in some instances, cash and checks do not drive many of the means of competition in the general purpose card market. In this respect, Prof. Katz's analogy of the general purpose card market to that for airplane travel is illustrative. Prof. Katz argues that while it is true that at the margin there is some competition for customers among planes, trains, cars and buses, the reality is that airplane travel is a distinct product in which airlines are the principal drivers of competition. Any airline that had monopoly power over airline travel could raise prices or limit output without significant concern about competition from other forms of transportation. The same holds true for competition among general purpose credit and charge cards. (*See* M. Katz Dir. Test. ¶¶ 11, 127.)

Accordingly, because card consumers have very little sensitivity to price increases in the card market and because neither consumers nor the defendants view debit, cash and checks as reasonably interchangeable with credit cards, general purpose cards constitute a product market.

2. *General Purpose Card Network Services Constitute a Relevant Product Market*

■ More importantly, general purpose card network services also constitute a product market because merchant consumers exhibit little price sensitivity and the networks provide core services that cannot reasonably be replaced by other sources. General purpose card networks provide the infrastructure and mechanisms through which general purpose card transactions are conducted, including the authorization, settlement, and clearance of transactions. (*See* Tr. 3197 (B. Katz, Visa U.S.A./Visa Int'l); Africk (MasterCard) Dep. at 11–12, 14–19.) Merchant acceptance of a card brand is also defined and controlled at the system level and the merchant discount rate is established, directly or indirectly, by the networks. (*See* Tr. 6134–35 (Pindyck, MasterCard); Tr. 2218–19 (Saunders, Household/Fleet); Flanagan (MasterCard) Dep. at 50–51.) These basic or core functions are indispensably done at the network level. (*See* Tr. 5979–80; 5984–85 (Schmalensee).)

Professor Katz also used the Merger Guidelines price sensitivity test to confirm the existence of a network services market. He noted that because costs attributable to system services are less than two

---

**9.** *See, e.g.,* Ex. P–1103 at MCJ000254 (1996 MasterCard U.S. region board minutes stating "with respect to share trends, Mr. Heuer noted that MasterCard has held its general purpose card dollar volume share over the past three years, but has experienced some share loss when compared only to Visa"); Ex. P–0750 (1998 letter to Visa U.S.A. CEO Carl Pascarella, per his request, providing U.S. market share of general purpose cards); Ex. P–0758 at 1 (1999 Visa U.S.A. board document providing "Visa's market share of cards in circulation of major all-purpose cards"); Ex. P–1180 (1999 Visa U.S.A. board document calculating "card volume ... market shares" for general purpose card brands); Ex. P–0793 at VU 1017663; Ex. P–0709; Stock (Visa U.S.A.) Dep. at 105–13.

percent of total credit card issuing costs, a ten percent increase in system service prices would translate to less than a 0.2 percent increase in issuers' total costs. Since issuers—the buyers of systems services—earn margins of about 26%, a 0.2 percent increase in their total costs would have a negligible effect on the profitability of issuing credit and charge cards. I adopt Prof. Katz's opinion that there would be no loss to network transaction volume in the face of even a 10% increase in price for network services—both because banks cannot provide the core system services themselves and it is implausible that they would exit the profitable credit and charge card market in response to such a small increase in price.

Professor Katz recognized that theoretically an increase in network service prices could also lead to a reduction in network transaction volume if issuers passed the price increase to downstream consumers of credit cards, who then responded by switching to other means of payment. However, since the 0.2% price increase to issuers would result in an even smaller percentage increase in the prices charged to cardholders, cardholders would have to have an unrealistically high level of price sensitivity before the system service price increase would become unprofitable to a hypothetical network monopolist. Accordingly, the Guidelines price test confirms the existence of a credit card network services market.

Moreover, Visa and MasterCard do not dispute that they participate in the general purpose card network services market, or that in that market they compete against American Express and Discover as networks. As Visa has explained, "[Discover] and American Express perform precisely the same 'system' functions as Visa and MasterCard, they just happen to do it themselves. That hardly means that there is no competition at that level." (Ex. P–1187H at 24, n.47; Defs.' Proposed Conclusions of Law ¶ 148.) In fact, Visa identified a network market of intersystem competition as a relevant market for antitrust purposes in the *Mountain West* litigation and admitted that such competition impacts consumer welfare, stating "[l]est there be any confusion, the ultimate impact of any harm to system level competition is felt by cardholders and merchants who use or accept general purpose charge cards."[10] Both former Visa CEO Bennet Katz and Visa's primary expert, Dean Schmalensee, agree that that position remains true today. (*See* Ex. P–1245 at 43; Tr. 3190–91 (B. Katz, Visa U.S.A./Visa Int'l); *id.* at 5985–87 (Schmalensee).) MasterCard also confirmed that systems competition affects consumer welfare. Professor Pindyck, its expert economist, testified that the exit of MasterCard from the systems market would result in significant consumer harm. (*See* Tr. 6108, 6113–16, 6120 (Pindyck, MasterCard).)

### 3. The United States is the Relevant Geographic Market

■ The United States is the appropriate geographic scope for the general pur-

---

10. *See SCFC ILC v. Visa U.S.A., Inc.*, 819 F.Supp. 956 (D.Utah 1993), *aff'd in part, rev'd in part*, 36 F.3d 958 (10th Cir., 1994) (hereinafter "*Mountain West.*") In *Mountain West* the Tenth Circuit considered the application of Visa's By-law 2.06, which prevented Discover from joining the Visa system to issue Visa cards. The court affirmed the rule, accepting Visa's arguments that because general purpose card networks constituted a separate, highly-concentrated market, competition in that market should not be further diluted by permitting Discover to enter the Visa network. The value of an additional one of thousands of Visa-branded issuers to intrasystem competition did not outweigh the effects of having weakened network or brand level competition through Discover joining the Visa network.

pose card product market and the general purpose card core systems services market for several reasons. (*See* Tr. 3187–88 (B. Katz, Visa U.S.A./Visa Int'l); *id.* at 1459 (Hart, Advanta/MasterCard); Ex. P–1235 at ¶ 143.) First, the exclusionary rules at issue are specific to the United States. Second, many other important decisions affecting the United States, including pricing, are made by the associations' U.S. Region Board and committees. (*See* Williamson (Visa Int'l) Dep. at 103–04.) Third, the national card base and acceptance network are critical assets that a system must possess to compete, because consumers principally purchase from merchants in the same country. Fourth, significant competition among issuers—the buyers of system services—occurs at the national level. Lastly, there is a national media market and systems pursue national promotional strategies. (*See* M. Katz. Aff. ¶ 154.)

### B. Defendants Have Market Power in the Network Market

■ The Government claims that defendants have market power in the market for general purpose card network services because they have the power to raise prices and lower output and/or innovation, either jointly or separately. Market power is defined as the "power to control prices or exclude competition." (*du Pont*, 351 U.S. at 391, 76 S.Ct. 994, *see Kodak*, 504 U.S. at 481, 112 S.Ct. 2072, *id.* at 464, 112 S.Ct. 2072 ("ability of a single seller to raise price and restrict output") *National Collegiate Athletic Ass'n v. Board of Regents of the Univ. of Okla.*, 468 U.S. 85, 109 n. 38, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("Market power is the ability to raise prices above those that would be charged in a competitive market."); *see also K.M.B. Warehouse Distribs. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir.1995) ("the ability to raise price significantly

above the competitive level without losing all of one's business").)

■ Market power may be shown by evidence of "specific conduct indicating the defendant's power to control prices or exclude competition." (*K.M.B. Warehouse*, 61 F.3d at 129.) In this regard, plaintiff has proven through the testimony of merchants that they cannot refuse to accept Visa and MasterCard even in the face of significant price increases because the cards are such preferred payment methods that customers would choose not to shop at merchants who do not accept them. (*See* Scully (Target stores) Dep. at 83–85; Rodgers (Saks) Dep. at 49–50, 58–59, 133; Tr. 692 (Zyda, Amazon.com); *id.* at 399–400 (Woods, Publix stores).) In addition, both Visa and MasterCard have recently raised interchange rates charged to merchants a number of times, without losing a single merchant customer as a result. (*See* Ex. P–1036 at DOJTE000242 (Visa U.S.A. interrogatory response stating that it was aware of no merchant that had discontinued accepting Visa cards since January 1998 "due, in whole or in part, to an increase in [Visa U.S.A.'s] interchange rates or an increase in a merchant discount as a result of an increase in interchange."); Schmidt (Visa U.S.A.) Dep. at 102; Schall (Visa U.S.A.) Dep. at 86; Beindorff (Visa U.S.A.) Dep. at 90; Heuer (MasterCard) Dep. at 52, 57–60; Pascarella (Visa U.S.A.) Dep. at 286–87; Shailesh Mehta (Providian) Dep. at 78–79, 163–64.)

Defendants' ability to price discriminate also illustrates their market power. Both Visa and MasterCard charge differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general purpose cards. (*See* Ex. P–0024 at 0685656 (adopting an interchange strategy under which "[h]igher increases are recommended in [mer-

chant] segments where the strategic value of bankcards is higher."); *see also* Schmidt (Visa U.S.A.) Dep. at 100–02, 117–20 (Visa's interchange pricing strategy considers the price sensitivities of different merchant segments); Pascarella (Visa U.S.A.) Dep. at 282–83, 285–86.) Transactions with catalog and Internet merchants, for example, which rely almost completely on general purpose cards, have higher interchange fees than 'brick and mortar' merchants. Defendants rationalize this difference by pointing to increased fraud in these merchant categories, but this explanation is belied by the fact that the Internet merchant, not Visa/MasterCard or their member banks, bears virtually all the risk of loss from fraudulent transactions. (*See* Tr. 686–87, 694 (Zyda, Amazon.com).) Even today, Amazon's fraud rate is lower than mail-order companies, yet it is charged (indirectly, through the merchant discount) the same interchange fee as these mail order companies. The reality is that Visa and MasterCard are able to charge substantially different prices for those hundreds of thousands of merchants who must take credit cards at any price because their customers insist on using those cards. As will be discussed below, there is also evidence that the exclusionary rules adopted by the associations reduce output and consumer choice by denying American Express and Discover the opportunity to issue cards through bank issuers who issue Visa and Master-Card.

▮ Of course, even if direct evidence of the ability to raise prices and reduce output or innovation were absent, it may be presumed that a firm with a large share of a highly concentrated market with high barriers to entry possesses market power. (*See Kodak,* 504 U.S. at 464, 112 S.Ct. 2072 (Market power "ordinarily is inferred from the seller's possession of a predominant share of the market.")); *FTC v. Staples, Inc.,* 970 F.Supp. 1066, 1081–82 (D.D.C. 1997) (evidence of market share and entry barriers have commonly been central to market power analysis.) At least in the absence of countervailing circumstances, market power exists when market share is sufficiently high and there are significant enough barriers to entry or expansion that the defendant can charge supracompetitive prices without loss of so many customers that the pricing becomes unprofitable. (*See, e.g., Southern Pacific Co. v. AT & T,* 740 F.2d 980, 1001 (D.C.Cir.1984); *cf. Ryko Mfg. Co. v. Eden Servs.,* 823 F.2d 1215, 1232 (8th Cir.1987) (market power analysis); *Ball Memorial Hospital, Inc. v, Mutual Hospital Ins., Inc.,* 784 F.2d 1325, 1335–36 (7th Cir.1986) (same).)

In this case, even a cursory examination of the relevant characteristics of the network market reveals that whether considered jointly or separately, the defendants have market power. Visa and MasterCard both have large market shares in a highly concentrated network market with only four significant competitors. In 1999 Visa members accounted for approximately 47% of the dollar volume of credit and charge card transactions and MasterCard members for approximately 26%. American Express accounted for approximately 20% and Discover for approximately 6%. Visa and MasterCard together control over 73 percent of the volume of transactions on general purpose cards in the United States. In terms of cards issued, they control about 85 percent of the market. (*See* Ex. D–4118.)

Furthermore, there are significant barriers to entry into the general purpose card network services market. Visa's CEO described starting a new network as a "monumental" task involving expenditures and investment of over $1 billion. (*See* Tr. 5224 (Pascarella, Visa U.S.A.); *see*

*also* Dahir (Visa U.S.A.) Dep. at 200–01 (building a global brand and acceptance network would cost between $2 and $5 billion).) In addition to the high costs of establishing a network and developing a brand name a new entrant must also solve the so-called "chicken-and-egg" problem of developing a merchant acceptance network without an initial network of cardholders who, in turn, are needed to induce merchants to accept the system's cards in the first place.

The difficulties associated with entering the network market are exemplified by the fact that no company has entered since Discover did so in 1985. Both AT & T and Citibank conducted entry analyses, but decided it would be unprofitable. (*See* M. Katz Dir. Test. ¶ 181.) John Reed, then co-CEO of Citibank, concluded that an entrant would need to capture a 20 to 25 percent market share to be successful. (*See* Reed Dep. at 38–41.) Although the defendants argue that non-traditional .companies, such as AT & T, America Online, Microsoft and others, including companies offering Internet-based alternative currencies, should be seen as potential entrants, the evidence shows otherwise. Visa and MasterCard do not regard these firms as competitors. Rather they are viewed by the associations as potential allies and partners, posing no significant threat to defendants' market share in general purpose card transactions. (*See* Fehringer (Visa Int'l) Dep. at 28–29; Ailworth (Visa U.S.A.) Dep. at 90–93, 105–06.)

The higher the barriers to entry, and the longer the lags before new entry, the less likely it is that potential entrants would be able to enter the market in a timely, likely, and sufficient scale to deter or counteract any anticompetitive restraints. (*See Dep't of Justice and Fed'l Trade Commn. Merger Guidelines,* § 3.0.) Where barriers to entry are high,

such as here, "a monopolist would find it easier to raise prices because it would be unlikely that a competitor would, or could, enter the market." (*Bon–Ton Stores, Inc. v. May Dept. Stores,* 881 F.Supp. 860, 876 (W.D.N.Y.1994); *see also Kelco Disposal Inc. v. Browning–Ferris Indus. of Vermont, Inc.,* 845 F.2d 404, 408 (2d Cir.1988) (high barriers to entry shown by fact that only two companies entered market in eleven year period and significant costs to enter impeded new entrants); *Fineman v. Armstrong World Indus.,* 980 F.2d 171, 201–03 (3d Cir.1992).)

Finally, Dean Schmalensee's own description of the network market characteristics aptly makes the point that "[t]here are, at most, five viable system competitors within the general purpose charge card market and entry of a new system is quite difficult." (Tr. 5987–88; *see also* Ex. P–1040 at DOJTE000289.)

Because Visa and MasterCard have large shares in a highly concentrated market with significant barriers to entry, both defendants have market power in the general purpose card network services market, whether measured jointly or separately; furthermore plaintiff has demonstrated that both Visa and MasterCard have raised prices and restricted output without losing merchant customers.

## C. The Rule of Reason and Unreasonable Restraints of Trade

A showing of market power in the relevant market does not alone establish a Sherman Act violation; rather a showing of market power must be associated with some form of abusive conduct. In this case the abusive conduct alleged is the impeding of the competitive process by the associations' dual governance structure and their exclusionary rules. According to the plaintiff, dual governance affects the incentives of directors whose banks have a

substantial interest in the other association, thereby causing less than vigorous competition between the two largest general purpose card networks in a highly concentrated market with only a handful of participants. Plaintiff also alleges that defendants' exclusionary rules restrain the competitive abilities of the networks that their members do not own, which not only limits their competitiveness but also allows the associations and their members to temper the competitive vitality of network and issuer-level competition. Plaintiff alleges that as a result of these restraints on the competitive process, consumers are denied the benefits of full competition, namely innovative and varied products and services as well as a marketplace responsive to consumer preferences.

■■■■ Although the Sherman Act, by its terms, prohibits every agreement "in restraint of trade," it is clear "that Congress intended to outlaw only unreasonable restraints." (*State Oil Co. v. Khan*, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997).) Certain agreements, like price-fixing or market-division agreements, are condemned as unreasonable *per se.* (*See id.,* at 10, 118 S.Ct. 275; *Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990); *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).) Other agreements are analyzed under the rule of reason. Plaintiff and defendants agree that analysis of the defendants' agreements as to dual governance and their exclusionary rules involves application of the rule of reason. That rule seeks to "determine whether the restraints in the agreement are reasonable in light of their actual effects on the market and their procompetitive justifications." (*Clorox Co. v. Sterling Winthrop,*

*Inc.,* 117 F.3d 50, 56 (2d Cir.1997).) Any agreement is unlawful (under the rule of reason) if its restrictive effect on competition is not reasonably necessary to achieving a "legitimate procompetitive objective, *i.e.,* an interest in serving consumers through lowering costs, improving products, etc." (*National Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 691, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).)

■■■■ The most full-fledged rule of reason analysis requires that "the factfinder weigh [ ] all of the circumstances of a case . . . ." (*Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *see also State Oil,* 522 U.S. at 10, 118 S.Ct. 275 (rule of reason analysis takes into account a variety of factors)) The Supreme Court's decision in *Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), still remains "[t]he classic articulation of how the rule of reason analysis should be undertaken." (*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assoc., Inc.,* 996 F.2d 537, 543 (2d Cir.1993).) According to the *Chicago Board of Trade* case:

[t]he true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the

reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

(*City of Chicago*, 246 U.S. at 234, 38 S.Ct. at 245; *see also North American Soccer League v. National Football League*, 670 F.2d 1249, 1259 (2d Cir.1982))

Importantly, the broad sweep of the rule of reason "does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason." (*National Soc'y of Prof'l Eng'rs*, 435 U.S. at 688, 98 S.Ct. 1355.) Rather, the rule of reason "focuses directly on the challenged restraint's impact on competitive conditions." (*Id.; see also id.* at 691, 98 S.Ct. 1355 ("the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition").)

■■■ The extent of the required analysis, however, depends on the type and circumstances of the restraint at issue. (*See California Dental Ass'n v. FTC*, 526 U.S. 756, 780, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999).) For example, where "the great likelihood of anticompetitive effects [from the restraint at issue] can easily be ascertained," an elaborate examination of market circumstances is not required. (*See California Dental Ass'n*, 526 U.S. at 770–71, 119 S.Ct. 1604; *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986); *NCAA v. Board of Regents*, 468 U.S. 85, 110, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); *National Soc'y of Prof. Eng'rs*, 435 U.S. at 692–93, 98 S.Ct. 1355.) Under this so-called "quick look" analysis, where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets," a "quick look analysis carries the day."

(*California Dental Ass'n*, 526 U S. at 770, 119 S.Ct. 1604.)

The court need not consider whether this case could have been decided based on a "quick look" rule of reason analysis. As a practical matter, the parties and the court have already undertaken a thorough analysis of the alleged restraints and their impact on the relevant markets; it would make little sense for the court to disregard any of the evidence presented.

■■■ The core of Section 1 inquiry is whether the challenged restraint is "unreasonable," *i.e.*, whether its anticompetitive effects outweigh its procompetitive effects (*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 & n. 12, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)) and, therefore, "whether the challenged agreement is one that promotes competition or one that suppresses competition." (*National Soc'y of Prof. Eng'rs*, 435 U.S. at 691, 98 S.Ct. 1355); *see California Dental Ass'n*, 526 U.S. at 772–73, 119 S.Ct. 1604 (Section 1 condemns agreements with "net anticompetitive effect"; agreement would be "anticompetitive, not procompetitive" unless "any costs to competition associated with the elimination of across-the-board advertising will be outweighed by gains to consumer information (and hence competition)" from restrictive rule).

■■■ Identifying "anticompetitive effects" under the rule of reason involves analysis of whether the competitive process itself has been harmed. (*See Sullivan v. National Football League*, 34 F.3d 1091, 1096–97 (1st Cir.1994) (defining "anticompetitive effects" as "injury to competition" or "harm to the competitive process").) "Restraints on competition [do not constitute antitrust violations unless they] have or [are] intended to have an effect upon prices in the market or otherwise ... deprive purchasers or consumers of the advantages which they derive from

free competition." (*Apex Hosiery Co. v. Leader*, 310 U.S. 469, 500–01, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); *United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir.1993) (identifying "reduction in output, ... increase in price [and] deterioration in quality" as anticompetitive effects in rule of reason analysis); *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 728 (3d Cir.1991) ("An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services."); *Wilk v. American Med. Ass'n*, 895 F.2d 352, 360–62 (7th Cir.1990) (finding that impeding consumers' free choice and raising costs of some health care providers were actual anticompetitive effects).)

▇▇▇ Under the rule of reason, the Government bears the initial burden (by a preponderance of the evidence) of demonstrating that each restraint has substantial adverse effects on competition such as an increase in price or a decrease in quality. (*Cf. Capital Imaging*, 996 F.2d at 546 (failure to show increase in price or "any decrease in quality" insufficient to meet burden of showing effects).) Once that initial burden is met, defendants bear the burden of coming forward with evidence of the procompetitive justification(s) for the agreements. If that burden is met, then the Government must prove either that the restraints are not reasonably necessary to achieve the procompetitive objectives or that the restraints' objectives can be achieved in a substantially less exclusionary manner. (*Id.* at 542–43.)

▇▇▇ No party disputes that antitrust law's concern with the free working of the competitive process applies with equal force to joint ventures. Although a joint venture may involve aspects of agreement among competitors to enable a joint venture to function, agreements among those competitors unrelated to the efficiency of the joint venture and in particular limiting competition in areas where the competitors should compete, are subject to scrutiny under the antitrust laws. With these principles in mind, the court turns first to the associations' dual governance structures.

## III. GOVERNANCE DUALITY IS NOT ANTICOMPETITIVE

### A. Definition And History

"Issuance duality" is the situation "in which a single bank issues cards on two ... different systems." (M. Katz Dir. Test. ¶ 17.) Plaintiff's expert asserts that issuance duality is, on balance, procompetitive. (*See id.* ¶ 191.) According to the plaintiff, "governance duality" is the "situation in which a bank has formal decision-making authority in one system while issuing a significant percentage of its credit and charge cards on a rival system." (*Id.* ¶ 17.) Plaintiff contends that while issuance duality is procompetitive, dual governance is anticompetitive. (*See id.* ¶ 191; see also Tr. 3645–46 (M.Katz).)

Initially the card associations were non-dual; their members issued only their own association's card. In 1971, Visa (then known as NBI) adopted By-law 2.16, which prohibited Visa members from issuing MasterCard cards or participating in the MasterCard system. (*See* Ex. P-0954 at 4; Tr. 3329 (B. Katz, Visa U.S.A./Visa Int'l).) However, under the By-law agent banks—smaller banks that did not issue Visa cards and instead formed agreements to have larger banks issue cards to the agent banks' customers—were permitted to be dual. (*See* Tr. 3329–30 (B.Katz).) One of Visa's members, Arkansas-based Worthen Bank and Trust Company, objected to competing against an agent bank that was able to sign merchants for both Visa and MasterCard. Worthen sued Visa, alleging that the exclusivity provision

violated the antitrust laws. (See Ex. P–0954 at 4; Tr. 3330–31 (B.Katz).)

The Eighth Circuit reversed a lower court ruling in favor of Worthen, holding that the by-law should have been analyzed under the rule of reason, and remanded the case to the district court. (See Tr. 3131 (B. Katz, Visa U.S.A./Visa Int'l).) Visa nonetheless chose to amend By-law 2.16 to fully prohibit duality, including on the agent bank side. (See Tr. 3332 (B.Katz); Ex. P–0954.) Visa wrote the Department of Justice and asked the Government to endorse amended By-law 2.16 as "a reasonable method of preserving that competition against the anticompetitive effects of dual membership." (Ex. P–0954 at 7.)

In October 1975, in a business review letter, the Department of Justice declined to approve the proposed Visa exclusivity rule, reasoning that the proposed by-law was too stringent and that certain of its restrictions on the acquiring side "might well handicap efforts to create new bank credit card systems and may also diminish competition among the banks in various markets." (Ex. P–0955 at 2–3.) Although the Government did "not have the same criticism of the proposed rule" with regard to dual issuance, the Government emphasized that its views were based only on the state of the market at that time, reserving the right to bring an enforcement action if circumstances changed. (Ex. P–0955; Tr. 3106–07 (B.Katz).) Following the business review letter, Visa attempted to permit duality on the acquiring side only, but quickly found it impractical. It therefore dropped its exclusivity requirement completely and allowed Visa members to become dual issuers. (Tr. 3108 & 3333–35 (B.Katz).)

After Visa eliminated its exclusivity rule, dual issuance spread rapidly, particularly among larger banks. In February 1977, Visa again raised its concerns with Justice Department officials, noting the prevalence of dual issuance, the movement toward common operations and marketing and increasing concerns about confidentiality issues. (See Tr. 3340–42 (B.Katz); Ex. D–0161, attached letter at 2–3.) In response, the Government "expressed no adverse opinion" about "the rush toward dual issuance." It instead indicated that "it perceived bank-to-bank competition of utmost importance" and "any risks to be taken should be to system-to-system competition." (Ex. D–1714 at VUTE0002801; Ex. D–0161 at 2; see also Tr. 3344–45 (B. Katz, Visa U.S.A./Visa Int'l).) The Government informed Visa that it "[did] not intend to reverse its present policy unless it sees substantial adverse effects on competition for cardholders and merchants attributable to duality." (Ex. D–0161 at 2.) Within a year, 20 of the 25 largest commercial banks were dual and dual issuers were responsible for almost 70 percent of Visa's sales volume. (See Ex. D–1714 at VUTE0002803.)

MasterCard, unlike Visa, has always maintained that duality is procompetitive, contributing to the growth, efficiency and competitiveness of the associations. Duality afforded members of the associations flexibility that promoted efficiencies, facilitated coordination on necessary standards and created benefits for banks and consumers. (See Schmalensee Dir. Test. at 48–52.) As Visa grew to be the association with the larger market share, duality became particularly important for the viability of MasterCard, as the smaller and more vulnerable association, as well as for member financial institutions. (See Pindyck Dir. Test. at ¶¶ 11, 81–83.) Duality gave MasterCard the opportunity to obtain business from members which otherwise might only issue cards under the Visa brand. (See id. at ¶¶ 80–83; Tr.2072;

2091–2092, 2095–96, (Boudreau, Chase); Fairbank (Capital One) Dep. at 63–64, 71, 191–193.)

By 1986 about two-thirds of the 100 largest bank credit card issuers had at least 25 percent of their cards on each system. (*See* Ex. D–3054.) This resulted in dual members who had strong financial interests in making sure that both card brands worked efficiently with each bank's back office operations. (*See* Tr. 3112–15 (B. Katz, Visa U.S.A./Visa Int'l).)

As a logical outgrowth of dual issuance and ownership, the Directors of the associations' Boards consisted primarily of representatives of member banks with substantial card portfolios of both associations. The Government claims that this dual governance structure caused anticompetitive effects in the network services market because the overlapping financial interests of dual governors reduced their incentives to compete against their other card product and as a result they sometimes prevented management from competing with the other association card brand.

In this regard, it is worth noting that the Government alleges that dual governance is the result of separate conspiracies between each association and its members. (*See* Cmplt. ¶ 155.) The Complaint does not allege a conspiracy between the two associations. In the context of the specific claims of Count One, the Government has the burden of establishing that Master-Card and one or more of its members and, separately, Visa and one or more of its members, consciously committed to place "non-dedicated" members on its board in order to limit competition between the two associations. (*See AD/SAT v. Associated Press*, 181 F.3d 216, 234 (2d Cir.1999)) (stating that "an antitrust plaintiff must present evidence tending to show that association members, in their individual ca-

pacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective.") The court finds no evidence of such conscious commitment.

**B. The Government's Examples of Consumer Harm from Reduced Competition**

■ Plaintiff relies in part on four specific examples of allegedly anticompetitive behavior in support of its theory that dual governance has blunted innovation in the credit and charge card market. The centerpiece of its proof on innovation is the claim that if MasterCard truly competed with Visa, it would have moved forward in the 1980's with plans to convert credit cards from the prevailing magnetic stripe technology to "smart" cards with embedded computer chips. However the record on smart cards does not support the plaintiff's theory that dual governance blunted innovation competition between Master-Card and Visa. In fact, there is no credible evidence that their individual decisions not to implement smart cards were linked in any way to governance duality. Rather, the proof at trial demonstrated that smart cards were not implemented in the 1980s because the associations believed that there was no business case for smart cards in light of the enormous investment that association members and merchants would have had to make in order to place smart card terminals at the point of sale.

*1. Smart Cards*

A smart card is a plastic card containing an embedded computer chip capable of performing calculations and storing data. The payment processing functions performed on a smart card substitute for some of the functions that can be performed on a central mainframe computer using a magnetic stripe card. (*See* Tr. 454 (Elliot, MasterCard).) When MasterCard

began to consider converting from magnetic stripe technology to chip or integrated circuit cards in 1984, it focused on them primarily as a security measure which would reduce fraud and credit losses. As of the mid–1980s, however, substantial investments had already been made in increasing "on-line" authorizations and controlling fraud. (*See* Russell (Visa U.S.A.) Dep. at 24–28 & 32–33.) Thus, the incremental gains from chip cards as a means of controlling fraud and credit losses, and increasing authorizations, were limited. Moreover, the costs of replacing the existing magnetic stripe infrastructure would have been substantial. Merchants—whose cooperation and financial support for a migration to chip technology were crucial to its success—did not believe that the extra effort and costs of processing chip cards would be justified by any real benefit over the recently installed magnetic stripe terminals. (*See* Rapp (Visa U.S.A.) Dir. Test. at 27; *see also* Ex. P–0231 at JE000064.) Card issuers also resisted the new technology, unconvinced that a business case existed. (*See* Ex. D–0049 at BAH02160; Rapp Dir. Test. at 25–27; Tr. 5542:1–25 (Rapp).) As a result, in the 1980s Visa and MasterCard concluded, after independent and joint analyses, that the significant costs of chip technology outweighed its limited benefits in the United States.

The Government's principal witness, John Elliott, was hired in 1984 as MasterCard's Executive Vice President of Electronic Services. He led a project to evaluate smart cards as an anti-counterfeit device. Throughout 1985 Elliott hired several consulting firms and ran pilots of competing smart card systems. (*See* Tr. 441–042, 529, 454–457, 459–60 (Elliott).) Despite a number of promotional activities engaged in by Elliott and then-CEO Russell Hogg in the fall of 1985 through the spring of 1986, the record is clear that MasterCard had not yet reached any conclusions regarding the financial business case for smart cards. (*See* Ex. P–1195; Tr. 471–72; 514–519 (Elliott).)

MasterCard commissioned a study by consultants Edgar, Dunn & Conover ("Edgar, Dunn"), regarding the economic feasibility of implementing smart cards in the U.S. or worldwide. The Edgar, Dunn study was completed in 1987 and concluded that a smart card implementation would have cost MasterCard members $1.3 billion. (*See* Ex. D–0345 at JE000163; Tr. 533, 563–564; 578 (Elliott).) If MasterCard were to implement the smart card project alone on an international basis, the costs savings would not have justified the investment—MasterCard would have lost $200–220 million. (*See* Ex. D–0345 at JE 000169; Tr. 518–519 (Elliott).) Edgar, Dunn further projected that if MasterCard were to implement the smart card project alone on a U.S.-only basis, for a cost to members of a billion dollars, there would have been only a modest profit generated. (*See* Ex. D–0345 at JE000169; Ex. P–0231 at JE000114; Tr. 577–78 (Elliott, MasterCard).) On the other hand, the study projected the returns to a joint MasterCard/Visa implementation to be significantly higher and profitable. (*See* Ex. D–0345 at JE000169; Ex. P–0231 at JE000114; Tr. 538 (Elliott).) [11]

***

11. Elliott criticized the Edgar Dunn study and MasterCard generally for considering only cost savings and for failing to consider the revenue potential that might flow from smart cards. (*See* Tr. 481–82 (Elliott).) Elliott, however, was not involved in any respect with the marketing side of the analysis and did not know whether any revenue analysis was conducted by anyone else at MasterCard. (*See id.; see also* Tr. 532–33 & 514.) There is thus no evidence that consideration of the revenue potential might have yielded a business case for MasterCard proceeding with smart cards.

In January 1987, John Elliott presented a proposal to the MasterCard Executive Committee, relying in part on the Edgar, Dunn study, that recommended that MasterCard proceed jointly with Visa on smart cards. (*See* Ex. P–0231 at JE000117; Tr. 483 (Elliott).) Based on Elliott's January 1987 presentation, the MasterCard executive Committee directed then-CEO Russell Hogg to contact Visa's CEO Charles Russell to consider the possibility of proceeding jointly with smart cards. (*See* Tr. 501 (Elliott).) However, at trial Elliott testified that he believed that MasterCard should have implemented smart cards alone and that the decision not to do so was related to dual governance. I find this testimony to be wholly unreliable, as Mr. Elliot exhibited an obvious bias against MasterCard and a complete lack of objectivity on the subject of smart cards throughout his testimony. (*See* Tr. 487–95.) Mr. Elliott has enjoyed a lucrative employment relationship with American Express both before and during the investigation stage of this action. Elliot's consulting agreement with American Express provided that between March of 1998 and March of 1999, he would be paid $42,000 per month without regard to whether he was actually called on to provide services. During that period, Elliot participated in one meeting and two phone calls with the Department of Justice. He was paid a total of $504,000 under the agreement. (*See* Tr. 519–523.)

Moreover, I credit the testimony of Pete Hart and Ed Hogan, corroborated by the slide presentation Elliott himself made to the Executive Committee when he worked at MasterCard, that MasterCard management believed (and proposed to the Executive Committee) that based on economies of scale and the large investment required, smart card implementation should go forward, if at all, in conjunction with Visa and possibly others. (*See* Tr. 1398 (Hart, Advanta/MasterCard); Hogan (MasterCard) Dep. at 223–24; Ex. P–0231 at JE000117–118.) [12]

Independent of MasterCard, Visa International had already concluded in a 1985 study that there was no business justification for Visa International to mandate a global migration to chip technology. The study showed high costs of operating a chip card system and small gains from reducing losses due to lost, stolen and counterfeit cards. (*See* Ex. D–0223 at BAH1290 & 1350; *see also* Tr. at 4691–4694 (Boston, Visa Int'l); Russell (Visa U.S.A.) Dep. at 179–82.) In January 1987, Visa U.S.A.'s Board also considered the merits of MasterCard's publicly stated plan and concluded that a conversion to smart cards was not justified at that time. (*See* P–0599 at VISA00796; Tr. 3213 (B. Katz, Visa U.S.A./Visa Int'l).)

In 1987, the CEOs of Visa and MasterCard met and decided to hire an indepen-

---

12. Elliott also claimed at trial that Hart expressed concern in a conversation over 13 years ago that MasterCard's smart card project might harm his Visa portfolio. (*See* Tr. 565–67; 585–87 (Elliott).) I reject this testimony and credit the testimony of Hart, who stated that such a conversation never occurred and that his only concern regarding MasterCard's smart card project related to his belief that there was no business case for smart cards. (*See* Tr. 1395–96; 1398 (Hart, Advanta/MasterCard).) I also credit Hart's testimony that when he was on the Board of Directors and Executive Committee of MasterCard from 1983 to 1988, he never attended a meeting where a Board member encouraged MasterCard to slow down its smart card program in order to avoid gaining a competitive advantage over Visa. (*See* Tr. 1273–74 & 1396 (Hart).) The only other members John Elliott implicated as being opposed to MasterCard pursuing smart cards were large issuers who were *not* on the MasterCard Board or the Executive Committee. (*See* Tr. 576 (Elliott).)

dent consultant to analyze the economic feasibility of implementing smart cards. (*See* Tr. 501–503 (Elliott).) Booz, Allen and Hamilton concluded that there was no business case for MasterCard and Visa proceeding jointly or alone on smart cards; that even a joint implementation would have been unprofitable, and recommended that the associations not pursue smart cards. (*See* Tr. at 582–83 (Elliott); Ex. D–0346 at 0346009.)

Plaintiff's expert concedes that there is no direct evidence linking "dual governance" to MasterCard's decision not to implement smart cards in the 1980s. (*See* Tr. 3981–82 (M.Katz).) Indeed, Professor Katz does not assert that it was inappropriate for MasterCard and Visa to pursue smart cards jointly. Rather, he concedes that "[d]ue to economies of scale, the business case for chip cards was in some ways stronger if more systems made use of the chip technology and the terminals that would be located on merchants' premises. Thus, even if MasterCard and Visa were true arm's-length competitors, MasterCard could have had an interest in Visa proceeding with chip card introduction." (M. Katz Dir. Test. ¶ 232.)

In 1994, at the request of its European members, MasterCard once again reviewed the potential for smart cards. (*See* Hogan (MasterCard) Dep. at 229–230; Tr.1894 (Lockhart, MasterCard); Ex. P–1116; Ex. P–0356.) Edgar, Dunn prepared an analysis finding possible cost savings to MasterCard members that could result from the implementation of smart cards. (*See* Ex. P–1116.) Despite senior management's belief that the Edgar, Dunn study was based on faulty assumptions, the Board resolved unanimously to fund the building of a smart card infrastructure, including setting industry-wide standards and developing specifications for various technical aspects of a smart card-based

payment transaction. (*See* Tr. 1844–45 & 1905–06 (Lockhart, MasterCard); Hogan (MasterCard) Dep. at 230–31; Ex. P–0356.)

Even by March 20, 1996, MasterCard management reported to the Board that there still was not a viable business case for smart card deployment in the United States. (*See* Ex. D–2784 at 2784009.) Management did believe, however, that in some regions of the world, MasterCard could have a business case to introduce smart cards. (*See* Tr.1907–08 (Lockhart).) Thus, MasterCard began exploring the possibility of investing in Mondex International, a smart card technology company. The MasterCard International Board voted unanimously to acquire a 51 percent interest in Mondex in November 1996. (*See* Ex. D–4199.)

Like MasterCard, Visa U.S.A. has the technology for chip cards, but it has "not been able to find a cogent business case or business model to develop the chip [card]." (Pascarella (Visa U.S.A.) Dep. at 272; *see also* Beindorff (Visa U.S.A.) Dep. at 114–15, 170–72 & 192–93.) With the exception of John Elliott, every witness to testify on the subject of smart cards has stated that he is unaware of any viable business case for the widespread deployment of smart cards in the United States. (*See e.g.*, Tr. 2227–28 (Saunders, Household/Fleet), Tr. 2383 & 2539; (Chenault, American Express); Tr.1907 (Lockhart, MasterCard); Tr. 1346 (Hart, Advanta/MasterCard); Wankmueller (MasterCard) Dep. at 20–21; *see also* Tr. 2855–56 (Golub, American Express); Tr. 3064–65 (Nelms, Discover); Krumme (JCB) Dep. at 27–29.) More than a decade after Elliot advocated the use of smart cards, neither Visa nor MasterCard has been able to demonstrate a viable business case for the wide-scale implementation of smart cards in the United States. This is so even though advances in

technology and standard-setting have eliminated or reduced certain of the obstacles to the early development of smart cards. Impediments remain, most notably cost and cost-bearing issues relating to wide-scale point-of-sale reterminalization. (*See* Tr. 5355–56 (Williamson, Visa Int'l).)

Only recently have American Express and certain individual bank card issuers begun to launch chip card programs in the United States. Those programs are limited to use on the Internet, not at the point of sale, so as to avoid the costs of merchant reterminalization. (*See* Tr. 4751–52, (Knox, Visa U.S.A.); *In Camera* Tr. 2252–55 (Saunders, Household/Fleet).) They require bringing the technology directly to the consumer in the form of a card reader to be used with the consumer's computer for card use on the Internet. (*See* Tr. 2752–53 (Golub, American Express); Tr. 3994–95 (M.Katz).)

Despite the overwhelming evidence that legitimate business considerations drove the associations' decision-making on smart cards, Professor Katz opined that there are "several facts that suggest the process and outcome were distorted by dual governance." (M. Katz Dir. Test. ¶ 232.) First, Prof. Katz points to the fact that in quantitative studies prepared by MasterCard and its consultants, MasterCard did not count any potential improved competitive position relative to Visa as an advantage. (*Id.*) However, it would be illogical for MasterCard to attribute any share-shifting benefit to pursuing a smart card initiative on its own. MasterCard had just concluded that even if all MasterCard and Visa issuers invested in smart card terminals its issuers would lose money.

Second, Prof. Katz pointed to the fact that MasterCard did not partner with American Express to combine scale and strengthen the business case for chip cards after Visa decided not to move

ahead. (*Id.* at 233) Given the results of the Booz, Allen study that it would have been unprofitable to the membership for MasterCard and Visa to jointly pursue smart cards, Professor Katz fails to explain why it could possibly have been profitable to the membership for MasterCard and American Express to pursue the implementation of smart cards.

Finally, plaintiff's expert points to Elliott's assertion "that banks in countries that did not have dual governance favored the introduction of chip cards as a means of gaining competitive advantage relative to Visa and its issuers, while U.S. members did not." (Tr. 3675–77 (M.Katz); *see* M. Katz Dir. Test. ¶ 233.) There is no evidence, however, that non-U.S. banks favored chip cards because they were from countries without dual governance. And Elliott himself conceded that international members wanted MasterCard to proceed with smart cards because "international members had, in many countries, received Government mandates that indicated an endorsement of chip card technology....[and] they had, in several countries, had their competing banks already involved in the issuance of a smart card." (Tr. 628–29 (Elliott).) Furthermore, Professor Katz acknowledged that "chip cards have come out in places that have been characterized and I believe do have higher telecommunications costs." (Tr. 3678–79 (M.Katz).)

Plaintiff's theory of competitive distortion also is inconsistent with the unanimous vote by MasterCard's Global Board to permit MasterCard to acquire a controlling interest in Mondex International for a commitment of over $150 million. (*See* Ex. D–2796 at 2796048–2796019.) The trial record demonstrates that MasterCard felt competitively disadvantaged with its internal chip development, and acquired a controlling interest in Mondex so that it could

compete against Visa and others. (*See* Tr.1916–17 (Lockhart, MasterCard).) The MasterCard Global Board understood that one of the reasons for MasterCard's desire to acquire a controlling interest in Mondex was to attack or compete with Visa. (*See* Tr.1903 (Lockhart).) At no point in time did any member of the MasterCard Board attempt to stop the Mondex acquisition to avoid harm to its Visa portfolio. (*See* Tr. at 1913 (Lockhart).)

Plaintiff's theory also fails to account for the fact that Visa and MasterCard currently have competing approaches to smart card technology. Visa's Open Platform program is based on Sun Microsystems' Java technology. (*See* Tr. at 3922 (M.Katz).) Visa invited other companies to participate in its Open Platform; Microsoft and British Telecom are members of the efforts. Recently American Express has switched to the Open Platform. (*See* Schapp (Visa Int'l) Litigation Dep. at 24–25.) MasterCard declined Visa's invitation to join; MasterCard continues to invest in and rely upon the Mondex technology for its smart card plans. Shortly after acquiring Mondex MasterCard created an industry Consortium to which it dedicated the Multos operating system for future development. (*See* Tr.1917 (Lockhart); Jacobs (MasterCard) Dep. at 127–28.) American Express joined initially (but as noted above has now switched to Open Platform) and Discover continues to cooperate with MasterCard and others in the MAOSCO Consortium. Visa is not a member of this Consortium. (*See* Jacobs (MasterCard) Dep. at 129, 182–83; Mannion (Discover) Dep. at 180; Gauthier (Visa U.S.A.) Dep. at 109–11.)

Plaintiff has also failed to demonstrate that MasterCard's decision not to pursue smart card implementation alone generated any adverse consumer welfare effects. Professor Katz conceded that he reached no conclusion as to whether there was in fact a business case for smart cards in the 1980s or whether smart cards would have succeeded in the marketplace to the benefit of consumers. (*See* Tr. 3667 (M.Katz).) He testified merely as to his belief that the decision-making process had been affected in some way. (*See id.* at 3666–67 (M.Katz).) He further admitted that the assertion, made at the Press Conference announcing this lawsuit, that smart cards have been delayed by a decade because of dual governance "is an oversimplification." (Tr. 3666 (M.Katz).) Finally, to the extent that chip cards would have reduced credit and fraud losses generally, John Elliott conceded modifications to magnetic stripe technology and other advances, have greatly reduced credit and fraud losses as a percentage of transaction volume. (*See* Tr. 549, 598 (Elliott, MasterCard).)

In support of its assertion that but for dual governance the world would be more competitive with respect to smart cards, plaintiff points only to the fact that consumers had to rely on American Express to innovate through its Blue Card. First, Blue does not have point of sale functionality, making the cost-benefit analysis of Blue quite different from the business case of smart cards functional at the point of sale. (*See* Tr. 793–95, (McCurdy, American Express); Tr. 2752–53 (Golub, American Express).) Second, MasterCard and Visa, independently, have made possible the technologies used in Blue. As noted, American Express initially relied on the Multos operating system which was developed by Mondex International in cooperation with, and supported financially by, MasterCard. Now American Express uses Visa's Open Platform. (*See* Tr. 4807–08 (Knox, Visa U.S.A.); Tr. 1039–40 (McCurdy, American Express).)

Plaintiff simply has not met its burden of proving that the associations' respective

decisions not to implement smart cards in the United States were linked in any way to anticompetitive behavior in general or to dual governance in particular.

### 2. Secure Electronic Transactions Over The Internet

In April 1995, Visa entered into an agreement with Microsoft to develop a global standard called Secure Transaction Technology ("STT") to secure e-commerce payments. (*See* Ex. D–0052.) Current and former Visa officials assert that the specifications were intended to be open and publicly available, although Visa hoped to achieve a competitive advantage with STT by being the first to market. (*See* Tr. 3445–46 (B. Katz, Visa U.S.A./International); Tr. 4630 (Herz, Visa Int'l); Herz Dep. at 162) Visa International and Microsoft also agreed that Microsoft would develop proprietary software products compliant with the specifications and receive a per transaction fee. (*See* Ex. D–0052; M. Katz Dir. Test. ¶ 235.)

In the summer of 1995, Visa International publicly announced its commitment to the development of an open payment security standard and through at least August 1995, Visa and MasterCard engaged in meetings and discussion to work toward a common standard. (*See* Tr. 4625, 4632 (Herz, Visa Int'l).) MasterCard CEO Eugene Lockhart wrote to Visa in August 1995 asking for their cooperation on a common protocol for Internet Security. When MasterCard refused to endorse the STT standard and ceased negotiations in September 1995, Visa International and Microsoft announced their standard at a press conference and published the STT protocol on the Internet. (*See* Tr. 4632–33 (Herz).)

According to Lockhart, MasterCard was concerned that the protocol that Visa and Microsoft were working on was not truly open because the specification did not disclose the application program interfaces to the Windows operating system, and favored a Microsoft application. In his view, STT would not have been an open, published standard because others could not read it and then write compatible application programs. (*See* Tr.1926 (Lockhart, MasterCard); *see also* Ex. P–0405 at MCJ 2774923–24.)

After the publication of STT, MasterCard, member banks, software vendors and technology companies including IBM and Netscape, who shared MasterCard's concerns that the Visa/Microsoft standard might not be open, non-proprietary and interoperable, began working toward a security standard of their own. (*See* Wankmeuller (MasterCard) Dep. at 46–47.) Within several weeks of the Visa Microsoft publication of STT, MasterCard published its Secure Electronic Payment Protocol ("SEPP") on the Internet. (*See* Tr. 3258 (B.Katz, Visa U.S.A./Visa Int'l); Tr. 4638 (Herz, Visa Int'l).)

In light of the now separate efforts of MasterCard and Visa, member banks and technology companies became concerned about the prospect of having two *de facto* standards in the marketplace; they wanted instead a common technical standard for interchange, settlement, authorization and secured transmission of transactions over the Internet. (*See* Tr.1939–40 (Lockhart, MasterCard); *see also* Ex. D–3170.) Dual issuers perceived two different technologies as costly and inefficient. (*See* Tr. 3521–23 (B.Katz, Visa); Dimsey (MasterCard/MBNA) Dep. at 401; Tr. 4638–41 (Herz).) Two different payment systems would require dual issuer banks to implement two standards to accept transactions. Merchants would have to have two different technologies at the market place, and consumers' software would have to accommodate both standards. In sum, multiple

standards would have caused duplicate costs for all parties. (*See* Tr. 4639–42; and 4686–90 (Herz).)

Pressure from all of these players in the industry pushed Visa and MasterCard to resume working together to create a joint specification based on the STT and SEPP specifications that ultimately became known as Secure Electronic Transaction ("SET") technology. (*See* Lewis (Visa Int'l) Dep. at 116–17; Hogan (MasterCard) Dep. at 149–52.) SET took the best of each specification "[s]o the result was that SET was significantly better from a technical design perspective than either of the predecessors had been." (Lewis Dep. at 117.)

Shortly after the release of SET in February 1996, Visa, MasterCard and other participants in the SET consortium solicited comments on the standard. American Express noted a specific requirement necessary to support the unique way in which American Express authorized transactions. Recognizing that a global standard needed to support business requirements of all payment brands around the world, the consortium changed the specification to include the American Express requirement. (*See* Tr. 4649–50 (Herz, Visa Int'l).) In December 1997 the first commercial production transaction involving the SET technology occurred; at around the same time the consortium formed a joint venture called SETCo to continue the development of the standard. (*See* Tr. 4646–47 (Herz); Tr.1940 (Lockhart, MasterCard).) American Express initially declined to join, but currently sits on the SETCo technical advisory board, permitting it to participate in directing the future of the standard. (*See* Lewis (Visa Int'l) Dep. at 151–52.) American Express has adopted the SET standard, meaning that merchants and cardholders can use SET with American Express transactions. (*See* Wank-

mueller (MasterCard) Dep. at 264–66.) Discover also declined to join as an equity holder. (*See id.* at 266.)

The plaintiff points to this chronology and to the statements of Visa executives Bennet Katz, Carl Pascarella and others to support its claim that Visa's agreement to cooperate with MasterCard both delayed the implementation of an internet security standard and was caused by dual governance. Plaintiff and its expert, however, have established no causal link between dual governance and any delay in implementing an Internet security standard.

As an initial matter, MasterCard never voted on Internet security standards at either the Board level or in any decision-making committee. Nor is there any evidence that "non-dedicated" directors of either MasterCard or Visa pushed the associations to cooperate in order to prevent either from gaining a competitive advantage over the other. Although plaintiff does correctly point out that two Visa directors at a Board meeting in October 1995 expressed a "need for a single standard," the minutes of the meeting reveal nothing to support plaintiff's claims that those directors were motivated by concerns about harm to their MasterCard portfolios if Visa were to independently market its Internet security technology. (*See* Ex. P–0770.)

The court finds that to the extent that dual-issuing member banks wanted MasterCard and Visa to work together in this area, the dynamic was driven by the nature of dual membership and dual issuance, not dual governance. There is no evidence that dedicated Visa issuers were more in favor of Visa pursuing a separate secured electronic transaction standard than non-dedicated issuers. (*See* Tr. 3699 (M.Katz).) The record reflects only that all banks had an interest in a single standard and in investing in a single infra-

structure to support that standard, regardless of how heavily weighted their portfolios were toward one association or the other. (*See* Tr. 4640 (Herz, Visa Int'l).)

The court also finds that the statements of Carl Pascarella (that he was forced to "come back" and work with MasterCard rather than pursuing a competitive advantage for Visa); of Bennet Katz before the FTC (MasterCard is trying to delay the process because it is behind Visa) and of Visa International in its submission to the European authorities (Visa and MasterCard's *members* put pressure on them to work together to develop a common technical standard) further reflect the operation of dual issuance and dual membership, rather than any anticompetitive conduct by dual board members. (*See* M. Katz Dir. Test. at ¶ 236; Pascarella (Visa U.S.A.) CID Dep. at 169; Dep. at 106–113; P–0901; Ex. P–0727 at VU 396161). Dual issuers understandably prefer a single set of back room procedures for all brands that they issue because multiple standards are inefficient and costly. (*See* Tr. 4674 (Hertz, Visa Int'l).) Indeed, Professor Katz conceded that the "banks would like some processes to be standardized ... [and] the desire for there to be some standardization is dual issuance." (Tr. at 3696:10–21 (M.Katz).) He further admitted that the entire industry—merchants, cardholders, software vendors and banks—saw value in having a single standard for an Internet security protocol. (*See* Tr. at 3696–97 (M.Katz).)

Plaintiff also has failed to introduce any evidence of consumer harm arising from the associations' pursuit of a joint security standard. In its Complaint, plaintiff alleges that the introduction of an Internet security standard was delayed as a result of MasterCard and Visa's joint activity. (*See* Cmplt. ¶ 94). The entire period of alleged delay, however, is about four months. Microsoft and Visa announced the availability of STT in late September 1995. (*See* Herz (Visa Int'l) Dep. at 15.) The joint Visa MasterCard specification, SET, was available by February 1996. (*See* Lewis (Visa Int'l) Dep. at 117.)

It is impossible to predict whether STT could have been brought to market any more quickly than SET; after its September announcement it still had to go through industry comment, revision, testing, commercial roll-out and adoption. (*See* Tr. 4648 (Herz).) Furthermore, it is unlikely that STT would have succeeded in becoming adopted in the marketplace, in light of the fact that SET, which comprises the best features of STT, has not. It is undisputed that SET has been a commercial failure and has not been implemented on a wide-scale basis. (*See* Tr. 3255 (B. Katz, Visa U.S.A./Int'l); Tr. 4002 (M.Katz); Beindorff (Visa U.S.A.) Dep. at 186–87.) One of the main reasons for the lack of penetration of SET is the success of the alternative SSL technology available to consumers from Netscape. (*See* Tr. 3698–99 (M.Katz).) Consumers and merchants are able to implement SSL at no cost and without any involvement by issuers, acquirers or the associations. (*See* Tr. 4001–03 (M.Katz).) Neither banks nor merchants have been persuaded that the investment in SET is justified by savings in fraud reduction or increases in incremental sales as a result of increased consumer confidence in the Internet market. (*See id.* at 4654; *see also* Beindorff (Visa U.S.A.) Dep. at 186–87 (there is no business case for SET as a security mechanism on the Internet; most merchants use and are satisfied with SSL).) Currently consumer demand for Internet security has been satisfied by this and other alternative competing products. (*See* Pindyck Dir. Test. at ¶ 116.)

Even if plaintiff is correct in asserting that cooperation and standardization in this area caused the security standard to come to market later than it would have, the introduction of two conflicting standards could have negatively impacted consumer welfare to a greater degree than any delay resulting from cooperation between MasterCard and Visa. As plaintiff's expert concedes, it is desirable to have some cooperation in setting the standards for the development of security technology for e-commerce. (*See* Tr. 3693 (M.Katz).) Plaintiff has not shown that these procompetitive effects were outweighed by the alleged four month delay in bringing the product to market. These facts support Professor Pindyck's opinion that there simply is no evidence of consumer harm arising from the preference of the associations to develop a joint security standard. (*See* Pindyck Dir. Test. at ¶ 116.)

### 3. *Comparative Advertising*

Plaintiff asserts that the dual governance structure of the associations historically has diminished comparative advertising. The court finds that Visa and MasterCard have generally refrained from naming each other in their ads and that on one occasion (the "Sisters" ad campaign) MasterCard did not name Visa in its advertising at the insistence of its U.S. Region Business Committee. The record also demonstrates, however, that throughout the years the associations had legitimate business reasons not to engage in comparative advertising and that currently and for some time advertising between the two associations has been highly competitive. Moreover, the court finds that no significant consumer harm arose from the 1992 "Sisters" ad decision.

The statements of former executives of Visa and MasterCard, Bennet Katz and Pete Hart, do establish that historically the associations have not attacked each other in their advertising in part because of "duality" or the "common interests of the associations." (Tr. 3192 (B. Katz, Visa U.S.A./Visa Int'l); *see* Ex. P–1042 at DOJTE000361; Tr. 1321 (Hart, Advanta/Mastercard).) Indeed, this was the policy of each association. (*See* P–0005 at 0014848; P–1212 at MCJ 2827244.) The testimony of Charles Russell, a former Visa CEO, corroborates this. (*See* Russell (Visa U.S.A.) Dep. at 116–17.)

The lack of comparison was also due in part, however, to the beliefs of management at MasterCard and Visa, as well as at American Express and Discover, that comparative advertising is not a superior method for brand promotion. Gene Lockhart testified that as CEO of MasterCard during 1995 and 1996, he chose not to name Visa in MasterCard ads because "I don't think you should spend your advertising money advertising somebody else's brand." (Tr.2028 (Lockhart, MasterCard); *see also id.* at 3122 (B. Katz, Visa U.S.A./ Visa Int'l) ("I'm not one that believes a lot in comparative advertising ... it made no sense to compare ourselves against a company that had a worse image than ourselves"); Hochschild (Discover) Dep. at 32–33 (comparative advertising was "not the strongest strategy"); Flanagan (MasterCard) Litigation Dep. at 61–2 ("We feel there are stronger ways to talk about our strength and superiority"); Child (MasterCard) Dep. at 125 (comparative advertising confusing to the consumer).)

There had also been a number of earlier legal disputes between MasterCard and both American Express and Visa relating to comparative advertising, (*see* Tr. 1399 (Hart, Advanta/MasterCard); Zebeck (Metris/Fingerhut) Dep. at 250; Tr. 3236–39 (B. Katz, Visa U.S.A./Int'l)), including a potential legal dispute between Visa and MasterCard regarding which association

had a greater number of merchant acceptance locations. This dispute was resolved in 1991 with an agreement between the associations not to claim superiority of merchant acceptance unless they could prove it. (*See* Ex. P–0321; Ex. P–0322.)

The specific example of the blunting of comparative advertising upon which the Government primarily relies is the MasterCard cancellation of the "Sisters" ad campaign. In 1992, MasterCard considered running an ad called "Sisters" that contained the tag line "No card is more accepted at home and abroad, not American Express, not even Visa." (Ex. P–0223.) The purpose of the ad was to put an end to the consumer perception that MasterCard was being accepted at fewer locations than Visa. (*See* Tr. 1318 (Hart, Advanta/MasterCard).) Members of the U.S. Region Business Committee—not members of the Global or U.S. Boards—were shown the ad and expressed concerns. In a May 1992 memo Peter Dimsey, then president of MasterCard's U.S. Region, advised the members of the Business Committee that "[t]he claim in the 'Sisters' commercial does the best job of any claim we've tested in restoring perception (of acceptance) to what it actually is—unsurpassed." He then went on to advise them that "nevertheless" the ad would be changed to "no card is more accepted in more places at home and abroad than MasterCard." (Ex. P–0223 at HI025698.)

Although Dimsey and Tonneson, a bank representative at the meeting, have testified that they recall at least one concern of the members had to do with the need to be sure of the accuracy of the acceptance claim in order to avoid litigation over unfair advertising, (*see* Dimsey (MasterCard/MBNA) CID Dep. at 159, 177–78; Dimsey Dep. at 160, 171; Tonneson (Visa Int'l) Dep. 37–38.) I find that the contemporaneous documents—the May 1992 minutes from the Business Committee and the memorandum from Dimsey to the Committee members—demonstrate that the Business Committee's paramount concern was whether the "Sisters" ad "benefitted MasterCard and did not negatively impact Visa" and that they had a "desire to build two strong bankcard brands." (Ex. P–0223, P–0301; *see* Norton (MasterCard) Dep. at 125–26; Tonnesen (Visa Int'l) Dep. at 38.) Clearly, the members of the Committee were motivated by concerns about their Visa portfolios.

While there is no dispute that neither the MasterCard U.S. Region Board nor the Global Board ever voted or opined on MasterCard's decision not to run the comparative tag line, it is also clear that it was the Business Committee's negative reaction that caused the ad to be cancelled. (*See* Heuer (MasterCard) CID Dep. at 21; Dimsey (MasterCard/MBNA) CID Dep. at 18; Tr. 2175 (Saunders, Household/Fleet); Ex. P–0224.) However, as Professor Katz testified, this incident illustrates only that "*issuers* with interests in both systems will have these reduced incentives. I don't know that the incident by itself shows the power of governors over issues." (Tr. 3652–53 (M.Katz).)

The plaintiff also points to the fact that MasterCard Canada ran the comparative ad in Canada. Because Canadian banks are only permitted to issue one brand, however, that fact provides no insight into whether dual governance as opposed to dual membership or dual issuance caused the American advertising decision. As for the ad's effect on the consumer, when a comparison is made between the perceived acceptance gap in Canada with the comparative advertising and the perceived acceptance numbers in the United States without the comparative tagline, the U.S. numbers are slightly better. (*See* Tr. 5767 (Flanagan, MasterCard); Ex. D–3045 at

MCJ2826704; Ex. D–3049 at MCJ2827319.)

Finally, the Government's expert could point to no valuable advertising information that consumers lacked as a result of MasterCard's or Visa's decisions regarding comparative advertising. (*See* Tr. 3655 (M.Katz).) He further acknowledged that the alternative tag line "No Card is More Accepted on the Planet" could have improved MasterCard's perceived acceptance gap with Visa. (*See id.* at 3945) Finally, he admitted that if the alternative ad achieved the same results in terms of closing the acceptance perception gap, the decision to not run the "Sisters" ad had no adverse consumer welfare effects. (*See id.* at 3947–48.)

As a theoretical matter, of course, the more informative ads are, the more consumer welfare is enhanced. However, as Dr. Rapp opined, "it takes somebody who understands the way consumers receive advertising, a specialist in that, to know whether or not using a less comparative phrase would have any less impact." (Tr. 5458–59 (Rapp, Visa U.S.A.); *see also* Rapp. Dep. 379–81.) In this case, MasterCard's current chief advertising executive, Larry Flanagan, credibly testified that consumers do not gain more information from an advertisement using the language "no card is more accepted-not Visa, not American Express" as opposed to "no card is more accepted on the planet." (*See* Tr. 5783–84.) In his opinion there may be more negatives than positives associated with comparative advertising, chief among them being the potential to confuse consumers. (*See id.* at 5778–79.)

Since 1997 Mastercard has engaged in the well-known and very successful "Priceless" ad campaign. For the previous several years MasterCard International had been losing share to Visa; one objective of the Priceless campaign was to reverse this

share decline. (*See* Tr. 5792; Ex. D–3557; Tr. 5771–73; 5786–87; Heuer (Master-Card) Dep. at 200.) Plaintiff's expert agreed that one of the effects of the Priceless campaign is to take market share from Visa. (*See* Tr. 3653–54 (M.Katz).) He also acknowledged that MasterCard's current *non-dedicated* Board approved the Priceless campaign. (*See* Tr. 3654 (M.Katz).) This example of the Master-Card Board authorizing MasterCard to attempt to shift share away from Visa runs squarely counter to the Government's dual governance theory.

Likewise, since at least the mid–1980's Visa has used its highly successful "It's Everywhere You Want To Be" ad campaign. I credit the testimony of a number of Visa executives and member bank representatives that the purpose of the campaign was to distinguish Visa from Master-Card by linking the Visa brand to the more upscale brand image of American Express. (*See* Tr. 4355–56 (Beindorff, Visa U.S.A.); Russell (Visa U.S.A.) Dep. at 115–16; Soderstrom (Visa Int'l) Dep. at 26; Schapp (Visa Int'l) Dep. at 66; Saeger (Visa U.S.A.) Dep. at 98–99.) This ad "attempted to . . . leave MasterCard where it was and leapfrog (Visa's) image over American Express . . . And the resultant shift in market share between Visa and MasterCard has to attest to that fact." (Tr. 2243 (Saunders, Household/Fleet).) For many years Visa has also regularly compared its services and products to MasterCard's in promotional materials and advertisements directed to member banks and argued that Visa was the superior association. (*See* Tr. 4983–85; 4994 (Schall, Visa U.S.A.); Ex. D–1887; Ex. D–1892; Ex. D–1894.)

Accordingly, although plaintiff did establish that in the past dual governance has led to decreased advertising competition between the associations, it failed to estab-

lish that any consumer harm resulted. Furthermore, plaintiff failed to demonstrate that at present advertising competition between the associations is anything but vigorous.

### 4. *Premium Cards*

In 1996, Visa had conducted consumer research and determined that there could be an opportunity for Visa to develop a premium product, tentatively called "Visa Platinum," to compete in the above-gold segment of the market. (*See* Tr. 4335–36 (Beindorff, Visa U.S.A.); *see also* Stock (Visa U.S.A.) Dep. at 88:18–92:19 (market research indicated opportunity at higher end of credit card market).)

As part of the development of the premium card, Visa U.S.A. marketing staff met with representatives of major member banks to solicit their input. (*See* Tr. 4337 (Beindorff).) Michael Beindorff, then the Executive Vice President of Marketing and Product Management for Visa U.S.A., also conducted an ad hoc meeting of key members of the Visa U.S.A. Marketing Advisors Committee. At this meeting, Visa management made a presentation on a proposed Visa Platinum card product. (*See* Tr. 4337–39 (Beindorff).) The advisors recommended against moving forward with the premium card at that time and suggested that Visa provide platform specifications for a less costly Platinum card product which had already been developed and introduced into the market by several issuers. (*See* Tr. 1139 (Tylenda, Fleet); Ex. P–0211.)

The plaintiff argues that Visa did not move forward with the product because its Visa Marketing committee members were concerned about its effect on their MasterCard portfolios. Based upon the testimony of Beindorff and James Tylenda, who represented Fleet at the meetings, as well as the contemporaneous documents, the court finds that Visa was unable to get approval from its members for legitimate business reasons rather than because of concern for their MasterCard portfolios.

Although there were projections that the new card would take business from existing MasterCard portfolios, a far greater percentage (49 percent) of business was projected to come from existing Visa portfolios. According to Tylenda, he and other Visa advisors considered this cannibalization rate for Visa cards to be, by itself, sufficient to pose a question about the advisability of a premium product. (*See* Tr. 1197 (Tylenda).) Tylenda also testified that the concerns raised by the committee members related primarily to the economics of providing the proposed services on the card—that is whether it would be profitable for issuers given the projected cost of the product. Some of the proposed services, such as a concierge service, would have been very expensive to provide and the recommendation expressed by the advisors to Visa staff not to go forward with the product design was based upon their belief that the product could not be marketed cost effectively. (*See* Tr. 1197–99 (Tylenda, Fleet).)

Beindorff corroborated Tylenda, testifying that the reaction of the committee members to the product was mixed, with some advisors expressing concerns about whether there was a positive business case for introducing a premium card product and others objecting to the association introducing a Platinum product when banks (or at least large banks) could develop a premium card product independently. (*See* Tr. 4337 (Beindorff, Visa U.S.A.).) Beindorff testified that the biggest concern for some of the larger issuers was the fact that "they were working on their own products ... and they preferred to have a head start in the marketplace relative to their other Visa competitors than to allow

Visa to develop a product that anybody would be able to issue." (Tr. 4339–40, 4342; *see also* Ex. D–0140 at VU1017714R.) As early as 1996, certain banks were developing and issuing their own premium cards to consumers. (*See* Tr. 4341–43 (Beindorff); *see also* Ex. P–0822 at VU1371785; Ex. D–2573 at 2573015 (MasterCard "[g]ave MBNA approval to issue a Platinum Card").) A number of the advisors who opposed the Visa-sponsored premium product had developed a premium card at their own respective banks. (*See* Stock (Visa U.S.A.) Dep. at 92–96.)

Visa nonetheless continued to pursue development of a premium card product. (*See* Tr. 4343–44 (Beindorff, Visa U.S.A.).) However, Visa management felt that it could no longer refer to its proposed premium product as "Visa Platinum" because of the banks which had already used Platinum for their cards. (*See id.* at 4344–45 (Beindorff).) While Visa established minimum parameters for cards to be issued as Visa Platinum cards, it turned its efforts to developing a premium product which would be superior to the platinum product. (*See id.* at 4343–44 (Beindorff); *see also* Ex. P–822 at VU1371789–90.)

After MasterCard introduced the premium product World Card in 1997, Visa developed a proposal for the Visa Signature card. In January 1998, Mr. Beindorff presented this proposal to the Product Development and Marketing Committee of the Visa U.S.A. Board of Directors. The Signature card was expected to take share from other brands in the marketplace, including MasterCard. (*See* Tr. 4345–46 (Beindorff, Visa U.S.A.).) In fact, Mr. Beindorff's presentation projected that, if introduced, the Visa Signature card would take seven percentage points from American Express and six percentage points from MasterCard. (*See id.* at 4346–48

(Beindorff)); Ex. D–2027 at VIF0686527.) Although the committee knew that the new product would take share from Master-Card, it endorsed the Visa Signature card proposal. (*See* Tr. 4345–46, 4350 (Beindorff).) In fact, the potential to shift share from MasterCard was one of the reasons the proposal was endorsed by the committee. (*See id.* at 4351 (Beindorff).) The Board of Directors subsequently approved the Visa Signature card in January 1998 with full knowledge that it was expected to take share away from MasterCard. (*See id.* at 4352 (Beindorff).); *see also* Ex. D–151 at VU0009119.)

The court finds that the plaintiff has failed to prove that there was (1) any delay in Visa U.S.A. introducing its premium card product because of "dual governance," that is, due to efforts by non-dedicated board banks; or (2) that any harm to competition or consumers resulted.

## C. Governance Duality and Alleged Admissions by Visa and Master-Card Executives

Plaintiff's other direct proof in support of its theory that dual governance is anti-competitive consists of statements made about "duality" by MasterCard and Visa executives during the 1980's and into 1993. The court has reviewed the testimony and documentary record and finds that the Visa and MasterCard executives who have expressed concerns about duality generally have used the term to refer to their concerns about dual issuance rather than dual governance. The court thus grants little weight to these references in assessing the competitive harm directly attributable to "governance duality." (*See* Tr. 3110–11, 3113, 3132–33, 3138, 3142–43, 3191–92 (B. Katz, Visa U.S.A./Visa Int'l); Tr. 1304–05, 1308–09, 1441–42 (Hart, Advanta/Master-Card); Russell (Visa U.S.A.) *Mountain-*

*West* Tr. 1397; *MountainWest* Dep. at 70–71. *See also* Tr. 3163, 3176–77, 3373–75, 3417–22, 3408, 3404–05, 3337–50 (B. Katz, Visa U.S.A./Int'l); Russell Dep. at 107–08.)

Even plaintiff's expert admits that he has never seen the term "dual governance" used in any business documents from Visa or MasterCard. (*See* Tr. 3717(M.Katz).) There is also no evidence in the record suggesting that the term was used in the payment cards industry prior to the outset of this litigation. (*See id.* at 3517 (M.Katz).) Rather, the record reflects that the term "duality" is commonly understood to mean issuance and acquiring duality—the ability to maintain membership and any corresponding ownership rights in each association.

In particular, plaintiff relies upon the testimony of former Visa U.S.A. and Visa International General Counsel Bennet Katz, who has testified for many years about his views on duality. As he made clear, though, from the outset of duality in the 1970s, he was not concerned about the governance issue but rather the "system duality" of members in both associations issuing both cards. At this trial, and contrary to the plaintiff's interpretation, he reaffirmed that he did not consider governance duality part of his concept of duality. (*See* Tr. 3113 (B. Katz, Visa U.S.A./Visa Int'l).) In his view, duality means that the banks are "owners and issuers or acquirers, that they're dual, they take on more than one product to issue..." (*Id.* at 3112.) Owners and members are treated relatively synonymously, inasmuch as members who joined the association received certain ownership rights. (*See id.* at 3176–77.)

At this trial Bennet Katz also stated that the duality "problem is in the membership and that's where I wanted to solve the problem." (*Id.* at 3163:5–10.) Indeed, when examined on statements from a number of documents both from the *Mountain*

*West* litigation and elsewhere, Katz reaffirmed that those statements spoke to "issuance duality," not governance duality. (*See id.* at 3373–75; 3417–22; *see also* Ex. P–0196 at 20101403; Ex. P–0007 at 0024160; Ex. P–0642; Ex. P–0984P1022 at 20101200 (all of which refer to "issuance duality").) From Katz' perspective, "if you want to solve the problem, you would roll back duality, but ... at this stage of the game I am not so sure the cure wouldn't be worse than the crime." (Tr. 3408.)

Similarly, Charles Russell's concerns are driven by members belonging to both associations and issuing both cards, as opposed to governance duality. Russell scoffed at a hypothetical structure for Visa where governors would be owners and other issuers would be licensees with no governing rights. (*See* Russell (Visa U.S.A.) Litigation Dep. at 107–09 ("You're dancing around an issue ... I'm still issuing both products. I might not have it at the board level, but I've got it at the other level. But I can still play one association off against the other. This isn't competition. It's a joke ... If you want to do something with straightening out and getting competition at the association level or the banks' level back into this, what you do is you separate. You don't dance around it. And you're dancing around it ... [y]ou roll back duality").) Mr. Russell made it quite clear that rolling back what he called "duality" meant telling banks they had to issue solely Visa or MasterCard and in either event, not permitting dual issuance with American Express, Discover or any other network.

Bennet Katz also testified that he was not aware of any instance during his tenure on the Visa International Board, which began in 1992, where a board member—"dedicated" or not—sought to prevent Visa from supporting an initiative because of the potential negative impact on Master-

Card. (*See* Tr. 3394–95 (B. Katz, Visa U.S.A./Visa Int'l).) He did testify that prior to 1992, while he sat on the Visa U.S.A. board, there were occasions when Visa U.S.A. was asked by members to coordinate certain initiatives with Master-Card. These projects, however, were fully disclosed to the Justice Department. For example, in the 1980s MasterCard and Visa were cooperating on a joint debit product, Entrée, as well as on warning bulletins and chargebacks. (*See* Ex. D–4181 (1986 letter from MasterCard General Counsel to Antitrust Division discusses with Division representatives regarding a "joint/common operating rules effort," attaching "a summary of the proposed Joint Debit Card program" and indicating date and time of future meeting between the associations and Division representatives to discuss proposed Joint Debit Card program).)[13] In particular, the efforts by members to drive Visa and MasterCard cooperation on warning bulletins, charge-back rules and software changes were all operational in nature and promoted efficiencies in the network systems by reducing duplication and cost. (*See* Tr. 3356–60; 3413–17).) It is uncontested that dual issuance creates incentives to standardize the back room operations at the issuing institution, and these efforts are consistent with those incentives. *(See id.* at 3638 (M.Katz).) It is also true that cooperation in these areas might have been procompetitive because of the cost savings; cooperating on innovation, unlike agreements to raise prices or reduce output, is much harder to categorize as anticompetitive, primarily because such cooperation may reduce prices to the consumer.

Plaintiff also points to a 1992 letter from the General Counsel of MasterCard to the Department of Justice as an admission that governance duality restrains competition. (*See* Cmplt. ¶ 62; M. Katz Dir. Test. ¶ 208.) In fact, the letter makes specific reference to common membership, not the Government's concept of governance duality. The letter was written in an unsuccessful attempt to convince the Department of Justice to allow MasterCard to place representatives on its board from banks which also had representatives on Visa's board. MasterCard argued that bank consolidations had limited the number of large traditional banks available to serve on the MasterCard board. The Complaint quotes the letter: "MasterCard and Visa simply do not 'compete' in any conventional business sense."

This sentence must, however, be read in full context:

> MasterCard and Visa do not "compete" in any conventional business sense. It is, in fact, their members, and not MasterCard and Visa, which issue the cards and sign up merchants. It is true MasterCard and Visa "compete" to maintain the value of their respective trademarks, and the goodwill associated with them. And they compete for the hearts and minds of members but it is those members which compete with each other in the marketplace and price the services to merchants and cardholders.

(Ex. P–0303 at MC 0029832.)

It is evident that MasterCard was asserting that, although the two associations compete, the most important competition for consumers—interest rates, fees, etc.—occurs at the issuer level where neither association operates.

Plaintiff places perhaps the most weight on a MasterCard memorandum dated Sep-

---

**13.** The joint debit project was discontinued after a state-driven legal challenge, and debit has been offered on a non-dual basis for ap- proximately fifteen years. (*See* Tr. 3354–56:14; 3412–13 (B. Katz, Visa U.S.A./Visa Int'l).)

tember 1992 from Peter Dimsey, U.S. Region President of MasterCard, to the MasterCard International U.S. Region Board of Directors in which he responds to a report distributed to the Visa U.S.A. Board by Visa's management. (*See* Ex. P–0318.) In fact plaintiff's counsel stated that "it's one of the more extraordinary documents I've ever seen in a case because it capsulizes the whole case." (Tr. 4187.) In particular, plaintiff has relied on a line in the memorandum which states that "the interests of the MasterCard and Visa Boards are fundamentally identical" to support its position regarding the anticompetitive effect of dual governance. When viewed in its entirety and in context, however, the memorandum reflects just the opposite—the heated competition between the two associations.

A review of the entire document reflects that Mr. Dimsey was responding to Visa's assertion that the actions of MasterCard's Board were threatening the profitability of MasterCard's traditional bank members and failing to represent the interests of those traditional members because of the influence of non-traditional (monoline) banks sitting on MasterCard's U.S. Board. (*See* Ex. P–0318 at MC0144100, MC0144105, MC0144107.) Thus, Mr. Dimsey was simply responding to this charge by stating that MasterCard's Board, like Visa's Board (or the Board of any association or corporation), was acting in the best interests of its members or shareholders. (*See* Tr. 1329 (Hart, Advanta/Master-Card).) In MasterCard's case, the Board was acting in the best interests of both its traditional bank and non-traditional financial institution members. (Dimsey (MasterCard/MBNA) CID Dep. at 209–12.)

Importantly, the memorandum goes on to describe just how MasterCard's Board was acting in the best interests of its members—by innovating and competing with

Visa. Indeed, on cross-examination, Professor Katz acknowledged that the memorandum reflects a number of areas of competition between MasterCard and Visa. (*See* Tr. 3962–66 (M.Katz).) Perhaps most significantly, the memorandum reflects that MasterCard's Board was engaging in competition by promoting a differentiated MasterCard brand and encouraging share-shifting from Visa to MasterCard—the type of activity that plaintiff contends does not occur because of dual governance.

The court finds that in their totality these so-called "admissions" are evidence that historically "duality" has led to some blunting of competitive incentives. It is equally clear however that the speakers were referring to dual issuance, ownership or membership, rather than to dual governance. These statements are not admissions that anticompetitive decisions have been made by "non-dedicated" Board members and do not support a theory that a Board of governors comprised solely of governors with portfolio skews of 80% or above will result in a more competitive structure. Plaintiff's arguments regarding these statements are also undermined by the record of competition between the associations demonstrated by the defendants. Lastly, whatever they may say about dual governance, the cited statements have little relevance in today's market.

**D. Plaintiff's "Dual Governance" Theory Is Totally Inconsistent With The Record of Vigorous Competition Between MasterCard And Visa**

1. *Innovations*

Professor Katz' theory is that non-dedicated association governors, those representing member banks issuing more than 20 percent of their card portfolio in the other association, will have a reduced incentive to support innovation competition

which shifts share between the associations. The record is replete, however, with examples of competitive initiatives by both associations, taken during periods of time when their boards were not comprised of dedicated governors, aimed at exactly that—shifting share from one association to the other.

Both associations moved from inefficient, labor-intensive, paper-based systems to sophisticated electronic systems and have continued to upgrade their systems and to provide fraud and loss controls and in doing so have taken different paths in competition with each other. (*See* Tr. 4483–84 (Dahir, Visa U.S.A.) (direct correlation between Visa's mission to increase member profitability and its innovations); Tr. 4852–53 (L. Elliott, Visa Int'l) (systems innovations intended to lower member costs and to get a competitive advantage over MasterCard).)

Specifically, Visa has made continuous improvements to its VisaNet system since it was implemented in the 1970's. (*See id.* at 4849–54 (L. Elliott, Visa Int'l); Ex. D–4515 (chart of significant VisaNet innovations over the last 30 years).) These innovations were instituted (1) to lower costs for members and therefore encourage them to issue Visa cards and send transactions through VisaNet on the acquiring side, and (2) to gain a competitive advantage over other card systems, specifically over MasterCard. (*See* Tr. 4852 (L. Elliott, Visa Int'l).)

Similarly, MasterCard has made continuous efforts to improve and upgrade its systems. Since the 1980s, it has had in place a "Systems Enhancement Strategy" (formerly referred to as OMNI). This strategy currently involves rewriting al-most all of the core MasterCard systems to upgrade processing and provide more flexibility to members. (*See* Africk (MasterCard) Dep. at 27–31; Tr. at 5565–66 (Selander, MasterCard).)

One major Visa systems innovation was PaymentService 2000 (PS2000), implemented in 1993 as a major upgrade to the VisaNet system. (*See* Tr. 4509 (Dahir, Visa U.S.A.); Tr. 4865 (L. Elliott, Visa Int'l).) Visa actively marketed the advantages of PS2000 to encourage members to issue Visa cards instead of MasterCard. (*See* Brooks (Visa U.S.A.) CID Dep. at 410–11; Derman (Visa U.S.A./Visa Int'l) Dep. at 75–77; Blewett (BancOne/First U.S.A.) Dep. at 87–89 (Visa used PS2000 as a selling point to a predominantly MasterCard issuer).) In 1994, in response to Visa's PS2000 program, MasterCard introduced its Interchange Compliance Program. This program links authorization and clearing processes but in a very different way than Visa's program does. (*See* Africk (MasterCard) Dep. at 54–55).)

Visa also continued to innovate in fraud detection and prevention, both to reduce costs for members and to compete with MasterCard. Between 1989 and 1994 Visa implemented three anti-fraud systems: Address Verification Service; Card Verification Value and Cardholder Risk Identification Service. Each was successful in reducing fraud rates and created a competitive advantage for Visa over MasterCard. (*See* Tr. 4856–4861, 4864 (L. Elliott, Visa Int'l).)

None of these Visa fraud innovations—AVS, CVV or CRIS—was developed in cooperation with MasterCard, nor were they shared with MasterCard. (*See id.* at 4857, 4859–60 (L.Elliott).)[14] To the con-

---

14. During Fran Schall's cross-examination, plaintiff showed her a letter (not authored or received by Ms. Schall) suggesting that Visa agreed to offer to share its CVV technology with MasterCard, but only after MasterCard had independently developed similar technol-

trary, Visa promoted these fraud services to members in comparisons with Master-Card and other card brands. (*See, e.g.,* Tr. 4981–84 (Schall, Visa U.S.A.).) Throughout the 1980s, MasterCard further improved its systems by implementing Banknet, MasterCom and other means to combat fraud. It also introduced the laser hologram as an antifraud device. (*See* Tr. 526–28, 455 (J. Elliott, MasterCard); Af-rick (MasterCard) Dep. at 17.)

Visa also has made continuous efforts to increase merchant acceptance and to provide better products and services to cardholders. (*See* Tr. 4478–80 (Dahir, Visa U.S.A.); Tr. 4976–79 (Schall, Visa U.S.A.); *see also* Rapp (Visa U.S.A.) Dir. Test. at 21 (listing some of the major innovations by Visa from the 1970's to the present).) Many of these innovations by Visa were designed to differentiate Visa from MasterCard. (*See, e.g.,* Russell (Visa U.S.A.) Dep. at 41–42; Tr. 4852 (L. Elliott, Visa Int'l).)

For its part MasterCard was the first to introduce co-branded cards on a wide-scale basis. MasterCard distinguished itself by offering greater flexibility than Visa in designing co-branding programs. (*See* Ex. D–2603; Ex. D–3001.) In 1990, Master-Card unveiled a co-branding strategy that resulted in numerous partnerships and card offerings. These co-branding deals contributed to the development of comprehensive rewards programs for cardholders. (*See* Pindyck Dir. Test. at ¶ 66.) MasterCard's co-branding programs were successful in shifting share from Visa to MasterCard. (*See* Tr. 3976–77 (M.Katz); Tr. 4515–17 (Dahir, Visa U.S.A.).)

MasterCard also introduced the purchasing card well before Visa. The pur-

chasing card is designed to be used by corporations to pay for goods and services and to compete with other forms of payment, including Visa cards. (*See* Tr. 1404–05 (Hart, Advanta/MasterCard).) Master-Card was also the first to introduce a fleet card. A fleet card allows companies to manage their vehicle fleets by issuing a payment card to cover maintenance and operating costs for those fleets. (*See id.* at 1954–55 (Lockhart, MasterCard).)

MasterCard has continually attempted to improve its commercial card products, including corporate, purchasing and fleet cards, by introducing innovative card features. (*See* Tr. 5569–70 (Selander, MasterCard).) For example, in 1997 MasterCard introduced an innovative premium card product known as the World Card. It was the first card product to offer this combination of features, targeted at high-spend business travelers interested in a product with no preset spending limit. (*See* Tr. 5642–43 (Selander, MasterCard); Ex. P–1104 at MCJ0000283–284.)

*2. A History of Share–Shifting Competition*

During the 1980's MasterCard's share had fallen sharply. (*See* Tr. 1382–83 (Hart, Advanta/MasterCard).) In contrast to Visa, and in order to capture market share from Visa, MasterCard permitted non-bank corporations into the credit card business, including AT & T, GM and GE. Monoline banks (banks without branch systems) also entered the marketplace in the early 1990s with notable success. MasterCard welcomed these new entrants into the MasterCard association and bene-fitted as these new entrants rapidly built their card portfolios. (*See id.* at 1363–64

---

ogy. (*See* Tr. 5029:1–19 (Schall, Visa U.S.A.).) The letter was never shown to Linda Elliott, even though it was authored by her superior, Roger Peirce. In any event, Ms. Elliott, who

had direct responsibilities for VisaNet and the related services, testified unequivocally that CVV was never in fact shared with Master-Card. (*See id.* at 4859–60 (L.Elliott).)

(Hart).) Visa was less willing to allow new entrants to join the associations, because of questions about whether this would be fair to the existing members that built the association. (*See id.* at 4511–13 (Dahir, Visa U.S.A.).)

While Visa studied the membership issue, it declared a moratorium and allowed no new non-bank members to join. As a result, all of the new issuers joined the MasterCard association. (*See id.* at 1385–86 (Hart); *id.* at 4514 (Dahir).) Master-Card gained share from Visa as a result of its alliance with these nonbanks and mono-lines. (*See id.* at 4516–17 (Dahir); *id.* at 1386 (Hart); *see also* Ex. D–3111 at 31110022 (MasterCard's share for general purpose credit cards increased from 30.7% in 1991 to 32.2% in 1992).) Visa's strategy to counter this share shift by marketing itself as the association for traditional issuers was not successful because the most successful and fastest growing issuers in this time period were non-banks and mo-nolines. (*See* Tr. 4561–62 (Dahir).) [15]

During the same time period, co-brand-ed card products became more prevalent, heavily promoted by new issuers such as MBNA. (*See id.* at 4514 (Dahir).) Co-branding is a partnership in which the card issuer joins its brand with a third party's brand to create an attractive value proposition for cardholders. (*See id.* at 4514–15 (Dahir).) Although the largest and best known co-branding programs are airline cards, today there are thousands of other co-branded cards available to con-sumers. During the early 1990s, when there was also a membership moratorium at Visa for non-banks, Visa's co-branding

rules were far more restrictive than Mast-erCard's. (*See id.* at 4516–17:12 (Dahir).)

While MasterCard was gaining the ma-jority of the new card issuance, Visa's management was becoming increasingly concerned about Visa's declining share. From 1991 to 1993, Victor Dahir, the Chief Financial Officer of Visa U.S.A., presented a chart showing the relative performances of Visa and MasterCard to the Board of Directors and warned of the considerable risk that, given the rapid number of new cards being issued by new entrants through MasterCard, Visa was going to lose share to MasterCard. This became reality in early 1993, when the results of the rapid growth of the General Motors program (which issue only MasterCard) caused MasterCard to gain sales volume share at Visa's expense. (*See id.* at 4516–17 (Dahir); *id.* at 1386–87 (Hart, Advan-ta/MasterCard); *id.* at 1960–61 (Lockhart, MasterCard); Ex. D–3111 at D3111022.)

MasterCard's success with new entrants and co-branded programs in the early 1990s led to Visa's decision in 1993 to enter the co-branding arena and compete direct-ly with MasterCard for these programs. In early 1993, when Visa experienced loss of share against MasterCard, the Visa U.S.A. Board of Directors was immediate-ly concerned and instituted a number of significant changes. Most notably, in Au-gust 1993, Carl Pascarella was appointed as the new President and Chief Executive Officer. Mr. Pascarella indicated to the Board of Directors that he was only willing to assume leadership of Visa if it competed more aggressively against MasterCard.

---

**15.** While MasterCard was open to non-banks such as AT & T, Visa's membership was pri-marily comprised of commercial banks. Dur-ing this time period, one of the options that Visa considered to maintain or gain share was a loyalty program designed to skew dual members toward Visa through cash incen-tives. (*See* Russell (Visa U.S.A.) *Mountain West* Tr. 1435.) While this loyalty program was not adopted in the early 1990s, the same concept forms the basis of the current Visa partnership program. (*See* Tr. at 4536–37 (Dahir, Visa U.S.A.).)

The Board accepted his terms. (*See* Tr. 5137 (Pascarella, Visa U.S.A.).) [16]

At Mr. Pascarella's first board meeting in October 1993, a resolution was passed at his urging giving Visa management the authority to approve proposed card programs, including co-branding programs. (*See id.* at 4519–20 (Dahir); Ex. P–0003 at 10; Tr. at 5141 (Pascarella).) Visa devoted tremendous marketing resources to its drive to obtain new co-branding programs. (*See* Tr. 5141–42 (Pascarella); Tr. at 1963–64 (Lockhart, MasterCard).) In February 1994, Visa U.S.A. adopted a program for co-branded cards, including cash incentives that would be provided to members to offset the cost of issuing and promoting these new cards.[17] Visa also offered other services to members to compete with MasterCard for co-branding programs.

Visa reversed its loss of share to MasterCard following Mr. Pascarella's "call to arms." In an early speech to Visa employees, Mr. Pascarella stated "The message is simple: Kill MasterCard." (Ex. P–1228 (video clip of speech); *see also* Tr. 5138–39.) Within six months, Visa was winning the majority of the co-branding programs and its share began to increase again.

(*See* Tr. at 4520–21 (Dahir, Visa U.S.A.); Ex. P–1165, Exhibit B; Tr. 5003–04 (Schall, Visa U.S.A.).) As the competition for co-branded programs continued to increase, both associations raised the cash incentives that they offered to members. (*See* Tr. 1218 (Tylenda, Fleet); *id.* at 5004 (Schall); *id.* at 4523 (Dahir).) The use of cash incentives also spread into other areas. Specifically, issuers who were conducting large-scale, national direct mail solicitations began to demand and receive cash incentives from the associations. (*See id.* at 4521–25 (Dahir).) MasterCard member relations employees constantly worked with members to craft direct mail solicitations that would provide a greater mail share for MasterCard. (*See id.* at 1972–73 (Lockhart, MasterCard); Flood (MasterCard) Dep. at 27.) Visa U.S.A. President and CEO Carl Pascarella testified that "we were in a very, very competitive environment where share of mail is very important." (Pascarella Dep. at 133.) As the associations battled for mail share, large issuers were negotiating for and obtaining per card payments in return for an agreement to have a large mail solicitation predominantly or exclusively devoted to one association.[18]

---

**16.** In June 1993, Visa International also adopted a competitive strategy of differentiating itself from MasterCard in order to secure a greater share of Visa issuance from dual members. (*See* Tr. 3430–3431, 3434–35 (B. Katz, Visa U.S.A./Visa Int'l); Ex. P–0664.)

**17.** Plaintiff has suggested that these co-branding incentive payments were made disproportionately to board banks. (*See* Tr. 4574–80 (Dahir, Visa U.S.A.); Ex. P–0748; Ex. P–1320, Ex. P–1321.) In fact, Visa offered these incentive payments on equal terms to all members that went forward with co-branding programs. (*See* Tr. 5005–06 (Schall, Visa U.S.A.).) The 15 to 20 banks that received incentives were the only issuers that were creating co-branded card products. (*See id.* at 5004–05 (Schall).) Similarly, the statistics in 1996–97 show that while a majority of

MasterCard's total incentive payments (including those for co-branding and other programs) went to the large issuers who happened to sit on the Board, a substantial amount of payments ranging between 30–35 percent went to non-Board members. (*Compare* Ex. D–4269 *with* Ex. D–4270.)

**18.** As with co-branding program incentive payments, plaintiff has suggested that incentive payments for direct mail solicitations were paid selectively to 10–15 and disproportionately paid to board members. In fact, in providing these incentives, Visa did not consider Board representation. Visa and MasterCard targeted the largest issuers who accounted for the vast majority of direct mail solicitations. During this time period 10–15 banks represented over 90 percent of the the

Because of the concern that issuers were playing the associations against one another and demanding ever-increasing amounts, Visa did not support the expanded use of cash incentives for mail share—unlike co-branding programs, the cards did not offer new value to cardholders or to the association. Visa also was concerned about using increasing amounts of money from the membership as a whole to support programs for a limited number of issuers. Ultimately, the effect would be to take money from other areas and reduce the amounts available to promote and support the Visa brand. (*See, e.g.*, Christofferson (BancOne/First U.S.A.) Dep. at 163–66; Tr. at 4525–27 (Dahir, Visa U.S.A.).)

### 3. *Share–Shifting Competition Culminates in Dedication*

#### a. Visa's Partnership Program

Both associations ultimately took steps to move away from ad hoc incentive payments to longer term agreements that would exchange monetary and other incentives for greater brand loyalty and dedication. In February 1999, the Visa U.S.A. Board adopted the "Partnership Program." (*See* Tr. 4537–38 (Dahir).) This program offers a uniform schedule of discounts to issuers and provides other support to members who agree to issue only Visa cards (including debit cards) and to reach 90 percent Visa credit card volume share within an agreed-to transition period. (*See* Tr. 4609, 4533–34, 4612 (Dahir); Ex. D–1594–R ("Visa Partnership Program Principles").) Nearing the end of 2000, 439 Visa U.S.A. members, constituting over sixty percent of its transaction volume, had committed to Visa under this solicitations. (*See* Tr. 5005 (Schall, Visa

program. (*See* Tr. 4538 (Dahir); Tr. 5164 (Pascarella).)

While the fee discounts that Visa offers under its Partnership Program Principles are available to any member interested in dedicating itself to Visa (*see id.* at 4540 (Dahir), Visa has executed independent side agreements with several of its largest members that provide significant additional financial incentives to those members in return for their commitment to Visa. (*See id.* at 4540–41, 4610–11 (Dahir, Visa U.S.A.) Of the Visa members that have received these special deals, all but one have one or more representatives on the Visa U.S.A. Board; the lone exception is Fleet, a bank that Visa expects to add to its Board in the near future. (*See* Tr. 4611 (Dahir).)

At its February 2000 meeting, Visa U.S.A.'s Board also enacted a by-law that every Board member from an issuing bank have at least 75 percent of its total transaction volume—credit and debit—on the Visa system. (*See id.* at 5164–65 (Pascarella); Ex. P–1039.) Visa plans to increase the required portfolio skew over time. (*See id.* at 5166 (Pascarella); 5305 (Schmidt, Visa U.S.A.).) At present, eleven of the twelve outside directors on Visa U.S.A.'s Board of Directors are affiliated with members that have committed to partnership agreements. (*See* Ex. 4500A.) The lone holdout, Suntrust Bank, sold most of its credit card portfolio and now issues only Visa off-line debit cards. (*See* Tr. 4539 (Dahir).) The Visa U.S.A. Board banks, accordingly, have effectively relinquished their right to issue new cards except on the Visa network in exchange for the incentives of the partnership program and for the right to serve on the Visa Board, where they can have say in the association's governance.

U.S.A.).)

b. *MasterCard's Member Business Agreements*

MasterCard has entered into "Member Business Agreements" with four of the largest United States card issuers—Citibank, Chase, Metris and Household (*see* Hanft (MasterCard) Dep. at 60–66; Zebeck (Metris/Fingerhut) Dep. at 201–02; Siddharth Mehta (Household) Dep. at 14–15), and with a total of 32 of MasterCard's largest issuers. (*See* Tr. 5596–97 (Selander, MasterCard).) At least two of the banks represented on MasterCard's U.S. Region Board, MBNA and Capital One, however, have not signed such agreements.

MasterCard's member business agreements, like Visa's partnership agreements, call for the banks to prospectively dedicate themselves to MasterCard. (*See* Ex. P–0498 at MCJ6058232 (outlining general terms of the member business agreements).) For instance, Chase's agreement with MasterCard has a five-year term and obligates Chase to reach an 80 percent portfolio skew (of its credit and charge cards) to MasterCard by July 2003. (*See* Ex. D–2555R.) In return, MasterCard has agreed to pay Chase a cash incentive and to provide Chase substantial discounts from the fees it pays to MasterCard.

While plaintiff and Professor Katz have suggested that these agreements were motivated by this litigation, both associations were exploring possible loyalty agreements long before this action commenced. The court credits the testimony of Victor Dahir that Visa had explored similar types of programs as long ago as 1988. The impetus for the 1998 partnership program was based upon a proposal from Citibank in Spring 1998 to offer greater brand dedication to Visa in exchange for lower fees. (*See* Tr. 4536–37 (Dahir); 5160–61 (Pascarella); *see also* Russell (Visa U.S.A.) *Moun-*

*tainWest* Tr. 1435 (Visa considered loyalty program in early 1990's).)

Similarly, Robert Selander, the President and CEO of MasterCard International, testified that MasterCard was trying to transform incentive programs into "broader, relationship-oriented programs" in 1996 and 1997 so that there was "a more durable, longer-term relationship." (*See* Tr. 5574–75 (Selander, MasterCard); *see also* Hanft (MasterCard) Dep. at 59–60 ("the concept of member business agreements predates October, 1998").) This strategy evolved into the member business agreements, which were not a response to this lawsuit, nor to any concerns about dual governance. (*See* Tr. at 5596–97 (Selander).) MasterCard had learned from the co-branding and mail share competition and developed the confidence to demand more commitment from its members as part of an overall improved relationship. In fact, MasterCard's Corporate Strategy Blueprint 1998–2002 (written in 1997) calls for MasterCard to "[d]eliver the 'MasterCard experience' via our relationship management process with major payments players globally [and] [e]stablish a partnership contract with our customers for mutual market benefit." (Ex. D–3902 at MCJ2180199.) Mr. Selander testified that this was the foundation for the member business agreements: "we need to have . . . clear understanding from our customers of what their expectations are and to have a longer-term, structured relationship which means that as we invest in that relationship, that we will see that come back to benefit the MasterCard joint venture." (Tr. 5585–86 (Selander).)

The competition between Visa and MasterCard has been fierce to sign members to these long-term issuing agreements. Through Visa partnership agreements and MasterCard member business agreements, the associations have tried to secure brand

loyalty commitments from their members, including the limited number of very large issuers who account for large percentages of card volume. (*See id.* at 5575–76, 5585–86 (Selander).) These large issuers continue to play the associations against one another. For example, Citibank was able to obtain a certain amount of flexibility from MasterCard regarding the use of the Citibank brand on its cards. (*See id.* at 2068 (Boudreau, Chase); 2230 (Saunders, Household/Fleet); 4915–16, 4930–31 (Wells, Wachovia).) This competition, and the willingness of member banks to shift share from one association to the other,

directly contradicts plaintiff's theory on dual governance.

Plaintiff's focus on dual governance has been rendered largely irrelevant by these agreements, which have led to current association Board compositions that are virtually "dedicated" under plaintiff's definition. Visa U.S.A. and International Boards are dedicated to Visa under plaintiff's definition. Below are the current portfolio skews (including those established by agreement) for both Visa U.S.A. (*See* Ex. D–4500A) and Visa International (*See* Ex. D–4688):

### VISA U.S.A.'s Board of Directors

| Member Bank | Estimated 1999 Share | Committed Credit Share By 2003 |
|---|---|---|
| Texas Independent Bankshares | 100% | 90% |
| U.S. Bancorp | 97% | 90% |
| Bank One (2 directors) | 83% | 90% |
| Bank of America (2 directors) | 79% | 90% |
| Suntrust Bankcard | 79% | ----- |
| First Union | 77% | 90% |
| Associates National Bank | 68% | 90% |
| Wachovia | 63% | 88% |
| First National Bank of Nebraska | 58% | 90% |
| Wells Fargo & Company | 46% | 90% |

### Visa International's Board of Directors—1999

| Member Bank | Visa Share |
|---|---|
| U.S. Bancorp | 93% |
| Bank of America | 80% |
| Associates Corporation of North America | 75% |
| Bank One | 71% |
| First National Bank of Nebraska | 59% |
| Firstar Corporation | 54% |
| Wells Fargo & Company | 53% |
| Banco de Credito del Peru | 100% |
| Canadian Imperial Bank of Commerce | 100% |
| First Rand Bank | 100% |
| Royal Bank of Canada | 100% |
| Visa Espana | 100% |
| Sumitomo Credit Service Co., Ltd. | 96% |
| Deutsche bank S.p.A. | 89% |
| UOB | 85% |
| Bankgesellschaft Berlin AG | 80% |
| Equitable Banking Corporation | 80% |
| Barclaycard | 77% |
| Banco de Brasil | 77% |
| Natexis Banques Populaires | 74% |

| | |
|---|---|
| Foreningssparbanken | 65% |
| Lloyds/TSB | 57% |

The trial record reflects that the MasterCard Global and U.S. Region Boards are comprised of a majority of members from institutions skewed towards MasterCard. Set forth below are the current portfolio skews (including those established by agreement) for both the Global and U.S. Region Boards.

### Bank Issuers on the MasterCard International Global Board of Directors—2000

| Member Bank | MasterCard Share of Credit and Charge Cards |
|---|---|
| Household | 95% * |
| Metris | 95% * |
| Citibank | 85% * |
| Chase | 80% * |
| USAA Federal Savings | 69.4% |
| MBNA | 52.1% |
| Bank of Montreal | 100% |
| ArgenCard | 100% |
| Bayerische Hypo-und Vereinsbank AG | 97.1% |
| Caisse Nationale de Credit Agricole | 94.4% |
| Orient Corp. | 55.3% |
| Commonwealth Bank of Australia | 53.0% |
| (* = per agreement) | |

### Bank Issuers on the MasterCard International U.S. Region Board of Directors—2000

| Member Bank | MasterCard Share of Credit and Charge Cards |
|---|---|
| Household | 95% * |
| Metris | 95% * |
| GE Consumer Card Co. | 87.8% |
| Citibank | 85% * |
| Chase | 80% * |
| Peoples Bank | 80% * |
| USAA Federal Savings | 69.4% |
| MBNA | 52.1% |
| Capital One | 33% |
| Key Bank | 100% (Debit Cards Only) |
| Union Bank | 100% (Debit Cards Only) |
| (* = per agreement) | |

MasterCard has also entered into Member Business Agreements with key Board members such as Citibank, Chase and Household that provide for those banks to be at least 80 percent MasterCard issuers. (*See* Ex. P–180.)

### E. The Government's Proposed Remedy

This court already has found that dual governance does not lead to anticompetitive effects. Perhaps no one factor confirms this more than Plaintiff's concession that skew is not the primary influence over how Board members vote, and thus does not drive Board members to act in any particular manner. In fact, the skew of directors' portfolios is only one of many, and not a decisive factor in board votes.

Plaintiff's own expert, Professor Katz, conceded that multiple factors besides skew affect how a board member will vote at any given time. For example, Prof. Katz admitted that although governors

make the ultimate investment decisions, non-governors have influence as well on management and the board. (*See id.* at 3518–19, 3713–14 (M.Katz).) Yet his theory does not account for the fact that non-directors, who may be non-dedicated in Professor's Katz' "but for" world, also exert important influence over association policies. Katz further admitted that directors take the interests of large issuers into account out of a desire to be re-elected, among other reasons. (*See id.* at 3716–17 (M.Katz).) Thus, skew is merely one factor that influences how a bank may vote on the board. Other factors include fiduciary duty, a desire for consensus, an individual bank's interests, cost savings, and likely benefits. (*See* Tr. 3565–67, 3590, 3594–95, 3712–13, 3869–70, 3870–71, 3875, 3891, 3893, 3916, 4062–63 (M.Katz).)

For this reason, plaintiff's expert generally discounts the importance of actual board votes in his "but for" world, despite the fact that his dual governance theory is premised on the assumption that board decision-making has been compromised. (*See id.* at 3869–71 (M.Katz).) In fact, Katz did not reach any opinions by examining board votes. (*See id.* at 3565–67, 3869–70 (M.Katz) (must be "cautious" in looking at votes due to multiple factors influencing voters).) Specifically, Professor Katz did not study the skews of the Global or U.S. Region Board for any time period before: (1) forming an opinion in this litigation; (2) constructing his "but for" world; and (3) preparing his Expert Report and direct written testimony. (*See id.* at 3932–33 (M.Katz).) Plaintiff's expert has not traced the decision-making behavior of certain board members over time as they have transformed from non-dedicated to dedicated members or vice versa. (*See id.* at 3901 (M.Katz).)

Perhaps it is this tenuous connection between portfolio skew and Board deci-sion-making (and therefore between skew and any alleged anticompetitive effects) that explains both the Government's and it expert's problems in crafting a remedy in this case. Professor Katz did not espouse a particular remedy, but rather hypothe-sized a "but for" world as a theoretical standard of comparison to determine what competition would be like absent dual governance. (*See* Tr. 3496–97 (M.Katz).) In his opinion, all Visa and MasterCard board members should issue between 80 and 90 percent on that association's card system, leaving open 10 to 20 percent for issuance of other card brands. According to Katz, this would ameliorate the purported harm from dual governance while promoting the goal of multiple issuance sought to be effectuated by the abolition of By-law 2.10(e) and the CPP. (*See* Tr. at 3500–03 (M.Katz); M. Katz Dir. Test. ¶¶ 188–189 & n.220.)

Yet Professor Katz could not seem to settle on a skew that would accomplish this goal. Katz testified that while a 79% skew as opposed to an 80% skew should not impact a board member's incentives, a 75% skew would be too low to stem the purported ill effects of dual governance. However, he offered no analysis or evidence to explain the difference in competitive effects between 75 and 80%. (*See* Tr. at 3500–03 (M.Katz).) He later testified that 80% is not a threshold for dedication: "There is increasing dedication as you increase percentage and I thought something [in] the 80 to 90 percent range is likely to strike a balance. I have not set a particular threshold." (*Id.* at 3597, 3889–90 (M.Katz).) In the end, Professor Katz testified only that dedication increases, even at levels below eighty percent, as skew levels increase. (*See id.* at 3500–03 (M.Katz).)

By contrast, the Government's suggested remedy in this case would require 100%

future issuance by Board members and mandate an 80% portfolio skew. These provisions are not found in the relief section of the Complaint, where the Government proposed simply that board members be "dedicated" to their association's brand, without mandating percentages for *portfolio skew* or *future issuance*. Plaintiff's proposed exclusive issuance remedy is also not contemplated in Professor Katz' "but for" world, and is in tension with plaintiff's position that dual issuance is on balance procompetitive. Because of industry consolidation, as of 1999, the twenty-two banks that collectively sit on the Visa and MasterCard Boards accounted for 78% of the credit card volume on those two systems in the United States. (Nilson Report Nos. 708, 709, 712). Assuming the largest issuers choose to remain on the Boards, under the Government's proposed remedy they may not issue American Express, Discover or MasterCard cards going forward and the opportunities for American Express or Discover are dramatically reduced.

### F. The Record Evidence of Actions Taken Through Board Votes Is Inconsistent with and Contradicts Plaintiff's Theory

Professor Katz has acknowledged that actions taken by the respective Boards of Visa and MasterCard to shift share between the two associations would undermine his theory. (*See id.* at 3932 (M.Katz).) In fact the record of board votes, ignored by Katz, reveals that MasterCard's and Visa's boards have consistently voted to allow management to compete vigorously with the other association, even when the competition was designed to shift share between them.

For example, in 1989 the Executive Committee of the MasterCard Global Board unanimously voted to authorize the CEO of MasterCard to take any action necessary to respond to the competitive actions of Visa without having to first approach the Board. At the time, MasterCard's Global Board—the only board in existence in 1989—was non-dedicated under plaintiff's definition of dedication. As reflected in the minutes, the Executive Committee understood that this competitive action could harm Visa. (*See* Ex. D–4203.) Plaintiff's expert acknowledged that this authorization was aimed at competing with Visa directly and conceded that such action was inconsistent with his theory regarding dual governance. (*See* Tr. 3932 (M.Katz).)

Other examples which are plainly inconsistent with Prof. Katz' theory include: (1) the 1996 U.S. Region Board's unanimous vote to reinstate co-branding incentives (which upon cross-examination Prof. Katz admitted was prompted by competition with Visa (*see id.* at 3915:3–20, M. Katz); (2) the unanimous 1996 votes of the Global and U.S. Boards to acquire a 51 percent interest and 10 percent interest in Mondex International and Mondex U.S.A., respectively; (3) the unanimous vote by the U.S. Region Board in 1995 in an EPS smart card venture, and (4) a 1993 U.S. Region Board unanimous vote authorizing the development of the MasterCard Purchasing Card product which was aimed at competing with Visa. (*See* Ex. D–4200; Ex. D–4199; Ex. D–4198; Ex. D–4201; Ex. D–4202.)

For all of these votes, MasterCard's Board was "non-dedicated" under plaintiff's definition and yet the Board voted, in all cases unanimously, to engage in a variety of competitive initiatives against Visa. Plaintiff's expert conceded that even though he reviewed some of these votes, he did not include in his analysis either those votes that were unanimous or those that did not reflect a "heterogeneity in the

voting" that bore a relationship to the skew. (Tr. 3917, 3929 (M.Katz).) As a result, the court finds that plaintiff's expert simply disregarded any votes that were inconsistent with his theory.

Plaintiff's expert ultimately did offer two votes at trial—the enactment of the CPP and the decision to stop co-branding incentive payments—as support for plaintiff's dual governance theory. MasterCard management began considering the possibility of adopting a rule or policy regarding banks partnering with American Express, as a result of the stated desire of American Express to "cherry-pick" just the key issuers or high end business of MasterCard and Visa. (Ex. D–4551 (Golub Speech).) Ultimately, the MasterCard U.S. Region Board, after considering "cherry-picking" and other concerns related to brand dedication, adopted the CPP. (*See* Tr. 18–20 (Lockhart, MasterCard); Ex. P–1204 at DOJTE 000796 (notes from June 1996 U.S. Region Board meeting re: cherry picking concern); Ex. P–0181 at CPW00189 (Pre-read for June 28, 1996 U.S. Region Board meeting detailing concern for brand dedication); Ex. P–0187 (Minutes of the June 28, 1996 Meeting of the U.S. Region Board of Directors); Ex. P–0188 (Minutes of the June 29, 1996 Meeting of the Global Board).)

Citing the testimony of Pete Hart that because Visa's By-law 2.10(e) was in place, MasterCard had an opportunity at that time to differentiate itself from Visa by *not* following its lead and enacting the CPP, (*see* Tr. 1459–1460 (Hart, Advanta/MasterCard)), plaintiff argues that a MasterCard board whose portfolio is principally made up of MasterCard cards—who was interested in competition with Visa—would likely have opposed the CPP. In support of his hypothesis that skew impacted decision-making, Professor Katz notes that 4 out of the 6 board members with the highest

MasterCard skews voted in favor of the CPP. (*See id.* at 3889 (M.Katz).) As defendants note however, a fair examination of the voting pattern demonstrates no correlation between skew and the vote on the CPP. An examination of the votes of the *eight* Board members with the highest skews—who plaintiff presumes would have similar incentives because of their skew levels—reveals that members of equal or similar skew voted differently. (*See* Ex P–1263—*In favor of CPP:* Saunders (Household) 80%; Wright (USAA) 72%; McGuinn (Mellon) 61%; McDonald (Signet) 60%; *Opposing CPP:* Zebeck (Fingerhut) 100%; Schauer (GE) 81%; Hunt (AT & T) 69%; Hartnack (Union Bank) 66%.)

Consistent with Professor Katz' acknowledgment that multiple factors affect why a board member votes a particular way, including skew, fiduciary duty and the individual interests of a particular bank, the record reflects that many of these banks were in discussions with American Express at the time of this vote and that this fact, and not skew, appears to provide the common thread among the banks that opposed the CPP. (*See* Tr. 3595–96, 3893–94 (M.Katz).) In fact, each of the opposing issuers had been engaged in discussions with American Express. (*Compare* P–1263 *with* Tr.1981–84 (Lockhart, MasterCard); Hartnack (Union Bank) Dep. at 22–25; Tr. 3594–96 (M.Katz).) Professor Katz further acknowledged that Advanta—with only a 26 percent MasterCard skew—voted against the CPP, presumably because Advanta also was in discussions with American Express at the time. (*Id.*)

Finally, plaintiff's expert acknowledged that MasterCard management and its Board members had concerns about the impact on the MasterCard brand should banks partner with American Express. (*See* Tr. 3886–87 (M.Katz).) Nonetheless,

plaintiff never asked the board banks who voted for the CPP whether they did so out of concern for MasterCard's brand or for some other reason.

Similarly, MasterCard's vote to stop co-branding incentives in 1995 does not support plaintiff's theory that dedication or skew levels affect the incentives of Board members to compete with Visa. Plaintiff's expert pointed to a vote to stop co-branding incentives by the U.S. Region Board in 1995 where 3 out of 14 directors voted against the proposal. Professor Katz asserted that this vote was consistent with his theory because 2 out of the 3 issuers with the highest skew voted against co-branding incentives "and if you look at all of the other issuers with lower skews, only one voted against." (Tr. 3914 (M.Katz); *see* Ex. P–1262.)

Again, a closer review of the trial record reveals inconsistencies. As an initial matter, plaintiff put forth no evidence why the Board members in fact voted against this proposal. Although plaintiff's expert sought support for his theory in the fact that two of the three board members with the highest skews voted against the proposal, he acknowledged that only 2 out of the 6 Board members with over a 70% skew voted against the proposal. Moreover, Professor Katz ignored MasterCard's stated rationale for stopping the payment of co-branding incentives—that Master-Card had an ideological disagreement with using the funds of all members to offer incentives to only a few members. (*See* Ex. P–0357 at MCJ 0000237; Ex. D–3845 at 3845004.) This stated justification is in no way inconsistent with the board's behavior—a "non-dedicated" Board permitted MasterCard to compete with Visa through co-branding incentives for nearly five years prior to this vote and the same "non-dedicated" Board that voted to stop co-branding incentives in 1995 unanimous-

ly voted to reinstate such incentives in 1996. (*See* Tr. 3913, 3915–17 (M.Katz).) At bottom, plaintiff's expert admitted that this example was "quite weak" support for his theory and he therefore chose not to put it in his direct written testimony—even though he testified about it on the stand. (*See* Tr. 3910, 3914 (M.Katz).)

1. *No Evidence Exists that a "Non–Dedicated" Global or U.S. Region Board Prevented MasterCard from Innovating or Competing Vigorously with Visa*

There is no evidence that any "non-dedicated" MasterCard Board member ever even expressed concern about MasterCard competing against Visa. Testimony from "non-dedicated" board members confirms that they never voted against a proposal because it might harm Visa competitively. For example, Shailesh Mehta from Providian sat on the U.S. Region Board when Providian had only a very small share of MasterCard issuance. During his tenure as a Board member, Mr. Mehta considered himself dedicated and never disagreed with or voted against any proposal put forth by the MasterCard management. (*See* Shailesh Mehta (Providian) Dep. at 26–27.) Richard Fairbank, Capital One's representative on the MasterCard U.S. Region Board, always voted in the best interest of MasterCard despite his bank's predominant Visa portfolio. (*See* Fairbank (Capital One) Dep. at 41–42.) Banco Popular currently issues 75% Visa cards and only 25% MasterCard cards. Yet, during Larry Kesler's five-year period of service on the MasterCard Latin America Caribbean Region Board, he has never voted against a MasterCard competitive initiative because it would have a negative impact on Visa. (*See* Tr. 198–201 (Kesler, Banco Popular).)

There is no evidence of any instance where MasterCard management refrained from bringing a competitive initiative to the MasterCard Global Board or U.S. Region Board because it believed the Board would not want MasterCard to compete fully with Visa. (*See, e.g.,* Tr. 1357 (Hart, Advanta/MasterCard).) Professor Katz did not offer any examples of specific initiatives being suppressed by management because of board duality.

2. *No Evidence Exists that a "Non-Dedicated" Board Prevented Visa U.S.A. or Visa International from Innovating or Competing Vigorously with MasterCard*

Plaintiff has not identified any "non-dedicated" Visa Board member with a significant MasterCard portfolio that took steps to blunt Visa competition with MasterCard. No Visa executive identified instances where the Board or Board members acted to restrain competition against MasterCard as a result of dual governance. (*See* Moore (Visa U.S.A.) Dep. at 185–86; Jensen (Visa Int'l) Dep. at 29–30, 67–68; Somerville (Visa Int'l) Dep. at 71–72; Morgan (Visa U.S.A.) Dep. at 80.) Although Bennet Katz offered several dated examples prior to 1992 where Visa U.S.A. was asked by members to coordinate with MasterCard, such as on smart card development, as discussed above these did not have material competitive significance and indeed likely led to procompetitive efficiencies.

### G. The Procompetitive Effects Of Dual Governance

Because the plaintiff failed to demonstrate that dual governance was anticompetitive, defendants had no obligation to demonstrate its procompetitive effects. Nonetheless, the record evidence demonstrates that in some instances dual governance had procompetitive effects, most notably by facilitating share-shifting competition by MasterCard.

In the early 1990's, many of the large traditional banks were represented on the Visa Board. As a point of differentiation, MasterCard became more willing to offer Board seats to non-traditional issuers and monoline banks during this time period. For example, Household Bank was appointed to the MasterCard Board during Hart's tenure because non-traditional industry participants had great growth potential and MasterCard was motivated by a desire to increase MasterCard's issuance volume. (*See* Tr. 1363–64 (Hart, Advanta/MasterCard).) GE was appointed because at the time they were the largest company in the world and a "very major" player in the consumer credit area. MasterCard had hoped that as a result MasterCard's market share would increase relative to Visa. (*See* Tr. 1365–66 (Hart).)

MasterCard also began to offer selected Board seats to other significant issuers, even though they may have had substantial Visa portfolios. For example, Don Boudreau from Chase Manhattan Bank and Richard Fairbank from Capital One were appointed to the MasterCard Board during Lockhart's tenure. Chase Manhattan and Capital One both had substantial Visa portfolios. (*See* Tr.1945–47 (Lockhart, MasterCard).) Providian was also elected to the U.S. Region Board despite being a small MasterCard issuer. (*See id.* at 2233 (Saunders, Household/Fleet).)

MasterCard believed that such offers, and any subsequent Board membership, would help it gain a larger share of the members' issuance for MasterCard through an improved working relationship. Thus, Lockhart felt that nominating a member who had a substantial Visa portfolio could be useful because it gave MasterCard the ability to market to this type of

member, and placing that member on the Board would guarantee many interactions with the representative. (*See id.* at 1943–44 (Lockhart).)

In many instances, MasterCard's plan has worked extremely well. For example, Household was added to MasterCard's Global Board in 1990, prior to the existence of the U.S. Region Board, as a "non-dedicated" member with a 45% MasterCard Portfolio. (*See* Ex. D–1768.) Household then became an original member of the U.S. Region Board created in 1991. By 1993 its portfolio was 84% MasterCard and had grown from approximately 1.5 million MasterCard cards to close to 12 million MasterCard cards. (*See* Ex. D–3062.) Household has remained a "dedicated" MasterCard issuer since that time. (*See* Ex. D–1792; Ex. D–1799; Ex. D–1805; Ex. D–1818; Ex. D–1828; Ex. D–1852.)

Similarly, GE Capital (formerly Monogram Bank U.S.A.) joined the MasterCard U.S. Region Board when the Board was created in 1991 as a "non-dedicated" member with a 31% MasterCard portfolio. (*See* Ex. D–1774.) By 1996, GE Capital was a "dedicated" member with an 81% MasterCard portfolio and its portfolio had grown from 929,202 MasterCard cards in 1991 to close to 5.5 million MasterCard cards. (*See* Ex. D–1805.) The skew of GE Capital's portfolio has changed since then due to the sales of portions of the portfolio, but by the end of 1999 GE Capital was again a "dedicated" member at 88% MasterCard. (*See* Ex. D–1852.) As Alex Hart testified, putting GE on the Board made MasterCard a better competitor. (*See* Tr. 1365–66 (Hart, MasterCard/Advanta).)

Other examples include AT & T UCS, which was given a seat on the MasterCard U.S. Region Board in 1992 when it had a 70% MasterCard portfolio. (*See* Ex. D–1780.) By 1997 its portfolio was 81% MasterCard. (*See* Ex. D–1818.) Although AT & T's portfolio skew fluctuated between 1992 and 1997, the most salient fact is that its MasterCard portfolio more than doubled in size in those years from approximately 8 million cards to almost 20 million cards. (*See* Ex. D–1780; Ex. D–1818.) In addition, Chase Manhattan was a Visa U.S.A. Board member when it merged with Chemical Bank, a MasterCard U.S. Region Board member in 1996. The merged entity, named Chase Manhattan, became a MasterCard U.S. Region and Global Board member with a non-dedicated portfolio of 49% MasterCard. (*See* Ex. D–1805.) However in July 1999, Chase, one of the largest card issuers in the U.S., signed a Member Business Agreement with MasterCard pledging to achieve and maintain a MasterCard transaction volume share of at least 80%. (*See* Ex. P–0180.)

The above reflect examples of vigorous share-shifting competition that Professor Katz chose to ignore in his written direct testimony, in which he concluded that dual governance was anticompetitive. (*See* M. Katz Dir. Test. ¶ 242.) Prof. Katz relied instead upon examples of board members whose skew did not increase to dedicated levels during their tenure on the board—Providian, Capital One, KeyCorp., Wells Fargo and Firstar. Professor Katz fails to acknowledge that although MasterCard may not have succeeded in transforming Providian and Capital One, both highly skewed Visa issuers, into dedicated MasterCard issuers, both members have substantially increased the numbers of MasterCards in circulation: Providian increased its MasterCard portfolio from 173,000 cards in 1996 when it joined the MasterCard Board to 1.5 million by the end of 1999 (shortly before Providian left the Board); Capital One has grown from approximate-

ly 2.7 million MasterCard cards in 1995 when it joined the Board to over 8.4 million MasterCard cards in 1999. (*See* Ex. D–1805; Ex. D–1852; Ex. D–1799.)

There is no evidence demonstrating that such a strategy has led to any anticompetitive behavior. No MasterCard Board member or management executive could recall an instance where the Board representative from a "non-dedicated" bank attempted to block MasterCard initiatives. Chase's issuance of MasterCard went up after Boudreau was appointed to the Board, and Boudreau never took any action to stop Lockhart from competing with Visa. (*See* Tr.1945–46 (Lockhart, MasterCard).) To the contrary, Don Boudreau is now the chairman of the MasterCard Global Board and committed to MasterCard's success. (*See id.* at 2062–63 (Boudreau, Chase).) Ronald Zebeck of Metris is not concerned about having Board members from banks that issue primarily Visa cards because in his view the people who sit on the MasterCard Board are professionals. "When they sit at the table, they're thinking about MasterCard, they're not thinking about their own individual institutions." (Zebeck (Metris/Fingerhut) Dep. at 204–206.)

### H. Plaintiff Has Failed To Demonstrate That Dual Governance Violates The Sherman Act

The foregoing facts reveal plaintiff's failure to demonstrate that dual governance causes any adverse effect on competition, and are thus fatal to the claim in Count One. Plaintiff, through its expert Prof. Katz, has posited a theory as to how dual governance might create disincentives for some forms of competition between the associations, but has failed to offer credible evidence to support that theory. First and foremost, plaintiff has failed to prove causation—that dual governance has caused

either association to alter its decision-making—except with respect to one limited competitive front, comparative advertising. Plaintiff did demonstrate that advertising decisions may have been "distorted" by dual governance but did not establish that any advertising decisions resulted in a price, quality, or output restriction for credit cards. Aside from that example, which no longer reflects the competitive vigor of advertising between the associations, there is no evidence that any "non-dedicated" governor of either association ever took any action to hinder, prevent or delay either association from competing with the other, or that any competitive decision of either association was ever distorted by the "dedication" levels of any governor.

The smart card considerations of the associations in the mid–1980s provide one example of the plaintiff's failure to establish causation. Professor Katz acknowledges that there is no evidence that any "non-dedicated" governor ever took any action to stop or delay a smart card initiative. The only evidence of causation proffered by plaintiff on the smart card issue is the inferences of Professor Katz, which the court rejects as unsupported by the evidence.

Further, there is simply no credible evidence that either MasterCard or Visa has declined to pursue a competitive initiative or an innovation for other than legitimate business reasons. Again using the smart card allegations as an example, plaintiff's expert testified that he had not reached any conclusions regarding the impact of the alleged delay in the development of smart cards on consumer welfare. The preponderance of the evidence is that smart card technology has not been implemented for credit cards at point of sale simply because there is no business case in the U.S. to justify the expenditures re-

quired for point of sale reterminalization. Plaintiff has likewise failed to show any other example of an effect on competition as a whole.

Accordingly, plaintiff has failed to meet its burden of establishing that dual governance caused a significant adverse effect on competition, and as a result, Count One fails.

## IV. BY–LAW 2.10(e) AND THE CPP UNREASONABLY RESTRAIN TRADE

■■■ With regard to Count Two, plaintiff contends that Visa By–Law 2.10(e) and MasterCard's Competitive Programs Policy ("CPP") have had an adverse effect on the market by excluding American Express and Discover from offering network services to bank issuers, resulting in decreased network-level competition and fewer and less varied credit card products to the consumer.

While defendants have argued that American Express and Discover have the same opportunities to market cards to consumers through the mail and over the Internet, the record demonstrates that the exclusionary rules have had an adverse effect on both the issuing and the network market. First, the exclusionary rules cause an adverse effect on the issuing market by effectively preventing Visa and MasterCard member banks from issuing American Express and Discover cards, reducing overall card output and available card features. As a result, consumer welfare and consumer choice are decreased. Second and more importantly for this case, the rules restrain competition in the network market because they prevent American Express and Discover from offering network services to the consumers of those services, the members of the Visa and MasterCard associations. As a result, American Express and Discover are forced to operate as single-issuer networks, limiting their transaction and issuance volume and stunting their competitive vitality. Network services output is necessarily decreased and network price competition restrained by the exclusionary rules because banks cannot access the American Express and Discover networks; conversely American Express and Discover cannot access the issuing competencies and segmented marketing expertise of the banks, nor their more profitable relationship customers with checking accounts, attributes which cannot be provided by the smaller banks and monoline banks to which American Express and Discover do have access.

### A. Visa and MasterCard Adopt Their Exclusionary Rules

#### 1. *Visa U.S.A. Adopts By-law 2.10(e)*

In 1991 Visa U.S.A. passed By-law 2.10(e). It provides that "the *membership of any member shall automatically terminate* in the event it, or its parent, subsidiary or affiliate, issues, directly or indirectly, Discover Cards or American Express Cards, or any other card deemed competitive by the Board of Directors." (Ex. P–0647) (emphasis added.) It was intended to complement By-law 2.06, which already prevented the American Express or Discover networks from being able to issue Visa cards on the Visa network indirectly by buying a Visa member bank and thereby becoming a member/owner of Visa. The Visa board has never "deemed" MasterCard (or Diners Club or JCB)[19] to be

---

19. Diners Club is owned by Citicorp, the largest Visa/MasterCard issuer. (*See* Tr. 4397 (Beindorff, Visa U.S.A.).) Although it ultimately never issued any JCB credit cards, Household Bank, whose representative, Mr. Saunders, was Chairman of MasterCard in 1996, had entered into an exclusive deal with JCB to issue JCB cards in the United States

"competitive" with Visa, (*see* Tr. 3268–69; (B. Katz, Visa U.S.A./Visa Int'l); Pascarella (Visa U.S.A.) Dep. at 53–54), despite the fact that at the time By-law 2.10(e) was passed, the worldwide volume on the Diners Club and Discover networks were about equal. (*See* Ex. D–1771 at 5; Ex. D–4098 at 5.)

Foreclosed in the United States by By-law 2.10(e), American Express by the fall of 1995 had entered into issuing arrangements with a number of international banks. (*See* Ex. P–0854.) Visa senior management became concerned that American Express' partnerships with Visa member banks would grow American Express' card issuance and merchant acceptance and erode Visa's market share. In response, Visa International began considering a global exclusionary rule patterned on 2.10(e). (*See* Tr. 3267–68 (B.Katz).) On June 5, 1996, after the head of the European Commission Directorate for Competition expressed doubts about the legality of such a rule, the Visa International Board delegated its authority to the various Regional Boards encouraging them to adopt the rule. (*See id.* at 3288–92 (B.Katz); Ex. P–0661.) Following this delegation, Visa's Latin American Board considered an exclusionary rule but after complaints filed by American Express declined to enact one. (*See* Tr. 3302 (B.Katz); Partridge (Visa Int'l) Dep. at 183, 302.) Ultimately, the only region with a prohibition on member bank issuance of American Express and Discover cards was and remains the United States.

2. *MasterCard Adopts Its United States Region Competitive Programs Policy*

As of early 1996, MasterCard had no rules prohibiting its members from issuing

American Express cards. (*See* Tr. 1769 (Lockhart, MasterCard).) By 1996, however, American Express had decided to change its single-issuer network strategy and invited Visa and MasterCard member banks to issue cards on the American Express network. American Express CEO Harvey Golub gave a speech to the Credit Card Forum in May, 1996 outlining why it would be profitable for banks to partner with American Express and specifically encouraging major MasterCard banks to consider the opportunity in light of the fact that MasterCard had no rule requiring them to give up their MasterCard portfolio if they did so. (*See* Ex. D–0671.) MasterCard CEO Eugene Lockhart and some other members of MasterCard's senior management thought that MasterCard could differentiate itself from Visa and gain share by *not* adopting a rule similar to Visa's 2.10(e). They believed this would encourage banks interested in issuing American Express cards to convert their Visa portfolios to MasterCard. (*See* Ex. P–0270; Tr. 1764–65 (Lockhart); *see also* Tr. 1459–60 (Hart, MasterCard).) Other senior MasterCard management, including MasterCard's current CEO, Robert Selander, strongly disagreed and wanted to "make it as hard as possible to have Amex do anything anywhere in the world." (*See* Tr. 1774; Ex. P–0293.)

Some MasterCard members in the United States accepted Golub's invitation and held discussions with American Express. By June 1996, Lockhart and Alan Heuer, president of MasterCard's U.S. Region, knew that four or five MasterCard members were considering issuing American Express cards: Fingerhut/Metris, Wells Fargo, Mellon Bank, Bank of New York

---

and planned to issue JCB cards in the United States. (*See* Tr. 2193–94, 2220 (Saunders,

Household/Fleet).)

and possibly First U.S.A. (*See* Tr. 1811–12 (Lockhart); *see also* Heuer (MasterCard) CID Dep. at 112, 130–31.) In the absence of any MasterCard-imposed prohibition, Lockhart expected five to ten large MasterCard issuers around the world, including the United States, to issue American Express cards. (*See* Tr. 1836 (Lockhart); Ex. P–0296 at MC85659.)

MasterCard evaluated whether to permit its members to issue American Express but found that unless MasterCard were guaranteed 80 to 90 percent of their members' portfolios, granting such permission would have weakened MasterCard. (*See* Tr. 1787 (Lockhart).) The MasterCard U.S. and International Boards met in London in June 1996 to consider whether to pass an exclusionary rule. At its June 29, 1996 meeting, MasterCard's International Board followed the approach taken by Visa International's Board three weeks earlier and delegated to MasterCard's regional boards the authority to enact rules to prohibit MasterCard's members from issuing American Express cards. (*See* Ex. P–0188 at CRW00544–45.) MasterCard also considered the fact that the European Commission had expressed disfavor with Visa's proposed global by-law. (*See* Tr. 1824 (Lockhart).)

The MasterCard U.S. Region Board enacted the CPP on June 28, 1996 over the objection of six board members, subject to a delegation of the authority to take that action by MasterCard's Global Board at the Global Board's meeting the following day. (*See* Ex. P–0187 at CRW00539.) A number of board members who opposed the CPP argued that the market should decide whether banks enter into distribution deals with American Express and that the banks, like supermarkets, should be able to offer their customers all available brands. (*See* Tr. 1282–83 (Hart, Advanta/MasterCard); Ex. P–0181 at CRW000193; Tr. 1827–28 (Lockhart).) Some members of MasterCard's senior management also believed that a policy directed to American Express "should apply to Discover, JCB, and Diners." (Tr. 1804–06 (Lockhart); *see* Ex. P–0271 at MC3449.) Notwithstanding these opinions, MasterCard decided that it could not afford to apply the CPP to other "competitive" programs such as Diners, which was principally owned by Citibank. (*See* Zebeck (Metris/Fingerhut) Dep. at 169.)

The CPP, applicable only in the United States, provides that with "the exception of participation by members in Visa, which is essentially owned by the same member entities, and [Diners Club and JCB], members of MasterCard may not participate either as issuers or acquirers in competitive general purpose card programs." (P–0181 at CRW 00190; *see also* P–0187 at CRW 00539.)

B. Abolition of Defendant's Exclusionary Rules Will Increase Competition at the Network Level and Benefit Competition and Consumers

Again, the core of Section 1 inquiry is whether the challenged restraint's "anticompetitive effects outweigh its procompetitive effects" (*Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 342 & n. 12, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)) and, therefore, "whether the challenged agreement is one that promotes competition or one that suppresses competition." (*National Soc'y of Prof. Eng'rs,* 435 U.S. at 691, 98 S.Ct. 1355; *see California Dental Ass'n,* 526 U.S. at 772–73, 119 S.Ct. 1604.) "Restraints on competition [do not constitute antitrust violations unless they] have or [are] intended to have an effect upon prices in the market or otherwise . . . deprive purchasers or consumers of the advantages which they derive from free competition." (*Apex Hosiery Co. v. Lead-*

*er,* 310 U.S. 469, 500–01, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); *United States v. Brown Univ.,* 5 F.3d 658, 668 (3d Cir.1993) (identifying "reduction in output, .. increase in price [and] deterioration in quality" as anticompetitive effects in rule of reason analysis); *Tunis Bros. Co. v. Ford Motor Co.,* 952 F.2d 715, 728 (3d Cir.1991) ("An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services."); *Wilk v. American Med. Ass'n,* 895 F.2d 352, 360–62 (7th Cir.1990) (finding that impeding consumers' free choice and raising costs of some health care providers were actual anticompetitive effects).)

Because of the defendants' exclusionary rules American Express and Discover have not been able to convince U.S. banks to issue cards over their networks. This prevents them from competing in the network services market for the business of bank issuers. (*See* Tr. 6055–58 (Schmalensee).) Since the bank members of Visa and MasterCard issue over 85% of general purpose cards comprising some 75% of the transaction volume, a huge portion of the market for network services is preserved for Visa and MasterCard. Those networks pay millions of dollars in incentive payments in the form of discounts from the price for network services to selected issuing banks to compete for their business and the banks play Visa and MasterCard against one another to obtain lower net prices and higher value for card network services. (*See* Tr. 4523–26, 4569–73 (Dahir, Visa U.S.A.); Ex. P–0748; Ex. P–0831; Ex. P–0790; Tr. 5324 (Heasley, Visa U.S.A.); Tr. 4407 (Beindorff, Visa U.S.A.).) Adding American Express and Discover would increase the number of service providers from two to four, enhance price competition and benefit consumers.

The addition of American Express and Discover will also increase the available supply and variety of network services. This will result in more card products for bank issuers and more options for consumers. Access to bank distributors will enable American Express and Discover to combine their services and features with the different product features and issuing skills of the associations' member banks. Whether or not similar products could also be issued on the Visa or MasterCard networks, restricting banks from issuing on the American Express or Discover networks restricts the choices available to them and their customers, who might prefer a combination of services on their American Express or Discover card which are now unavailable. Through the exclusionary rules Visa and MasterCard also limit competition among the member banks by preventing them from competing against each other by offering their customers Amex and Discover brands and network features.

Should the exclusionary rules be eliminated, American Express and Discover would seek to work with a variety of bank issuers to grow market share and increase merchant acceptance of their cards. (*See* Tr. 2536 (Chenault); Rapp (Visa U.S.A.) Dep. at 458 (predicting that elimination of defendants' exclusionary rules would result in an increase in American Express' market share).) Since the card network services business is driven by scale, increasing the scale of American Express and Discover will reduce their costs and increase their competitive strength. (*See* Tr. 5991 (Schmalensee).) The exclusionary rules contain American Express and Discover's ability to grow market share while effectively maintaining the defendants' market share and power.

The defendants argue that there are many alternative card distribution channels available to American Express and Discover other than the associations' mem-

ber banks, including mail, and that there are already plenty of cards and product features in America's credit and charge card market. While true, these arguments focus on American Express and Discover's success as issuers, but ignore how the exclusionary rules have hampered them as networks. The member banks are a unique distribution source for general purpose card products because of their experience and expertise. They also control access to the primary financial relationship in America—the checking account. No amount of effort by American Express and Discover to issue through non-member banks, retailers or other organizations will provide consumers with the range of choices to which they are entitled. While abolishing the exclusionary rules will undoubtedly help American Express and Discover, its primary effect will be to increase competition and consumer welfare.

1. *The Exclusionary Rules Limit Incentives for Banks to Issue American Express and Discover Cards*

It is largely undisputed that the exclusionary rules have resulted in the failure of Visa and MasterCard member banks to become issuers of American Express and Discover-branded cards. (*See* Tr. 6055, 6058 (Schmalensee) (exclusionary rules a "significant cause" of inability of American Express and Discover to sell network services to banks); Tr. 4394–95 (Beindorff, Visa U.S.A.) (confirming increased market share for American Express absent 2.10(e)); Tr. 1418 (Hart, Advanta/MasterCard); Ex. P–0277.) The following specific examples illustrate this point.

a. Banco Popular

Banco Popular is one of the largest issuers of Visa and MasterCard cards in Puerto Rico. It originally issued only Visa cards but subsequently offered MasterCard cards (soliciting, *inter alia*, its customers who already had a Visa card) to give its customers "a chance to have a second card with the same bank. A lot of people like to have one of each, for whatever reason." (Tr. 153 (Kesler, Banco Popular).) Visa did not object to Banco Popular expanding its brand offerings to include MasterCard cards. (*Id.*)

For similar reasons, Banco Popular was interested in offering American Express cards to "give [its] customers more choices, to have a third brand." (*Id.* at 157, 182 (Kesler).) It negotiated an issuer agreement with the American Express network and offered features on the American Express cards it issued that were not features it offered on Visa cards. Those features included purchase protection and an extended warranty on purchases made using Banco Popular's American Express card. (*See* Tr. 182–84 (Kesler).) Though Visa and MasterCard offer similar programs, features such as purchase protection and extended warranty depend on a network's customer service capabilities for implementation. American Express believes it has a high reputation for customer service which distinguishes its product. (*See* Tr. 639 (McCurdy, American Express); *see also* Ex. P–0091; Ex. P–1238; Ex. P–1239; Ex. P–1240.)

Consumers in Puerto Rico now enjoy the benefits of intrabrand competition among issuers of American Express cards: Banco Popular, American Express and (soon) Banco Santander (which recently executed a card-issuing arrangement with American Express) all compete for American Express customers in Puerto Rico. (*See* Tr. 360–61 (Kesler); Lucki (MasterCard) Dep. at 35–36.) Moreover, because of Banco Popular's competition with American Express' proprietary card business in Puerto Rico, Banco Popular has felt that it had to offer services and features on its

cards that were at least comparable to those offered by American Express as an issuer. (*See* Tr. 182 (Kesler).) When Banco Popular began issuing American Express cards, both associations assured Banco Popular that it remained a member in good standing,[20] and also communicated their intentions to improve the quality of service that they provide. (*See id.* at 167–68; *accord* Child (MasterCard) Dep. at 141; Lucki (MasterCard) Dep. at 72; *see also* Partridge (Visa Int'l) Dep. at 371–72.)

Banco Popular also wanted to issue American Express cards to its mainland United States customers, and it explored that possibility with American Express. (*See* Tr. 161 (Kesler, Banco Popular); Ex. P–0142.) Banco Popular recognized, however, that because of defendants' exclusionary rules, to issue American Express cards in the United States it would have to give up its Visa and MasterCard memberships in the United States. Doing so would have caused significant customer disruption, forced the bank to liquidate or sell its existing Visa and MasterCard customer accounts, and terminated the bank's Plus and Cirrus ATM network memberships.[21] (*See* Tr. 159–60 (Kesler).) In a September 3, 1997 letter, Visa U.S.A. informed Banco Popular that if it wanted to continue to issue Visa cards in the continental United States, it could neither issue cards nor solicit customers for American Express in the continental United States. (*See id.* at 175–76 (Kesler); Ex. P–0252.) Consequently, Banco Popular still has not agreed to issue American Express cards in the mainland United States. (*See* Tr. 357 (Kesler).) If the exclusionary rules did not exist, it would in fact do so. (*See id.* at 166 (Kesler).)

b. Advanta

In 1995, Advanta considered issuing cards on the American Express and Discover networks. (*See id.* at 1279, 1299 (Hart, Advanta/MasterCard).) In Advanta's view, issuing Advanta/American Express products would have been a benefit to Advanta. (*See id.* at 1295 (Hart).) There would have been consumer interest in such a card, and such a product offering would have benefitted consumers. (*See id.* at 1280, 1296 (Hart).) In 1995, since MasterCard had no policy prohibiting such deals with its competitors, Advanta proceeded with negotiations with American Express. (*See id.* at 1285–90 (Hart)) Advanta consumer research regarding working with American Express "encouraged" Advanta; Hart believed that Advanta could have issued over three million American Express cards. (*Id.* at 1287; 1418 (Hart).) When the MasterCard Board adopted the CPP, Advanta "had to narrow our focus considerably" to stay within the parameters of the defendants' exclusionary rules. (*Id.* at 1291 (Hart).) Advanta did not believe that it could simply leave both Visa and MasterCard in order to issue American Express cards. (*See id.* at 1291–92 (Hart).)

---

**20.** MasterCard sent a letter explaining to Banco Popular the terms and assurances it wanted in connection with Banco Popular's issuance of a competitive card. (*See* Ex. P–0145.) Banco Popular then negotiated with MasterCard for terms that it found fully reasonable. (*See* Tr. 168–73 (Kesler, Banco Popular); Ex. P–0144.) MasterCard never even sought to enforce such terms on Banco Popular's issuance of Visa cards. (*See* Tr. 173–74 (Kesler).)

**21.** To issue American Express cards in the United States, Banco Popular recognized that it would need marketing and other financial assistance from American Express to defray the costs associated with losing its Visa and MasterCard memberships. (*See* Tr. 161 (Kesler).)

In an attempt to conform to By-law 2.10(e) and the CPP, Advanta went forward with a "Rewards Accelerator" program that linked MasterCard usage on an Advanta bankcard with aspects of American Express' rewards program. (*See id.* at 1292–93 (Hart).) The program resulted in litigation between Visa, MasterCard and Advanta; Visa and MasterCard claimed that the MasterCard link to American Express' rewards program violated By-law 2.10(e) and the CPP. (*See* Tr. 1839 (Lockhart, MasterCard).) The litigation concluded with a settlement that terminated the Rewards Accelerator program. (*See* Tr. 1293–95 (Hart).)

Advanta sought to issue American Express cards to its small business customers in late 1998, after it had sold its consumer card portfolio to Fleet. (*See* Tr. 722–23 (McCurdy, American Express).) In addition to the American Express brand's attractiveness to its small business customers, Advanta was interested in American Express' data capture capabilities and its "privileged rates" program under which small business cardholders would be entitled to discounts at affiliated merchants. (*See id.* at 723–25 (McCurdy, American Express).) American Express recognized that Advanta would bring small business lending expertise that American Express itself did not possess. (*See id.* at 728–29 (McCurdy).) At that time, Advanta had 250,000 small business customers whose accounts Advanta would have to convert from Visa or MasterCard to American Express if it were to move forward with the issuance of the American Express cards. (*See id.* at 729–30 (McCurdy).) Advanta expressed "tremendous concerns" to American Express both about the actual cost of such a conversion, as well as the

potential damage such a conversion would cause to its customer relationships. (*Id.* at 730 (McCurdy, American Express).) Although Advanta would have been interested in issuing American Express small business cards if the defendants' exclusionary rules did not exist (*see id.* at 731 (McCurdy)), it did not in the present environment proceed with the issuance of those cards. (*See id.* at 733 (McCurdy).)

### c. Bank One

Bank One, one of the largest card issuers in the United States, has held numerous discussions with American Express regarding the possibility of issuing American Express cards. (*See, e.g.,* Christofferson (Banc One/First U.S.A.) Dep. at 56–57, 80, 136.) Its executives testified that such an arrangement would benefit both Bank One and American Express by emphasizing the strengths and abilities that each party offered. (See Neubert (Banc One) Dep. at 73–74) Bank One's "core value" was its experience and knowledge of "all that goes into running a revolving card business." American Express, on the other hand, brought experience in the "nonrevolving charge business [and] marketing capabilities." (Neubert Dep. at 86–87.)

Bank One recognized, however, that any card-issuing arrangement with American Express would result in the unacceptably high cost of the bank losing its association memberships. It retained independent consultant Jerry Craft [22] to analyze possible American Express opportunities. (*See* Neubert Dep. at 141–46.) Craft's assessment showed that "Direct Issuance" of American Express cards was Bank One's "most desirable" option for strategic fit, customer control and data ownership, and

---

**22.** Craft has nearly thirty years' experience at top Visa and MasterCard issuers such as NationsBank (now Bank of America) and Wacho-

via. He was called *by Visa* to testify on its behalf in the *Mountain West* trial. (*See* Craft (Banc One) Dep. at 1–15, 81–82.)

that it would benefit the bank and its customers.[23] But this option was the "worst" as to the "barriers" resulting from the "current state of association By-laws and policies." (Ex. P–0227 at 11.) Craft testified that direct issuance would trigger association retaliation and that Bank One could not afford to leave the associations due to their extended merchant acceptance networks. (*See* Craft Dep. 68–69.)

Absent the exclusionary rules, it would have tried to issue American Express cards. (*See* Neubert (Banc One) Dep. 77–78; Christofferson (Banc One/First U.S.A.) Dep. 87; *see also* McCurdy, Tr. 778.) In fact, with the hope that the Government's lawsuit would result in a prompt settlement and elimination of the defendants' exclusionary rules, Bank One representatives contacted American Express immediately after the Government filed its complaint in order to become American Express' first U.S. network issuer. (*See* Ex. P–0104 at AMEX0002580436–37.)

In addition to the three banks discussed above there were many additional Visa and MasterCard member banks which expressed interest in issuing American Express cards. Prior to Mr. Golub's Credit Card Forum speech in 1996, American Express had discussions with Nations Bank, Metris (Fingerhut), Chemical, Manufacturers Hanover and Bank One about possible bank issuance of American Express cards. (*See* Tr. 2352–53 (Chenault, American Express); Zebeck (Metris/Fingerhut) Dep. at 48–49; Ex. P–0818.) After the Golub speech, American Express had conversations with Union Bank, First Consumers National, Key Corp, First USA, MBNA, Dime, Mellon, Wachovia, Banco Popular North America, and Heartland Savings Bank. (*See* Tr. 1477–87 (Cracchiolo, Ameri-

can Express); Tr. 645, 722–31, 740, 743–47, 753–73, 784–87 (McCurdy, American Express); Ex. P–0698.) Because of the exclusionary rules, however, the discussions were "nonstarter[s]." (Tr. 2368 (Chenault); *see also* Ex. P–0946 at 4 ("given [MasterCard's] current policy," Union Bank "would not currently pursue American Express' proposal."); Ex. P–0278, Ex. P–0127 and Ex. P–0128 (internal MasterCard analyses of particular segments of Visa and MasterCard issuers' portfolios that issuers might convert to American Express cards if given the opportunity); *cf.* Ex. P–0767 at VU0634319 (Citibank presentation to Visa and others describing desire to "eliminate line of business restrictions").)

American Express' dealings with Capital One are a typical example of the impact of the exclusionary rules. American Express has executed a network card deal with Capital One, one of the largest United States Visa and MasterCard issuers, in the United Kingdom (where the associations do not have equivalent exclusionary rules). Capital One told American Express' Ken Chenault that the bank could not move forward with discussions about issuing American Express cards in the United States due to the exclusionary rules. (*See* Tr. 2369–71 (Chenault).) As a result, United Kingdom consumers can obtain a Capital One issued American Express card, but United States consumers cannot.

Discover has also found that defendants' exclusionary rules have deterred United States issuers from entering issuing arrangements with Discover. For example, First USA approached Discover to discuss a possible issuing arrangement. (*See* Tr. 2985–86 (Nelms, Discover).) With defen-

**23.** As Craft explained, "We felt the number one reason issuers would be willing to work with American Express is they could improve their performance and better serve their customers." (Craft (Banc One)Dep. at 73–74.)

dants' exclusionary rules in place, Discover and First USA discussed an arrangement under which First USA would assist Discover in marketing Discover cards to First USA's affinity customers so long as First USA would have the right to purchase the resulting Discover card accounts when the by-laws were changed or eliminated. Although First USA would have liked to issue Discover cards itself, it would not do so for fear of losing the ability to issue Visa and MasterCard cards. (*See id.* at 2987, 3051 (Nelms).)

### C. Multiple Bank Issuers Strengthen Networks and Significantly Enhance Network–Level Competition

Multiple bank issuing is important for a general purpose card network to effectively offer network-level services. (*See* Tr. 5224–25 (Pascarella, Visa U.S.A.).) Robert Selander admitted that a network cannot maintain "a viable global franchise [with only] one or two issuers." (*Id.* at 5611–12 (Selander, MasterCard).) Member banks provide networks with an effective distribution system. (*See* Tr. 4819 (Knox, Visa U.S.A.); P–0799 at VU1154199; P–0582 at VIF7035389; Partridge (Visa Int'l) Dep. 126, 130–3.) In particular, multiple issuers allow a network to take advantage of "better skills" and "new techniques" of various issuers, including coming up with new ways to get credit cards to consumers. (Bignall (Visa Int'l) Dep. at 113.) As recognized by Visa U.S.A., "[t]he merchants and cardholders signed in rural and isolated locations represent a difficult and costly market for competing products to tap. By providing expanded Visa access to these markets, the small institutions provide a marketing and cost advantage over that of competing *systems.*" (Ex. P–0050 at 714326 (emphasis added); *see also* Schmidt (Visa U.S.A.) Dep. at 18–19; Siddharth Mehta (Household) Dep. at 51–52.)

Multiple bank issuance of general purpose cards strengthens general purpose credit and charge card networks in three fundamental areas: increased card issuance, increased merchant acceptance, and increased scale. When combined with new products and services that bank issuance provides—such as the practical ability to offer customers a debit product on the network infrastructure (discussed below)—strengthening the networks in these areas benefits consumers both directly (by ensuring availability of new products and services) and indirectly (by lowering network costs that are passed on to consumers).

#### 1. Increased Card Issuance

Acquiring additional issuers leads to increased card issuance. Even though there are thousands of issuers already in the United States, more are always better. (*See, e.g.,* Beindorff (Visa U.S.A.) Dep. at 344–46; Hanft (MasterCard) Dep. at 190–91; Russell (Visa U.S.A.) Dep. at 40–41; Schall (Visa U.S.A.) Dep. at 207–10; Ex. P–0867 at WBC9980–81.) The same would hold true for American Express (and Discover) should the exclusionary rules fall. Visa U.S.A.'s general counsel testified that By-law 2.10(e) exists because of the likelihood that the number of American Express cards issued in its absence could be substantial. (*See* Allen (Visa U.S.A.) Dep. at 313–14.) Other Visa executives also acknowledged that American Express' partnerships with banks in the United States would result in an increase in the number of American Express cards in circulation. (*See* Tr. 4394–95 (Beindorff, Visa U.S.A.); *see also id.* at 5253 (Pascarella, Visa U.S.A.).)

#### 2. Increased Merchant Acceptance

Merchant acceptance, and the consumer perception of merchant acceptance, is vital

to a network for obvious reasons. (*See* Tr.2005 (Pascarella, Visa U.S.A.); Tr. 2219 (Saunders, Household/Fleet); Pascarella Dep. at 172–73.) Card features are irrelevant if consumers cannot use the card. (*See* Tr. 4355 & 4387 (Beindorff).) As a result, increased merchant acceptance— and increased perception of merchant acceptance—can lead to an increase in card issuance and transaction volume. (*See id.* at 1810–11 (Lockhart, MasterCard); *id.* at 2977–78 (Nelms, Discover); *id.* at 4390 (Beindorff); *see also* Ex. P–0619 at VISA002708–09.)

### a. American Express Merchant Acceptance Issues

In 1999, both Visa and MasterCard believed that they had a significant acceptance advantage over American Express in the United States, which they sought to maintain. (*See* Tr. 4423 (Beindorff); *id.* at 5213–14 (Pascarella, Visa U.S.A.); *id.* at 3622 (Selander, MasterCard).) American Express has a merchant acceptance level measured by percentage of card holder spend[24] of about 96%. When measured by looking at the percentage of merchants that accept general purpose cards that also accept the American Express card, however, it is lower. (*See* Tr. 2716–17 (Golub, American Express).)

To raise its merchant acceptance rate, American Express has lowered it merchant discount rate, reorganized its sales force, and developed arrangements with merchant acquirers. Among small merchants American Express offers a flat fee discount rate (merchants with volume of under $5,000 per year). Even with this program in place, with a discount rate that is comparable and possibly lower than that of Visa and MasterCard, American Express has not been able to attract a significant number of small merchants. It does not believe that this will improve until small merchants see more consumers with American Express cards. (*See id.* at 2720–21 (Golub, American Express).)

### b. Discover Merchant Acceptance Issues

Domestic and international acceptance is Discover's "biggest strategic issue" today. (Tr. 2976–77 (Nelms, Discover).) Discover has taken steps to increase its merchant coverage, including using independent sales forces to acquire merchants, providing incentives to major retailers, streamlining acceptance functionality by simplifying fraud and chargeback rules as compared with the associations, and improving Discover's price to merchants. (*See id.* at 2979–80 (Nelms); *see also* Robins *MountainWest* Dep. at 35–37.)

Discover has been able to narrow its merchant acceptance gap in the United so that it is now accepted at close to ninety percent of the locations that accept Visa or MasterCard. (*See* Tr. 2981–82 (Nelms).) However, it still suffers from a perception gap (based on its lower acceptance in the past) that places it at a competitive disadvantage because consumers are embarrassed when their card is rejected and do not try to use it again. (*See id.* at 2982; *id.* at 2976–77; *id.* at 2982 (Nelms).) Nelms therefore views Discover's acceptance at ninety percent of Visa

**24.** "Card holder spend" measures the amount of multiple-cardholder spending that could be transacted on American Express cards (meaning at merchants that accept American Express, whether an American Express card is used or not) relative to the total credit card spending of those multiple cardholders. A cardholder spend of 96% means that consumers holding both an American Express card and a bank-issued Visa or MasterCard could pay for 96 out of every 100 dollars of credit expenditures with the American Express card. (*See* Tr. 2715 (Golub).)

and MasterCard U.S. locations as deceiving, because Discover's merchant acceptance perception gap results in customers refraining from using Discover cards even where they are accepted. (*See id.* at 2982 (Nelms).)

Discover has already lowered its merchant discount rate to gain acceptance (*see* Ex. P–0416 at MCJ4002287 (Discover offers "extremely low interchange/discount rates")); lowering it further would not close the gap. Discover instead needs more card issuance and transaction volume, which can only realistically be obtained via third-party issuers, to become a more relevant network. (*See id.* at 2982–84 (Nelms); *see also* Heasley (Visa U.S.A.) Dep. at 12 (increased cardholder base makes it easier to increase merchant acceptance).)

### 3. *Scale and Relevance*

Multiple issuers provide networks with the scale, and, in turn, the relevance that they require to be strong competitors. (*See* Tr. 6060 (Schmalensee).) As Charles Russell, former CEO of both Visa U.S.A. and Visa International, explained, scale drives the card network business and lowers network costs, thereby increasing the networks' ability to offer services at lower, competitive prices. (*See* Russell (Visa U.S.A.) Dep. at 39–40; *see also* Tr. 2424, 2579, 2614 (Chenault, American Express); *id.* at 2723, 2768 (Golub, American Express); Pascarella (Visa U.S.A.) Dep. at 136; Krumme (JCB) Dep. at 178–81, 191–92; Reed (Citibank) Dep. at 39–41; Partridge (Visa Int'l) Dep. at 199–200.) Both Discover and American Express seek multiple issuers to drive volume to reach a scale that would increase their networks' competitiveness. (*See* Tr. 2979 (Nelms, Discover); *id.* at 2563 (Chenault, American Express).)

### D. Banks Provide Essential Attributes to Network Competitors

The Visa and MasterCard member banks are the sources of virtually all of the expertise in issuing general purpose cards in the United States outside of American Express and Discover themselves. Together, those member banks are responsible for 85 percent of all credit card issuance and are the source of innovative card marketing ideas. (*See generally* M. Katz Dir. Test. ¶¶ 281–90 & Figure 20.) As discussed below, the banks provide special skills, expertise and relationships with consumers that collectively strengthen the general purpose card networks.

The Visa and MasterCard member banks have substantial value as card issuers and offer hard-to-duplicate card issuing skills and experience. (*See, e.g.,* Zebeck (Metris/Fingerhut) Dep. at 25 (each of MasterCard's 3,000 issuers have their own unique point of differentiation from other MasterCard issuers).) Even though American Express and Discover are successful issuers, they cannot alone duplicate the strength and breadth of issuance and acceptance achieved by the defendants through issuance by thousands of different entities. (*See* Tr. 2359–60 (Chenault, American Express); *id.* at 2990–91 (Nelms, Discover).)

For example, Advanta had exceptional skill at targeting consumers, stratifying markets and identifying target prospects. With its expertise at tailoring offers to those targeted prospects, Advanta earned higher returns than most firms in the industry. (*See* Tr. 1414–15 (Hart, Advanta/MasterCard).) Similarly, MasterCard (and Visa) member First USA (which was subsequently purchased by Bank One) "had strong database marketing skills, had strong alliance marketing capabilities," as well as "size and capabilities" that would

appeal to American Express. (*See id.* at 1793–94 (Lockhart, MasterCard).)

Many banks have developed specialized expertise in profitably targeting particular consumer segments. Banco Popular has established expertise in marketing cards (including American Express cards) to the Hispanic population in Puerto Rico. But for defendants' exclusionary rules, Banco Popular would use its expertise in issuing American Express cards in the United States, specifically targeting the Hispanic population. (*See* Tr. 166 (Kesler, Banco Popular); *see also* Ex. D–0554.) Similarly, MBNA possesses specialized co-branding/affinity knowledge and expertise. (*See* Tr. 2744–45 (Golub, American Express); *see also* Heasley (Visa U.S.A.) Dep. at 179–81.) Banks such as Metris and Providian specialize in marketing to low-income ("sub-prime") households. (*See* Siddharth Mehta (Household) Dep. at 78–81; Zebeck (Metris/Fingerhut) Dep. at 25–27.)

### 1. Banks Offer Cross-Selling Opportunities to More Profitable "Relationship" Customers

In order to be competitive, networks need access to bank issuers. Banks maintain the "strongest" position of trust with consumers, another significant advantage in the cross-selling of general purpose cards to consumers. (*See* Tr. 4815–16 (Knox, Visa U.S.A.); Ex. P–1265 at VU0592765; Ex. P–1015 at V02 0110.) Cross-selling refers to the ability to market products to consumers with whom a relationship already exists. Cross-selling is especially important as the effectiveness of direct mail solicitation decreases. (*See* Tr. 2372 (Chenault, American Express); *see also* Tr. 2207 (Saunders, Household/Fleet) (direct mail response rates have dropped from three to five percent in the early '90s to a current average of approximately one percent); Ex. P–0690 at VU0078871 (direct mail has become a less effective marketing tool); Ex. P–0486 at MCJ4351612 ("All else being equal . . . customers are significantly more likely to choose a card offered by their primary financial institution than any other institution").)

Cross-selling by banks at and through their branches is a key channel for profitable new account acquisitions across all product lines and has been acknowledged as the second-most significant driver of new card acquisition. (*See, e.g.,* Ex. P–0706; Ex. P–0829; Ex. P 1213 at MCJ2352016.) Recognizing this fact, the associations have developed cross-selling training programs for their members and a number of member banks have generated significant numbers of new accounts through cross-selling. (*See* Ex. P–0396 at MCJ2352016; Ex. P–0401 at MCJ2369645; Ex. D–3975 at MCJ0115821; Ex. P–0060 at 1058324; Ex. P–0030 at 0691887; Schall (Visa U.S.A.) Dep. at 16–20; Nole (First Union) Dep. at 42–43; Tr. 1158–59 (Tylenda, Fleet); Ex. P–0209 at F3853; *see also* Rhein (Wells Fargo) Dep. at 13–18; Arena (Citibank) CID Dep. at 50–51; Ex. P–0871 at WBC16636 (Wachovia).)

Such branch solicitations are also less expensive to issuers than are direct mail solicitations. (*See* Ex. P–0835 (Visa U.S.A.'s 1998 cross-selling practices "benchmark study" reporting that member branch solicitation cost less than $29 per account acquired, while direct mail solicitation cost more than $60 per account acquired).) Issuers also offer special features or services to their cross-sold customers that they do not provide to direct mail, non-relationship customers. Wachovia and U.S. Bank customers, for example, receive a single consolidated statement for both their checking and credit card accounts, and can view their credit card ac-

count information through bank ATMs. (*See* Ex. P–0835 at VU 1587136, 288.)

Through the use of account information uniquely available to banks with whom those customers have a demand deposit account relationship, these bank issuers more cheaply, easily and effectively find and market credit cards to those consumers. (*See* Tr. 5393–94 (Williamson, Visa Int'l); Laufer (Argus) Dep. at 107–09; Armentrout (Crestar) Dep. at 23; Nole (First Union) Dep. at 78–81; Cosman (BankBoston) Dep. at 36; Tr. 5319–20, 5322 (Heasley, Visa U.S.A.); Ex. P–0529; Heasley Dep. at 107–112; Fulton (Bank of America) Dep. at 24, 32–35; Ex. P–0082 at ABT002468.) Additionally, banks regard information about their customers as proprietary and do not share it with third parties, including American Express and Discover. (*See* Tr. 5319–20 (Heasley, Visa U.S.A.); Phillips (Bank of America) Dep. at 79–80.) Issuers have found that commercially available credit reports alone provide significantly less reliable information about prospective cardholders than banks possess about potential cross-sale targets. (*See* Ex. P–0804 at VU1207313.)

Furthermore, "relationship" accounts are substantially more profitable than non-relationship accounts. (*See* Tr. 4946 (Wells, Wachovia); Tr. 5318 (Heasley, Visa U.S.A.); Boardman (Visa Int'l) Dep. at 117; Nole (First Union) Dep. at 45–46; Fulton (Bank of America) Dep. at 20, 44–45, 53, 61–62, 67–68; Phillips (Bank of America) Dep. at 108; Tonnesen (Visa Int'l) Dep. at 163; Ex. P–0219 at First Union 7504; Ex. P–0220 at First Union 7548; Ex. P–0833 at VU1586975 (May 1999 study stating that 72 percent of issuers claim branch accounts more profitable).) The increased profitability of relationship accounts is driven by several factors. First, defendants and their member bank executives have recognized that relationship customers have a higher response rate to new account solicitations. (*See* Tr. 4951–52 (Wells, Wachovia); P–0871; Tr. 2214 (Saunders, Household/Fleet); Fulton (Bank of America) Dep. at 40; Hegarty (Wachovia) Dep. at 78–79, 94–95; Ex. P–0078 at 1BA011021051.) Second, relationship customers use their primary bank's card more frequently than other cards. (*See* Nole (First Union) Dep. at 80; 115–16; Ex. P–0081 at 1BA012031638 ("higher utilization").) Third, such customers are less likely to close their account. (*See* Tr. 5321–22 (Heasley, Visa U.S.A.); Heasley Dep. at 105–06; Beindorff (Visa U.S.A.) Dep. at 197–98; Flood (MasterCard) Dep. at 74; Armentrout (Crestar) Dep. at 71; Boardman (Visa Int'l) Dep. at 115–16.) Lastly, relationship customers are less likely to default and result in a credit loss to the bank. (*See* Armentrout Dep. at 72–73; Fulton (Bank of America) Dep. at 42–43, 46–47, 62, 68; Nole (First Union) Dep. at 80–81; Ex. P–0080 at 1BA012012300; Ex. P–0833 at VU1586975 ("92% of issuers claim losses are lower").)

The defendants' members issue significant numbers of cards to their retail bank customers. (*See, e.g.*, Beindorff (Visa U.S.A.) Dep. at 174–75 (20 percent of outstanding Visa cards are issued by banks to their DDA customers); Tr. 1228, 1231–32 (Tylenda, Fleet); Ex. P–0207 (before the bank expanded nationally, 52 percent of Fleet's cardholders had another relationship with Fleet); Tr. 4953 (Wells, Wachovia) (Wachovia has issued credit cards to 29 percent of its retail customer base); Ex. P–0835 at VU1587187 (Coamerica reported its DDA penetration to be 50 percent).) Through the exclusionary rules, the defendants' members foreclose American Express and Discover from competing for such relationship cardholders.

### 2. *Traditional Banks Offer Links to Hundreds of Millions of Demand Deposit (Checking) Accounts*

Banks are also important to network competitors because they provide the link to the checking accounts that will provide the platform for the next wave of card products. Roughly ninety percent of U.S. families have at least one checking account ("demand deposit account" or "DDA"). Visa and MasterCard member banks are the custodians of the vast majority of these accounts. United States consumers view the DDA as their primary financial relationship. (*See* Tr. 5394 (Williamson, Visa Int'l).) Defendants too have stressed the importance of the DDA as the primary relationship that a bank has with the consumer. (*See, e.g.,* Tr. 4415 (Beindorff, Visa U.S.A.); McEwen (Visa U.S.A.) Dep. at 31–33; Ailworth (Visa U.S.A.) Dep. at 145. Because they directly access the customer's DDA, debit cards are now and will remain in the future the core focus of defendants' relationship card strategies. (*See* Tr. 4414–15 (Beindorff) (discussing Ex. P–1269 at VU0264999); *see also* Tr. 4811 (Knox, Visa U.S.A.).)

Bank access to DDA accounts is of competitive significance for two distinct reasons: (1) a network that is able to utilize debit accounts has a link to the next generation of payment devices for which the debit account will be the "core" payment service; and (2) a network with the ability to provide debit products (particularly offline debit) gains economies of scale by running additional products over the same network facilities.

Because the debit card accesses the cardholders' DDA, the core of the bank's relationship with its retail bank customers, defendants view debit cards as the "portal" to chip-based "relationship" cards. (*See* Tr. 5394–95 (Williamson, Visa Int'l); Ex. P–0547 at VIF0598559; Ex. P–0456 at MCJ4251014 ("Debit will be a bridge to the chip platform."); Ex. P–0064 at 1073804 ("[t]his migration will be led through debit").)

Through a single multi-function chip card, defendants intend that issuers will be able to provide their customers the ability to access credit *and* debit accounts, as well as offering other features such as "sophisticated loyalty schemes." (*See, e.g.,* Tr. 5394–95 (Williamson, Visa Int'l) (developing a multi-function chip-based relationship card is part of Visa International's current strategy); Ex. P–1078 at CC 09 016482; Ex. P–0547 at VIF0598556; Ex. P–0704 at VU0241290; Tr. 2209–10 (Saunders, Household/Fleet); Brooks (Visa U.S.A.) Dep. at 83–84; McEwen (Visa U.S.A.) Dep. 33–34, 38–40, 45; Ex. D–0223 at BAH 1379 (recognizing in *1985* the ability of smart cards to provide cardholders access to multiple accounts); *see also* Tr.2019–2020 (Lockhart, MasterCard) (MasterCard global strategy since the mid 1990s has presumed that chip-based debit cards would be the "primary access tool" for cardholders); Ex. D–3872 at MCI0369701–03.) Visa research has revealed consumer interest in these multi-function "relationship" cards. (*See* Ex. P–0549 at VIF0604470; Tr. 5396 (Williamson, Visa Int'l); Schapp (Visa Int'l) Dep. at 48–51.)

As suppliers of DDAs, the centerpiece of the multi-function relationship cards, banks are in the best position to offer these next generation products to consumers. (See Tr. 5394 (Williamson); Tallman (Visa U.S.A./Visa Int'l) Dep. at 161–62; Ex. P–0535 at VIF0403236 (because banks possess customer relationships, "the most valuable assets available," they "have the upper hand in the evolution of their industry").) By forbidding their member banks from issuing competitors' general purpose cards, defendants' exclusionary rules thus

foreclose the competitive threat that American Express and Discover otherwise might pose to that relationship card strategy. (*See* Beindorff (Visa U.S.A.) Dep. at 307–09; Ex. P–0819 at VU1367107; Ex. P–0067 at 1123830.)

There are two basic classes of debit products available in the United States today—on-line and off-line. Although both take money directly from a checking account, they function differently. On-line debit cards require consumers to enter a PIN number on a PIN pad at an ATM or at the point of sale. The transaction is authorized and settled instantaneously through immediate access to account balance information for the account to which the card is linked.

An offline debit card, such as a Visa check card or MasterCard's Master Money card is also authorized instantaneously, but the authorization is based upon a file of information that is held by a third party processor. This file contains account balance information supplied to the processor on a daily basis by the issuing member banks. After authorization, the processor sends a transaction file to the issuer of the card who debits the transaction to the customer's demand deposit account. (*See* Ex. D–0820.) American Express and Discover have studied issuing off-line debit products over their networks in the United States to compete with Visa and MasterCard's virtual monopoly in this area. They have found, however, that without access to banks' demand deposit accounts this is not a viable strategy. (*See* Tr. 2994–96 (Nelms, Discover); *id.* at 2747–48 (Golub, American Express); *id.* at 2378 (Chenault, American Express); *id.* at 946 (McCurdy, American Express); Hochschild (Discover) Dep. at 104–05; Ex. P–0114; Ex. P–0084.)

The process used by bank issuers to settle off-line debit transactions is only available when the debit card issuer also holds the cardholder's demand deposit account. Accordingly, while either the Discover or the American Express network could follow the authorization process described above if they had member bank issuers operating on their networks, American Express and Discover, as issuers, cannot. Without access to bank accounts, an American Express or Discover off-line debit card would have to be authorized and settled through the Automated Clearinghouse (ACH), an inferior system for at least two reasons. First, in an ACH transaction the card issuer lacks the ability to check the cardholder's account balance information before the transaction is authorized, and once authorized clearance of the transaction can take three to five days or longer. These factors entail increased fraud and credit risks relative to Visa and MasterCard off-line debit products. Second, in ACH transaction consumers receive only limited transaction information on their bank statements. (*See* Tr. 2995 (Nelms, Discover); *id.* at 2624–25, 2627, 2629–30, 2684–85; 2697–98 (Rothschild, American Express); Tr. 2379 (Chenault, American Express); *id.* at 1619–20 (Cracchiolo, American Express); Ex. P–1121 at AX008127.)

In addition, American Express or Discover off-line debit cards issued without bank partners do not benefit from the essentially free distribution system of the Visa/Mastercard networks. Bank issuers on the Visa/MasterCard networks simply attach off-line debit functionality to the ATM cards routinely distributed to most banking customers. In contrast, American Express and Discover would have to convince bank customers to take a second debit card in addition to the debit card linked to their bank accounts. (*See* Tr. 2996–97 (Nelms, Discover); *id.* at 2629;

2701–02 (Rothschild, American Express); Ex. P–1121 at AX008127.)

The inability to provide debit functionality on a cost-effective basis further limits the effectiveness of American Express and Discover as suppliers of credit and charge card network services. (*See* Tr. 2996–97 (Nelms), *id.* at 2613–14 (Rothschild).) Because off-line debit transactions run over the same network as credit and charge transactions, the addition of debit volume improves network economies of scale and increases network relevance. (*See id.* at 2996–97, 3077 (Nelms); *see also id.* at 2613–14 (Rothschild).) In addition, debit functionality makes a network more attractive for consumers and banks desiring a range of products over a single brand or card. (*See* Ex. P–1268 at VU0231981.)

### 3. *Non–Bank Issuers Are Not Adequate Substitutes*

Because of the exclusionary rules, American Express has considered partnering with retailers and insurers. (*See, e.g.,* Tr. 787–90 (McCurdy, American Express) (discussions with State Farm); *id.* at 2600–01 (Chenault, American Express) (discussions with Neiman Marcus); Ex. D–0609 at AMEX0004397734.) Such non-bank issuers are not an economically attractive alternative to member banks for issuing general purpose credit and charge cards. Those organizations lack the expertise, experience, personnel, and reach to be effective marketers of cards. Historically, only a handful of retailers and insurers have chosen to enter the general purpose card market. For example, in 1994, only four retailers (Nordstrom, Circuit City, JC Penney, and The Spiegel Group) were among the top 200 bank card issuers, and they made up only 0.4 percent of total charge volume of the top 200 bank card issuers. (*See* Ex. D–3250 at MCJ4368355; Ex. D–1792 at

VUTE0004006–07; Ex. D–3232 at MCJ4368173–74; Ex. D–3233 at MCJ4368183; and Ex. D–3237 at MCJ4368223.) In addition, only a handful of insurers have issued general purpose credit cards in the past decade, including USAA, Travelers, Prudential, and Primerica. In 1994, these four issuers made up only 2.5 percent of the credit card volume of the top 200 bank card issuers. (*See id.*) Moreover, due to recent changes in banking and insurance laws, insurance companies are partnering with Visa and MasterCard members banks (*e.g.,* Citibank merging with Travelers Group), thereby further reducing the pool of prospective non-bank issuers. (*See* Tr. 791–92 (McCurdy, American Express).)

Small banks not in the Visa and MasterCard system also lack card-issuing infrastructure and the skills, expertise, and relevance that Visa and MasterCard issuing banks provide. (*See* Krumme (JCB) Dep. at 183–85, 191–92, 196.) Hundreds of banks already have agent relationships with companies like MBNA and First USA whereby those banks provide the services to issue cards to the small banks' customers. (*See* Christofferson (Banc One/First U.S.A.) Dep. at 71–72.)

Nor can American Express and Discover profitably compete to buy additional portfolios to increase their size—and therefore merchant "relevance"—principally because they cannot be Visa or MasterCard members. If they buy a portfolio they must flip it to their own network immediately; the high loss rates in doing so make it impossible for either proprietary system to bid profitably for such portfolios in comparison to banks, who need not switch brands at all. (*See* Tr. 2216–17 (Saunders, Household/Fleet) (Household would leave relationship with JCB rather than risk forfeiting its Visa and Master-

Card membership should the exclusionary rules be applied to JCB).)

### E. Bank Issuance Across All Networks Would Increase Product Variety And Consumer Choice

#### 1. *Increased Card Consumer Choice*

Because cardholders believe there are differences among credit card brands, many issuers want to be able to deliver them a brand choice. (*See* Tr.2071–72 (Boudreau, Chase); *id.* at 1236–37 (Tylenda, Fleet); Zebeck (Fingerhut/Metris) Dep. at 55–56; Tonnesen (Visa Int'l) Dep. at 136; Ryan *MountainWest* Dep. at 8, 34.) Ron Zebeck believed that Metris' ability to offer American Express products would allow him to appeal to a customer segment that he could not reach merely with Visa or MasterCard branded cards. (*See* Zebeck Dep. at 147–48; *see also* Hartnack (Union Bank) Dep. at 29–30; Blewett (Banc One/First U.S.A.) Dep. at 32, 45–46; Fehringer (Visa Int'l) Dep. at 147.) Similarly, many banks also have an interest in offering multiple brands to satisfy consumer demand. (*See* Tr. 6064 (Schmalensee) (all else being equal, "a bank would prefer to have the option to issue multiple brands").)

This is so because the issuers recognize that the combination of banks' knowledge and features with network features and brand preference yields customer value. Visa International's long-range strategy proposal written in 1993 recommended increased differentiation from MasterCard. Visa International tried to sell its proposal to its dual members by arguing that if "Visa services" were differentiated from MasterCard services, "[m]embers will be able to *combine their own marketing strategies with the capabilities of their chosen system* to create more real and more easily perceived differences in the marketplace." (Ex. P–1176 at V052280

(emphasis added).) These combinations can effectively meet consumer demand because general purpose card issuers are not merely distributors of commodity products such as "spices or ice cream." A card issuer, instead, "actually determines the main characteristics of the card which it puts on the market (in competition with the other issuers)." (*See* Tr. 3137–38 (B. Katz, Visa U.S.A./Visa Int'l) (discussing Ex. P–0727 at ¶ 28).)

To return to the example of Capital One and American Express in the United Kingdom, it is undisputed that *either* Capital One or American Express could reach every consumer with an offer of *some* brand of credit card (*see* Tr. 2543 (Chenault, American Express)); yet, it is only the combination of Capital One and American Express that provides consumers the ability to take advantage of the combined skills of both entities. As Mr. Chenault explained:

"What you need to have a distinction on is pure capability versus the combination of two brands into the marketplace. Consumers like to, in fact, have an additional relationship, so Capital One can bring in American Express. Obviously anyone has the capability to mail a wide range of customers, but it is that combination that comes in and the ability to match products and services to specific customer segments. That is why Cap One did the deal in the U.K. Their arm was not twisted. They saw the benefits to grow their business."

(Tr. 2542–43 (Chenault).)

General purpose card issuers, if permitted, would be attracted to features of the American Express or Discover networks. Because American Express and Discover are closed-loop systems that deal directly with merchants, those brands have the infrastructure to collect data and details

about spending that many consider superior to defendants' capabilities. Utilizing this resource, they could offer their bank issuers, merchants and consumers sophisticated data mining skills to provide targeted promotions to various consumer segments. (*See id.* at 2544 (Chenault)); *id.* at 3011 (Nelms, Discover); *id.* at 764–67 (McCurdy, American Express); Partridge (Visa Int'l) Dep. at 138; Somerville (Visa Int'l) Dep. at 81–82. Both Advanta and Wachovia expressed interest to American Express in the data capture capabilities of its closed-loop network. (*See* Tr. 724–25, 762 (McCurdy).)

By working with American Express, banks could develop products that provide unique benefits to their customers. Banks could construct American Express products that are linked to rewards programs in their local market (something that could be difficult for American Express to do), or construct products that link the card product to transaction accounts, to asset management accounts, to sale of mortgages or other financial products that the bank offers. (*See* Tr. 2747 (Golub, American Express); *see also* Hochschild (Discover) Dep. at 162–63.) Because of the exclusionary rules, Banco Popular customers in Puerto Rico who wish to have Platinum service using the American Express card can do so, but customers of Wachovia (which expressed an interest in a similar program) do not get the same benefit. (*See* Tr. 722–23 (McCurdy); *see also* Hegarty (Wachovia) Dep. at 105–06.)

### 2. *Increased Merchant Consumer Choice*

Not only issuers and card consumers but also merchants would benefit from an increase in competition among general purpose card networks, because merchants, as well as issuers, are consumers of network services. While, as Dean Schmalensee explained, it is very difficult to analyze the effects on consumer welfare of increases or decreases in interchange rates, merchants—and ultimately consumers—have an interest in the vigor of competition to ensure that interchange pricing points are established competitively. (*See* Tr. 5983 (Schmalensee).) Moreover, enhanced competition from American Express and Discover would likely cause defendants to be more responsive to the interests of merchants. For instance, when Discover successfully convinced Wal–Mart in the early '90s to accept its credit cards, Visa's concern about potential volume loss at Wal–Mart led it to offer promotional support to Wal–Mart for the first time. (*See* Robins *MountainWest* Dep. at 35–44.) The enhancement of intersystem competition and the strengthening of American Express and Discover as network competitors would likely have similar results.

### F. Visa and MasterCard Would Respond to Greater Network Competition From American Express and Discover By Increasing Their Own Competitive Intensity

Repeal of defendants' exclusionary rules would also cause Visa and MasterCard to respond to the greater network competition by offering new and better products and services of their own, thereby benefitting consumers. For example, Eugene Lockhart recognized that MasterCard would have to "speed up" its development of a premium card product in response to the American Express initiative with member banks. (*See* Tr.1998–99 (Lockhart, MasterCard); Ex. P–0277 at MC6383.) Lockhart also noted that MasterCard would have to consider partnering with a travel agency to compete with American Express travel services.

A Visa International Competitive Assessment cautions that Visa must "proac-

tively strengthen" its product offerings with member banks in response to actual and potential American Express/member bank card issuing relationships abroad. Moreover, the same memorandum notes that Visa would have to increase its competitive intensity in the United States should American Express be able to work with member banks: "To date, AmEx has been precluded from partnering with U.S. banks, although that situation could change. Since bank partners could significantly increase acceptance and cards, Visa needs to monitor the situation and counter with competitive products that meet banks needs." (Ex. P–0575 at VIF6008245.)

### G. An Exemplar: Bank Issuance of American Express "Blue" Would Increase Network Competition and Consumer Welfare

Just as consumers benefit from banks offering different Visa and MasterCard products, consumers would benefit from the additional choice banks would be able to provide by offering American Express as well. (*See* Blewett (Banc One/First U.S.A.) Dep. at 46.) One example of the potential consumer benefits prevented by the exclusionary rules would be increased issuance of the American Express "Blue" multi-application smart cards through multiple issuers. In 1999, American Express introduced and began to market "Blue from American Express," a general purpose card with both a magnetic stripe (allowing for use anywhere standard American Express cards are accepted) and an integrated circuit (allowing for multi-application products). The chip-based card has a capacity and a platform for building applications over time, for broad uses, "across a wide range of industries, applications and people." (Tr. 2755 (Golub, American Express).)

The chip's current functionality is primarily authentication of the cardholder when used in conjunction with a chip card reader on a personal computer. The reader can be used to insert the card and authenticate the person who is using that card for purposes of shopping on the Internet. Use of the card in conjunction with the reader provides for more security to the individual than would otherwise be the case. (*See* Tr. 2753 (Golub).) While this limited function is currently "marginal," Blue offers a platform and an operating system that allows applications to be developed and downloaded to the chip for widespread use by millions of consumers. (*See id.* at 2756 (Golub).)

Blue has been a success for American Express, but its success has nevertheless been constrained by the fact that because of the exclusionary rules, American Express is its sole issuer. As with any piece of computing hardware, the chip card is dependent on application developers to write the software to support innovative new uses of the card. Thus, another "chicken and egg" problem appears—software developers have no incentive to write applications for a piece of hardware that does not have wide distribution. (*See id.* at 2946 (Golub).)

Absent the exclusionary rules, American Express would make the smart card feature available to banks that issue on the American Express network. (*See id.* at 2382, 2539 (Chenault, American Express); *id.* at 2757 (Golub).) For example, Capital One and others are interested in working with American Express to issue the card and provide innovative features. (*See id.* at 2537–38 (Chenault, American Express); *see also id.* at 1499–1500 (Cracchiolo, American Express) (international network partners interested in Blue technology).)

Bank issuance of Blue on the American Express network would greatly enhance

both the functionality and scale of the Blue card. In terms of functionality, if banks were able to issue their own multi-application smart cards on the American Express network, "then in fact the whole technology community and suppliers and marketers and companies will be very focused on bringing real value functionality into the chip." (*See* Tr. 2382–83 (Chenault).) Multiple issuers would offer a variety of features designed to appeal to different consumers, maximizing the benefit of a multi-application card. (*See id.* at 2383–84 (Chenault); *id.* at 2758 (Golub).)

The mass deployment of bank issuing resources would improve the scale economies of smart card issuance. (*See* Tr. 2539–40 (Chenault).) American Express would be able to utilize the banks' distribution channels, their marketing skills, their capabilities and their customer relationships to obtain the needed scale of deployment. (*See id.* at 2383 (Chenault).) Through mass deployment, the costs of a range of added technological features could be lowered on a per-card basis. (*See id.* at 2382–84, 2539–40 (Chenault).)

Should the "Blue" smart cards continue to proliferate, particularly via multiple bank issuers, consumers will benefit because increased functionality will result from increased scale. Moreover, competition with the associations will also be enhanced because the defendants would surely respond with their own accelerated programs for development of competitive smart card products. Visa itself has recently acknowledged that its network of multiple issuers provides it a "strength to leverage" a powerful response to American Express' Blue card. Because of its "single processing platform and multiple bank membership," Visa believes that it has the ability to "develop 'one dozen solutions'" to each one that American Express can create, and that its members can use those "solutions" to customize smart cards for the particular customer segments they serve. (Ex. P–0836 at VU 1589532; *see also* Tr. 4819 (Knox, Visa U.S.A.); Ex. P–0840 at VU 1603610–11 (Visa's "Product & Operations Competitive Response: American Express Blue Card" describing Visa's advantage in responding to Blue by creating a system-wide platform with a "common set of issuing tools [that] will reduce the overall investment required of Member Banks and shorten the time to market"; such a system will allow Members "to customize the platform by adding their proprietary applications").) In short, the evidence is clear that multiple issuer networks provide the best competitive means for consumers to obtain the long-recognized benefits of smart cards.

### H. The International Experience

With no exclusionary rules in place in foreign countries, American Express has had modest success in partnering with over sixty banks to distribute its card products. It had almost three million bank-issued American Express cards in force outside the United States and more than one million of those cards have been issued as network cards in countries where consumers could have obtained an American Express card directly from the American Express network. (*See* Tr. 1520 (Cracchiolo, American Express); Ex. D–4677.)

In 1998 Visa International determined that its member banks were satisfied with their partnerships with American Express and believed that they were gaining a competitive advantage as a result. (*See* Ex. P–0566.) Visa learned that the partnerships satisfied member bank desire to "expand their range of products and affiliate with an innovative or high quality brand like Amex or to simply offer American

Express to their customers as an additional card." (*See* Ex. P–0802.)

Regardless of how one measures the "success" of American Express' efforts internationally, it is important to note that both Visa and MasterCard reacted competitively to American Express' alliances with their foreign member banks. For example, after the Visa European Region Board decided not to adopt a by-law similar to By–Law 2.10(e) in the U.S., it directed that Visa compete aggressively by making sure that members could offer a "full range of competing products." (Ex. P–0667; *see also* Ex. P–1192; Ex. P–0668.) Management responded with a number of significant initiatives offered to member banks specifically to reduce their incentive to partner with American Express. (*See* Ex. P–0238.) These included, among others, permission for multi-national corporate cards, increasing network support for the Visa premium product, and improving service to merchants. MasterCard responded similarly to American Express on the international level. (*See* Ex. P–0467.)

## I. Defendants Have Not Met Their Burden to Come Forward with a Valid Procompetitive Justification to Excuse the Anticompetitive Effects of Their Exclusionary Rules

The antitrust laws permit horizontal entities to combine their skills to create a product that could not be created separately, and such ventures may employ reasonable restraints to make the joint venture more efficient. (*See, e.g., Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 23–25, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); *Rothery,* 792 F.2d at 223–24.) However, the rule of reason still requires an analysis of whether the injury to competition effected by the restraint outweighs its purported benefits. (*See, e.g., Sullivan,* 34 F.3d at 1102 (holding that a particular ancillary restraint did not constitute a per se violation of the Sherman Act and remanding for a determination of the case under a rule of reason analysis); *Northwest Stationers,* 472 U.S. at 293–98, 105 S.Ct. 2613 (same); *cf. SCFC ILC, Inc. v. Visa U.S.A. Inc.,* 36 F.3d 958, 964–65 (10th Cir.1994) (rejecting arguments that joint ventures require a "special" rule of reason review, but finding no violation of Section 1 on the specific facts of the case).) While the plaintiff bears the initial burden of demonstrating that the challenged restraint in fact harms competition, once a plaintiff succeeds in establishing the actual adverse effects of an alleged restraint, the burden shifts to the defendant to establish its pro-competitive redeeming virtues. (*See Clorox,* 117 F.3d at 59.)

Here, Plaintiff does not dispute the fact that MasterCard and Visa are legitimate joint ventures. Whereas prior to the creation of the associations, only American Express and Diner's Club offered cards that could be used throughout the United States, the associations allow thousands of individual financial institutions to offer cards and independently compete on the most important competitive issues such as fees, interest rates, payment terms, reward programs, and the like. Plaintiff merely asserts that the harm to competition caused by the exclusionary rules outweighs the benefit, such that the rules unreasonably restrain trade in violation of the Sherman Act.

Because the Government has shown that the defendants' actions significantly affected competition as a whole in the network market, the court must analyze whether defendants' proffered procompetitive justifications for the CPP and By–Law 2.10(e) suffice to justify these exclusionary rules. The defendants claim that the exclusionary rules are "loyalty" or "cohesion" devices

that protect their fragile association structure by preventing "cherry picking," their term for American Express's strategy of selectively courting only the associations' strongest bank issuers. They have also asserted a "free-riding" claim, based on the notion that the exclusionary rules are necessary to protect each association from American Express (or other network competitor) taking some association asset without compensation.

1. *Contemporaneous Evidence Shows that Defendants' Real "Justification" Was to Stop Competition from American Express and Discover*

By-law 2.10(e) and the CPP are restrictions of, by and for the member banks. (See Tr. 6032 (Schmalensee); Schmalensee Dep. at 191–92; *see also* Beindorff (Visa U.S.A.) Dep. at 294.) Defendants have stated that the exclusionary rules are motivated by concern that some banks, selectively courted, might reach agreement with American Express and Discover, and that those banks would gain a "competitive advantage" over other member banks. (*See, e.g.,* Tr. 1820 (Lockhart, Master-Card); Cawley (MBNA) Dep. at 72–74; Zebeck (Metris/Fingerhut) Dep. at 164–65; Tr. 2223 (Saunders, Household/Fleet); Beindorff (Visa U.S.A.) Dep. at 304; Ex. P–0182 at CRW00459; Allen (Visa U.S.A.) Dep. at 397–98; Doyle (Texas BancShares) Dep. at 169–70; Dahir (Visa U.S.A.) Dep. at 252–53; Fairbank (Capital One) Dep. at 113–14; Hanft (MasterCard) Dep. at 228–30; Ex. P–0266.)

To prevent competition on those terms in the United States, the member banks agreed that any bank that obtained such an advantage would be penalized by being excluded from participation in both dominant general purpose card systems. The result, as intended, has been that no bank has broken rank; rather than lose access to the Visa and MasterCard networks (as well as their ATM networks, Cirrus and Plus), no bank in the continental United States has agreed to issue American Express cards. (*See* Ex. P–0777 at VU0644425 (Visa analysis of Citibank leaving the bankcard associations recognized that by forfeiting international Plus and Cirrus ATM acceptance, even if it affiliated with American Express or Diners, Citibank would not be nearly as competitive); Tr. 159–60 (Kesler, Banco Popular) (testifying that Banco Popular feared risk of losing Cirrus/Plus membership—an important service to its customers—should it issue American Express cards in mainland United States).)

Visa's and MasterCard's exclusionary rules also serve to protect the associations' products from vigorous network competition. As Lockhart explained, MasterCard adopted its CPP because it recognized that the opportunity to issue American Express products—at least some of which Lockhart acknowledged to be superior to Master-Card's (*see* Tr. 1877 (Lockhart))—would result in a loss of volume and share to American Express. (*See id.* at 1874–75 (Lockhart).) Lockhart further explained:

American Express' brand had a specific position in the marketplace. It was one at the higher end, it had higher transaction values on a dollars per transaction basis. The imagery associated with the brand was excellent. *We stood a real chance of losing.* Our brand was at the other end of the spectrum and we had been losing Gold Card share for the previous several years. *Every share point was worth real revenue to us* and if we found that because T & E, travel and entertainment cards went away, Corporate Cards and Gold Card and eventually Platinum Cards went away, the revenue hit to us would have been a material item.

(*See id.* at 1875–76 (Lockhart) (emphasis added); *see also* Ex. P–0424 (predicting market share loss for Visa and Master-Card if their members were able to offer American Express and Discover cards); Child (MasterCard) Dep. at 33 (increase in American Express merchant acceptance would harm MasterCard).) Likewise, former Visa executive David Brooks also recalled discussions within Visa in 1996 of the potential that Visa member issuance of American Express cards could strengthen American Express as a competitor. (*See* Brooks (Visa U.S.A.) Dep. at 23–24; *see also* Ex. P–0067 at 1123830 ("More Amex Cards Would Weaken Visa Brand to Detriment of Member Profitability.").)

The contemporaneous evidence shows that defendants' motives are to restrict competition at the network and issuer levels to enhance member bank profitability. Visa maintains By-law 2.10(e)—and, indeed, tried to extend By-law 2.10(e) to all regions throughout the world—to stop American Express from forming card-issuing relationships with member banks. Visa recognizes that such relationships would increase American Express' market share and merchant acceptance while reducing Visa's revenues and its members' collective profitability. Indeed, Visa halted the international expansion of 2.10(e) only in the face of criticism from international antitrust agencies.

Although Visa now claims that changes in By-law 2.10(e) would be a fatal blow to its system (*see* Tr. 4373 (Beindorff, Visa U.S.A.)), such was not always its view. In late 1993, Visa was "flexible" in seeking ways to tailor By-law 2.10(e)'s prohibitions *to accommodate one of its largest members*, Bank One, which was seeking to work with American Express. (Tr. 5223–24 (Pascarella, Visa U.S.A.); *see also* Ex. P–0071 at 1139072–74 (1997 document proposing ways to "eliminate/adjust" By-law

2.10(e) in the event American Express were to acquire a large Visa member).)

Similarly, the evidence shows that MasterCard adopted its CPP in response to American Express' overtures to U.S. banks to issue American Express cards. As Mr. Lockhart's testimony made evident, there were only two reasons for MasterCard's CPP: (1) to make sure that if all the members couldn't have the advantage of issuing American Express cards, none would (*see* Tr. 1819–20 (Lockhart, MasterCard)), and (2) to avoid loss of market share by the two networks that the members own. (*See id.* at 1783–84, 1787, 2003 (Lockhart).) Like Visa's willingness to consider changes to By-law 2.10(e) at the requests of Bank One, MasterCard adopted a "policy"—rather than a rule—specifically so that it would have the flexibility to change course should a business opportunity (*e.g.,* a request from a large issuer such as Citibank) present itself. (*See id.* at 2001–03 (Lockhart).)

Describing American Express' motives with the pejorative term "cherry picking" does not change the anticompetitive purpose of the rules: to restrict competition among competitor networks and banks. The admitted, anticompetitive purpose of limiting brand competition among bank issuers raises serious antitrust and economic concerns. If Visa and MasterCard were traditional for-profit stock companies, an agreement among competitors not to deal with a supplier would constitute a *per se* illegal group boycott. Indeed, Dean Schmalensee admitted that it would be economically "reasonable" to condemn such a boycott. (Tr. 6094–95 (Schmalensee).) Defendants' members should not be able to accomplish via association rules what they would clearly be barred from doing in any other context. As Dean Schmalensee explained in his writings, "joint ventures should not provide an orga-

nizational ruse for evading the antitrust laws," especially since joint ventures can provide a vehicle for consumer harm. (*Id.* at 6095–96 (Schmalensee); *see also id.* ("Antitrust laws should prevent joint ventures from engaging in anti-competitive activity that would have been prohibited if the entrepreneurs and investors in the joint venture had chosen some other organizational form.").)

### 2. The "Loyalty" and "Cohesion" Justifications for the Exclusionary Rules Do Not Withstand Scrutiny

Defendants maintain that the exclusionary rules promote loyalty and cohesion. According to Visa U.S.A.'s expert, Professor Gilson, partial exclusivity (*i.e.*, allowing each defendant to be exempt from the other's exclusionary rule) is justified by the fact that a "self-enforcing mechanism" limits opportunistic behavior between the associations, but not between the associations and their closed, for-profit competitors. Professor Gilson, who is a law and business professor, offers no empirical analysis to support his position and his opinion is based on a cursory examination of selected facts. (*See* Tr. 5872–75 (Gilson).) Most importantly, Professor Gilson's testimony is belied by the uncontradicted record evidence.

As Professor Gilson explains the theory, for the "self-enforcing mechanism" to work, issuers must possess the ability to shift resources between associations to share collectively in any single issuer's attempted opportunistic behavior; with American Express and Discover there is no "self enforcing" mechanism because other association members cannot gain access to the closed loop systems to shift resources. Visa's Partnership Program and MasterCard's Member Business Agreements, however, have resulted in locking up substantial shares of the two associations' bases so that they resemble more and more Amex and Discover's closed loop systems. (*See id.* at 5907–08 (Gilson).) Accordingly, issuers cannot easily respond to "opportunistic" behavior in the "open" joint venture systems either. (*See id.* at 5909–11 (Gilson).)[25] The agreements seriously undermine the validity of the "self-enforcing mechanism" and defendants' justifications for the exclusionary rules because they demonstrate that association members are willing to voluntarily sign agreements which deny them the ability to counteract the opportunistic behavior that the rules ostensibly combat. While Professor Gilson recognizes this to some extent, he refuses to acknowledge the fact that his theory is inconsistent with the current state of affairs at Visa and MasterCard.

Further undermining their invocation of the need for cohesion is the fact that the associations have always tolerated great divergence in the interests of (and dealings with) members without governance disruption. Visa has maintained two classes of members (charter members and non-charter members) for over eight years, each with different levels of rights, and both coexist within the association. (*See* Ex. P–1164 at VISA2401; Ex. P–1175 at V04 0364; Tr. 5342–43 (Heasley, Visa U.S.A.);

**25.** Carl Pascarella implicitly conceded this when he acknowledged that the need for By-law 2.10(e) will diminish (or disappear) as Visa's Partnership Agreements mature (*see* Tr. 5239 (Pascarella)), as defendants can secure the same loyalty from their members by agreement that they want to ensure through their exclusionary rules. (*See* Williamson (Visa Int'l) Dep. at 53–54.) Association Board members committed by contract to defendants would be incapable of—and uninterested in—"opportunistic behavior" that would have the effect of damaging the association to which they have dedicated themselves.

*see also* Tr. 5717 (Selander) (MasterCard has a two-tiered membership structure as well).)

Perhaps the most concrete evidence dispelling the notion that the associations are "fragile" (and thus need "loyalty" rules) comes from the associations' dealings with individual members regarding dedication agreements. As discussed above, both MasterCard and Visa specially negotiated individual incentive compensation packages with select members. These individual agreements with virtually all of the largest issuers, controlling more than half of all card issuance, are considered highly confidential and their terms are not shared with other members of the cooperative. (*See* Tr. 4580–81 (Dahir).) The evidence is overwhelming that such secret and non-uniform payments did not cause disruption even though—as Dean Schmalensee admitted—they were not "trivial" exceptions to the normal rule that a cooperative treats members uniformly. (Tr. 6070 (Schmalensee).) [26]

There has also been no evidence of disruption caused by the presence of large, non-dedicated members in the associations. Defendants, for instance, have come forward with no evidence that MBNA's decision not to enter into any dedication agreement caused dissension or disruption within Visa. (*See* Tr. 5236 (Pascarella); Tr. 5331 (Heasley).) Visa has taken no steps to remove those member banks that have not signed Partnership Agreements with Visa or banks that *have* signed Member Business Agreements with MasterCard. (*See id.* at 4406–07 (Beindorff, Visa U.S.A.).) For instance, although Citibank signed a Member Business Agreement with MasterCard, Visa has not sought to remove Citibank from the association, and has offered no evidence of dissension or lack of cohesion as a result of its continued membership in the association. (*See id.* at 5231 (Pascarella); *id.* at 5332 (Heasley).) The fact that Citibank is a member of Visa and yet is dedicating itself to MasterCard while continuing to control Diners Club has not caused any divisiveness or lack of cohesion at the Visa board level. (*See id.* at 5232 (Pascarella); *id.* at 5332 (Heasley); *id.* at 6049–50, 6065–66 (Schmalensee).)

Defendants have also asserted that By-law 2.10(e) is necessary to keep American Express from behaving "opportunistically." However, there is no evidence as to why it would be any more opportunistic for American Express to offer a deal to a large issuing bank than it is for Master-Card to offer a special deal to a Visa bank.[27] According to Phil Heasley, Chair-

---

**26.** The mere fact that this court had to hear testimony *in camera* concerning Visa's and MasterCard's negotiations and product development efforts with individual member banks dispels the argument that "cohesion" requires all members to be treated equally and that all association information must be shared with all members.

**27.** *See* Pascarella (Visa U.S.A.) Dep. at 66–68 (failing to explain why MasterCard's joint venture status allows for differentiating MasterCard from American Express for 2.10(e) purposes). The "cohesion" justification is also belied by the long history of member bank dealings with American Express that has never otherwise caused a lack of "cohesion"

among the member banks. *See* Beindorff (Visa U.S.A.) Dep. at 295–96 (ATMs, travelers checks); Allen (Visa U.S.A.) Dep. at 268–72 (banks have offered American Express cardholders lines of credit); Dahir (Visa U.S.A.) Dep. at 240–41; Powar (Visa U.S.A.) Dep. at 23–26 (no disruption to Visa system from banks issuing both Visa and American Express travelers checks); Jensen (Visa Int'l) Dep. at 13–14 (Visa did not prohibit member issuance of American Express travelers checks); Schmalensee Dep. at 343–44, 347 (no disruption to cohesiveness resulting from over 1400 banks offering lines of credit to American Express gold card users); Ex. P–0858 at VU2342845 (Visa executives recogniz-

man of Visa U.S.A.'s Board, just as American Express is a serious competitor, MasterCard is a serious competitor and its efforts to take Visa business cause serious concerns. (*See* Tr. 5341 (Heasley).) Visa has enticed Wells Fargo to sign a Partnership Agreement even though Wells was one of MasterCard's top three corporate card issuers. (*See id.* at 5617 (Selander, MasterCard).) MasterCard seeks to do the same to Visa issuers. (*See id.* at 5617–18 (Selander).) Selander characterized these actions as "competition" that was perfectly appropriate. (*Id.* at 5617–18 (Selander).) Defendants claim that the possibility of American Express offering a competitive alternative to member banks is "cherry-picking" (*see id.* at 5617–18 (Selander)), while the same behavior by each association's largest competitor poses no threat to either association's cohesiveness or governance. This inconsistency cannot withstand scrutiny.

Defendants do not dispute that there is no evidence of "disruption" or "lack of cohesion" outside of the continental United States—where many member banks issue American Express cards. Mr. Selander is not aware of any disruption resulting to the MasterCard system as a result of MasterCard member banks issuing American Express cards elsewhere in the world. (*See id.* at 5625 (Selander).) As a Visa International Board member, Mr. Heasley is not aware of any disruption or harm to Visa International from the fact that Visa members are issuing American Express cards abroad. (*See id.* at 5334 (Heasley, Visa U.S.A.).) Similarly, Mr. Williamson is unaware of any negative effects resulting from member bank issuance of Ameri-

can Express cards. (*See* Tr. 5380 (Williamson, Visa Int'l).)

The defendants also cannot dispute that American Express card issuance by Banco Popular of Puerto Rico has caused no disruptive effect. (*See id.* at 6082 (Schmalensee); *id.* at 5901 (Gilson); *id.* at 173, 190–91 (Kesler, Banco Popular).) Indeed, both Visa and MasterCard knowingly continue to have banks that issue American Express serve on their Regional, and even International, Boards. (*See, e.g.,* Tr. 173 (Kesler, Banco Popular); Partridge (Visa Int'l) Dep. at 34–35, 38; *see also* Cullen (Visa Int'l) Dep. at 71, 75–77 (Visa International executive did not hesitate to name American Express issuer to Visa executive committee in Turkey).)

There is even less support in the record for defendants' contention that the exclusionary rules are necessary to prevent member free-riding. Any free-riding claims are unavailing given Visa and MasterCard's lack of "rules" concerning member bank use of their card-issuing relationships, data and information. Defendants and their member bank executives have repeatedly testified that Visa and MasterCard have *no* interest in the banks' relationships with their customers; so there is no asset on which free-riding could occur. (*See* Antonini (First Union) Dep. at 95 (card issuing expertise belongs to banks); Nole (First Union) Dep. at 66–67 (bank owns cardholder relationship), 114–15 (card issuing expertise belongs to the issuer); Allen (Visa U.S.A.) Dep. at 274–75 (Visa has not made banks pay for switching Visa card to MasterCard cards); Beindorff (Visa U.S.A.) Dep. at 71–72 (no pay-

---

ing that some banks might want American Express to be offered on certain emerging products: "Virtual world is an environment the bank[s] don't own so they are more willing to consider doing things differently) (*i.e.,* allowing Amex in a bank wallet."). Beindorff

maintains that Board banks that issue even 10% American Express cards would be able to stifle advertising spending even though board members with 10% MasterCard portfolios would not do so. *See* Tr. 4409 (Beindorff, Visa U.S.A.).

ment when banks flip brands), 263–65 (cardholder relationship belongs to banks, not Visa); Hanft (MasterCard) Dep. at 147–48; (nothing "unlawful or improper" in Citibank converting Visa cards to MasterCard, and MasterCard has no obligation to compensate Visa for Citibank's actions); Heasley (Visa U.S.A.) Dep. at 157–58; Rhein (Wells Fargo) Dep. at 56–58; Zebeck (Metris/Fingerhut) Dep. at 195–96; Child (MasterCard) Dep. at 137; Gustafson (Visa U.S.A.) Dep. at 40; Boylan (NatWest) Dep. at 134–37; Cawley (MBNA) Dep. at 7–10.) As Dean Schmalensee described, Visa and MasterCard do not prevent the sale by their members of customer lists. (*See* Tr. 6065 (Schmalensee).)

In sum, the court finds that the record belies the defendants' primary justification for the exclusionary rules—that ensuring equality of opportunity for members is necessary to protect the fragile associations. The associations consistently have treated members differently without any disruption to the cohesion of the joint ventures. Both associations maintain two classes of members, and both associations have confidentially offered different terms to different members to induce them to enter into dedication agreements. Defendants have presented no evidence that either of these practices of unequal treatment have caused any disruptions in the governance of the associations. Neither does defendants' claim of free-riding withstand scrutiny. Instead, there is substantial evidence that by adopting and enforcing the exclusionary rules, the member banks agreed not to compete by means of offering American Express and Discover branded cards. Such an agreement constitutes an unreasonable horizontal restraint and cannot be permitted.

Relevant case law supports this finding. The Supreme Court has rejected the notion that keeping a level playing field between various competitors is a procompetitive justification for a horizontal restraint. (*See NCAA,* 468 U.S. at 117–20, 104 S.Ct. 2948 (rejecting justification that small teams should get equivalent television coverage as large teams); *see also* XI Hovenkamp, *Antitrust Law,* ¶ 1907(b) (defense that an agreement ensures that weaker market participants get a "fair" share of the trade is generally rejected).) Furthermore, in *Federal Maritime Commission v. Aktiebolaget Svenska Amerika Linien,* the Court discounted similar proffered procompetitive justifications, including a justification that the exclusionary rule was designed to "preserv[e] the stability of the conference" because, as is the case here, there were no facts to support any such theory. (*See,* 390 U.S. 238, 251, 88 S.Ct. 1005, 19 L.Ed.2d 1071.)

That defendants are joint ventures does not alter the analysis. In similar joint venture contexts, the Supreme Court has deemed anticompetitive those horizontal restraints that limit the output of individual association members. (*See, e.g., NCAA,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (limiting number of games that could be televised and fixing of minimum price); *see also Chicago Prof'l Sports Ltd. v. NBA,* 961 F.2d 667, 673–76 (7th Cir. 1992) (Easterbrook, J.) (condemning the NBA's restraint on number of Chicago Bulls basketball games broadcast on television superstation).) The Court has also struck down those restraints that force association members to "withhold from their customers a particular service they desire," *Indiana Federation of Dentists,* 476 U.S. at 459, 106 S.Ct. 2009 (group of dentists agreeing to withhold directly providing x-rays to insurance companies), or impose on association members a "ban on competitive bidding." (*National Soc'y of Prof. Eng'rs,* 435 U.S. at 692, 98 S.Ct. 1355; *see also Law v. NCAA,* 134 F.3d 1010, 1020 (10th Cir.1998) (striking on

summary judgment a joint venture's membership rule concerning salary levels pursuant to "quick look" rule of reason analysis).)

Courts have been especially concerned where horizontal competitors have agreed via their joint ventures to restrict the output of individual members of the venture. (*See NCAA,* 468 U.S. at 104–06, 104 S.Ct. 2948.) Output restrictions cover the number, type, and quality of goods produced and the harms associated with such restraints affect consumer welfare in ways similar to those of price restraints.[28] As discussed above, defendants' exclusionary rules have created an output restriction that is particularly anticompetitive in its effects on consumer welfare. (*See Indiana Fed'n of Dentists,* 476 U.S. at 454–56, 106 S.Ct. 2009 (striking agreement among competitors to refrain from providing insurance companies with x-rays; insurance companies had alternate means to assess coverage claims but analysis of x-rays submitted directly to the insurance company were the preferred method); *Sullivan,* 34 F.3d at 1100 (restrictive ownership rule allowed a group of owners to exclude from the League and from competing with them, "people who may be more effective competitors than they are" and have had a "competitive advantage").)

Since defendants' exclusionary rules undeniably reduce output and harm consumer welfare, and defendants have offered no persuasive procompetitive justification for them, these rules constitute agreements that unreasonably restrain interstate commerce in violation of Section 1 of the Sherman Act.

**J. Visa International Is an Appropriate and Necessary Defendant as to Count Two of the Government's Complaint**

 Before trial and at the close of the Government's case, Visa International moved to dismiss the claims against it on the ground that it was not an appropriate defendant in this case. Plaintiff argues, and the court agrees, that Visa International is a necessary defendant as to Count Two of the Complaint because it has the authority to adopt exclusionary by-laws in the United States.

Visa International is a Delaware association owned by its members. Visa International owns the Visa brand and licenses that brand to Visa U.S.A., which in turn sublicenses the use of that brand to its member banks. (*See* Allen (Visa U.S.A.) Dep. at 26–28.) Visa International's "role is dominant" on issues relating to the Visa brand. (*See* Tr. 5391–92 (Williamson, Visa Int'l).)

Visa U.S.A. relies upon Visa International processing centers for all transactions, including domestic ones. (*See* Tr. 5390 (Williamson).) Moreover, "Visa USA as a region is very dependent upon Visa International for all of its technology development." (Tr. 4743 (Knox, Visa U.S.A.); *accord* McEwen (Visa U.S.A.) Dep. at 36–37.) Visa International By-law Section 15.02, entitled "Fundamental Principles," defines the relationship between the Visa International Board of Directors and its Regional Boards, including the Visa U.S.A. Board. The Visa International Board has sole authority to regulate interregional matters. In addition, intraregional matters having a significant effect on the worldwide Visa

---

**28.** The term "output reduction" can mean "a marketwide decrease in the number of units produced. But it can also refer to a decline in the quality of the goods, or a decline in the rate of improvement or innovation that is committed to a particular market." XIII Hovenkamp, *Antitrust Law* ¶ 2104a at 36; *see also General Leaseways* 744 F.2d at 595 (describing economic consequences of output restrictions).

program may be preempted or regulated by the International Board of Directors. (*See* Ex. P–1168 at VI000056.) Under Section 15.02(d), the Visa International Board possesses the final power to classify matters as interregional, intraregional or intraregional having significant effect on worldwide Visa programs. (*See* Tr. 3296 (B. Katz, Visa U.S.A./Visa Int'l); Ex. P–1168 at VI000056.) Because Visa International has the authority to declare whether Visa U.S.A. By-law 2.10(e) is "interregional" or "intraregional having significant effect on worldwide Visa programs," it therefore has the authority under Section 15.02 to preempt or regulate the Visa U.S.A. Regional Board on this matter.[29]

Visa International By-law Section 15.05, "Conflicts or Controversies," provides an independent basis on which the Visa International Board could regulate Visa U.S.A. By-law 2.10(e). "Conflicts and/or controversies" subject to Visa International Board consideration are those "involving claims that the rules, regulations and/or policies of a Regional Board" that (a) "adversely affect members (or their owners or members) operating in other regions" or (b) "are inconsistent with the rules, regulations and/or policies, *or otherwise not in the best interests of the corporation*" (Ex. P–1168 at VI000057 (emphasis added).) The Visa International Board can resolve the conflict or controversy with approval by three-fourths of the "eligible voting membership of the Board of Directors (with the Regional Directors representing such region ineligible to vote)." Such a vote will be binding upon the Regional Board. (Ex. P–1168 at VI000057.) Under Section 15.05, the Visa International Board therefore has the power to preempt a Visa

U.S.A. policy that is inconsistent with what it determines to be the best interests of the Visa International corporation. (*See* Tr. 3300 (B. Katz, Visa U.S.A./Visa Int'l).)

In the past, Visa International has provided affirmative encouragement for By-law 2.10(e) and would have passed its own international version of that rule absent intervention from foreign competition authorities. (*See* Tr. 3288–89 (B.Katz).) In June 1996, the Visa International Board delegated authority to the United States Region, among others, to ensure that the United States Region knew the International Board supported a continuation of By-law 2.10(e). (*See id.* at 3290–92 (B.Katz); Ex. P–0661 at V030425–26.) Since Visa International has the power to impose its own version of By-law 2.10(e) unless legally prevented from doing so, Visa International's motion to dismiss is denied.

## V. REMEDY

### A. By-law 2.10(e) And The CPP Are Abolished

As the court has found liability under Count Two it grants, in part, the remedies requested by the Government. As an initial matter, the court notes that there is no reason to believe that abolishing the exclusionary rules would be disruptive to the governance of the associations. Both the Visa and MasterCard International Boards include a substantial majority of directors from banks who are currently dedicated to their respective brand and yet govern networks where foreign issuers may, and do, issue any brand they choose in any amount they choose. That regime has admittedly

---

**29.** The fact that the Visa U.S.A. representatives on the Visa International Board have enough votes to block such a resolution is completely irrelevant. The court cannot assume that the Visa U.S.A. directors on the International Board would act contrary to the best interests of the International members as a whole and simply vote the U.S. members' "point of view."

caused no disruption or effect on the cohesiveness or ability to compete of either Visa International or MasterCard. Consequently, given the clear anticompetitive effects of defendants' exclusionary rules, the repeal of those rules in the United States is entirely justified.

■ More specifically, because the court has found that defendants' exclusionary rules restrict competition between networks and harm consumers by denying them innovative and varied products, the court orders them repealed and enjoins any further prohibition by the defendants of the issuers' ability to issue general purpose and debit cards on other general purpose networks. As discussed above, the court has found that the abolition and prospective injunction of defendants' exclusionary rules will open the market to American Express and Discover to compete with MasterCard and Visa to enter into card issuing arrangements with banks. The combination of the distinct characteristics of the American Express and Discover networks with the specific attributes and issuing competencies of the issuing banks will result in increased output and consumer choice, in addition to strengthening the networks by increasing their scale and relevance.

Despite defendants' objections, the court includes debit cards in its prohibition against the future adoption of exclusionary rules. The evidence demonstrated that the future of credit card products will be built on, and dependent upon, debit functionality. Defendants are developing relationship cards and multi-function "smart" cards whose principal characteristic will be access to customers' demand deposit accounts. Credit cards that do not also have debit functionality will fall by the wayside. Accordingly, if the court were to permit defendants to exclude issuer banks from issuing debit cards of network rivals, de-

fendants could accomplish the same anticompetitive goals of By-law 2.10(e) and the CPP through the backdoor of debit.

Moreover, including debit as a necessary part of the remedy does not put it in the same product market with general purpose cards. The fact that Visa and MasterCard are suppliers of both debit and general purpose card services over their networks is irrelevant to product market definition. Nor does the fact that one piece of plastic may permit consumers to choose conveniently between credit and debit mean that consumers will see debit as a "substitute" for credit as that term is used in defining product markets.

Accordingly, the court orders that: (1) defendant Visa U.S.A., Inc. shall repeal By-law 2.10(e); (2) defendant MasterCard International Incorporated shall repeal the Competitive Programs Policy, and (3) each defendant is enjoined from enacting, maintaining, or enforcing any by-law, rule, policy or practice that prohibits its issuers from issuing general purpose or debit cards in the United States on any other general purpose network.

■ The court further intends to permit any issuer to terminate without penalty its obligations under any agreement it entered into with either defendant prior to the date of entry of this Final Judgment, pursuant to which the issuer committed to maintain a certain percentage of its general purpose card volume, new card issuance, or total number of cards in force in the United States on that defendant's network.

While the agreements themselves are not inherently anticompetitive, the associations' past foreclosure of American Express and Discover from competing to enter into the agreements has greatly and impermissibly altered the competitive landscape in the network and card markets. Because such agreements between

issuers and Visa and MasterCard now predominate the market, American Express and Discover have been effectively foreclosed from a large portion of the card issuing market, and will continue to be so foreclosed for the duration of those agreements. Accordingly, the court permits issuers to rescind such agreements without penalty in order to permit American Express and Discover to compete on equal footing with Visa and MasterCard for issuing agreements with card issuers. The court grants the member bank issuers a period of two years in which to rescind current dedication agreements because the evidence at trial demonstrated that the competition for such agreements is vigorous and they are heavily negotiated.

The court also permits the defendants, upon termination of a dedication agreement by an issuer, to petition the court for the equitable return of funds paid under the agreements which at the time of termination have not been earned by the issuer. This provision is made necessary by the fact that in exchange for issuer promises of dedication, the associations not only granted volume and pricing discounts to be earned incrementally over the course of the agreement, but in some instances made payments at the beginning of the agreement's term in anticipation of the agreement continuing through the agreed-upon term.

**B. Other Proposed Remedial Provisions**

 In connection with Count Two, the Government also sought remedial provisions barring any "discriminatory" rules. In its reply brief concerning the remedy in this case, plaintiff notes that these proposed remedial provisions

target ... By-law 2.10(e) and the CPP, *and the closely-related practices, described by Mr. Nelms in his testimony,* *concerning the ability of members of Visa and MasterCard to own equity in American Express or Discover.* As matters now stand, Visa and MasterCard members can own equity in both associations, but in no other networks. This blatantly discriminatory treatment is another means, closely related to the exclusionary rules, that prevents American Express and Discover from gaining access to members of Visa/Mastercard as customers for network services.

(Pl's Reply Memo. on Remedy at 17 (emphasis added).)

As an initial matter, plaintiff's expert did not offer any opinions on the elimination of discriminatory rules or practices of Visa and MasterCard other than By-law 2.10(e) and the CPP. He did not opine on the particular anticompetitive effect of any such rules. Nelms did offer testimony on behalf of Discover that he believes Visa By-law 2.06 prevents Discover from offering equity in the Discover network to entice issuers of Visa and MasterCard to enter into issuing agreements with Discover. He further testified that this would prevent Discover from achieving competitive levels of transaction volume and merchant acceptance to compete as a network, while it would permit Citibank, the owner of Diner's Club, to issue Visa cards. The court agrees in principle with the Government that Visa and MasterCard may not enact any rule or maintain any practice concerning a member bank's right to own equity in another network unless it applies equally to the owners of the other three significant networks, not merely two of the three. Such a rule or practice could frustrate the remedy granted by this court abolishing the exclusionary rules at least as to Discover and if so in the court's view would violate the Final Judgment as it now stands. In any event, if the proposed anti-discrimination provisions are intended pri-

marily to address discriminatory rules about equity ownership in competing networks, they should be drawn to address those rules particularly; as written plaintiff's proposed remedial provisions III(G) and III(H) are overbroad, uncertain, and risk prohibiting practices that may be on balance procompetitive.

## VI. PROPOSED FINAL JUDGMENT

### I. *DEFINITIONS*

As used in this Final Judgment:

A. "By-law 2.10(e)" means Visa U.S.A. By-law 2.10(e), adopted by the consent of the Visa U.S.A. Board of Directors on March 15, 1991.

B. "Competitive Programs Policy" means the MasterCard Competitive Programs Policy, adopted by the U.S. Region Board of Directors on June 28, 1996.

C. "Defendants" means Visa U.S.A. Inc; Visa International Corporation; and MasterCard International Incorporated.

D. "General purpose card" means a card issued pursuant to the rules of a general purpose card network that enables consumers to make purchases from unrelated merchants without accessing or reserving funds, regardless of any other functions the card may have.

E. "General purpose card network" means any of the general purpose card networks operated by Visa International Corporation and Visa U.S.A. Inc.; MasterCard International Incorporated; American Express Company; and Morgan Stanley Dean Witter & Co., as of the date of entry of this Final Judgment.

F. "Issuer" means a person that is authorized to issue cards on a general purpose card network, that person's subsidiaries and affiliates, and any of their officers, employees, or agents, including agent banks.

G. "Person" means any natural person or any business, legal or Governmental entity or association.

### II. *APPLICABILITY*

A. This Final judgment shall apply to the Defendants and each of their affiliates, subsidiaries, officers, directors, agents, employees, successors, and assigns; to any successor to any substantial part of the business; and to all persons acting in concert with any Defendant and having actual notice of this Final Judgment.

B. Each Defendant shall require, as a condition of the sale or other disposition of all or substantially all of its assets, shares, or other indicia of ownership, that any purchaser agree to be bound by the provisions of this Final Judgment and *that such agreement be filed with the court.*

### III. *PROHIBITED AND REQUIRED CONDUCT*

A. Defendant Visa U.S.A. Inc., shall repeal By-law 2.10(e).

B. Defendant MasterCard International Incorporated shall repeal the Competitive Programs Policy.

C. Each Defendant is enjoined from enacting, maintaining, or enforcing any by-law, rule, policy or practice that prohibits its issuers from issuing general purpose or debit cards in the United States on any other general purpose card network.

D. For a period of two years from the date of entry of this Final Judgment, or, if timely appealed, the final order of the highest-level appellate court granting all or part of the relief in this section, each Defendant shall permit any issuer to terminate, without penalty, any agreement it entered into with that Defendant prior to the date of entry of this Final Judgment, pursuant to which the issuer committed to maintain a certain percentage of its gener-

al purpose card volume, new card issuance, or total number of cards in force in the United States on that Defendant's network. Except that in the event of such termination, the Defendants may make application for the equitable return of any funds paid to the issuer but not yet earned under the agreement.

## IV. *LIMITATIONS*

A. Except as provided in Section III(D) of this Final Judgment, nothing in this Final Judgment prohibits a Defendant from entering into an agreement with any individual issuer pursuant to which a Defendant gives consideration to an issuer in exchange for the issuer maintaining a certain percentage of its general purpose card volume, new card issuance, or total number of cards in force on that Defendant's network.

## V. *ADDITIONAL PROVISIONS*

A. Within sixty (60) days after this Final Judgment becomes effective the Defendant shall furnish a copy of this Final Judgment to each of Defendant's directors, officers, employees, and members.

B. This Final Judgment shall take effect 90 days after the date on which it is entered.

C. Jurisdiction is retained by the court for the purpose of enabling any of the parties to this Final Judgment to apply to this court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of its provisions, for its enforcement or compliance, and for the punishment of any violation of its provisions.

The parties shall have until Wednesday, October 17 to submit any comments and objections regarding the Proposed Final Judgment to the court.

**SO ORDERED.**